**In The Matter Of:**

*W.K., et al v.*

*Red Roof Inns Inc, et al*

**PL Sum. J.**

**Ex. _014_**

*Michael Thomas*

*February 2, 2022*

*D'Amico & Associates, Inc.*

*Court Reporters & Videoconferencing*

*5855 Sandy Springs Circle #140, Atlanta, GA 30328*

*(770) 645-6111 or toll-free (888) 355-6111*



D'Amico & Associates, Inc.

Certified Court Reporters

Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


| | | |
|---|---|---|
| W.K., E.H., M.M., R.P., | ) | |
| M.B., D.P., A.F., C.A., | ) | |
| R.K., K.P. and T.H., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO. 1:20-cv-5263-MHC |
| | ) | |
| RED ROOF INNS, INC., FMW | ) | |
| RRI NC, LLC, RED ROOF | ) | |
| FRANCHISING, LLC, RRI WEST | ) | |
| MANAGEMENT, LLC, VARAHI | ) | |
| HOTEL, LLC, WESTMONT | ) | |
| HOSPITALITY GROUP, INC., | ) | |
| and RRI III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| E.F., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO. 1:20-CV-04373-SDG |
| | ) | |
| RED ROOF INNS., INC., RED | ) | |
| ROOF FRANCHISING, LLC, HJA | ) | |
| ENTERPRISES, INC., and SAI | ) | |
| NATIONAL HOSPITALITY | ) | DEPOSITION OF |
| VENTURES, LLC, | ) | MICHAEL THOMAS |
| | ) | |
| Defendants. | ) | February 2, 2022 |


D'AMICO & ASSOCIATES, INC.
Court Reporters & Videoconferencing
5855 Sandy Springs Circle, Suite 140
Atlanta, Georgia  30328
(770) 645-6111
www.DamicoAssociates.com

1

1               IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF GEORGIA

3                      ATLANTA DIVISION

4
   JANE DOE 1, JANE DOE 2,      )
5  JANE DOE 3 and JANE DOE 4,   )
                                )
6               Plaintiffs,     )   CIVIL ACTION FILE
                                )
7       vs.                     )   NO. 1:21-cv-04278-WMR
                                )
8  WESTMONT HOSPITALITY         )
   GROUP, INC., RED ROOF INNS,  )
9  INC.; FMW RRI NC, LLC, RED   )
   ROOF FRANCHISING, LLC, RRI   )
10 WEST MANAGEMENT, LLC and     )
   VARAHI HOTEL, LLC and RRI    )
11 III, LLC,                    )
                                )
12              Defendants.     )
   _____)

13

14

15

16

17             Videotaped deposition of MICHAEL THOMAS,

18  taken on behalf of the Plaintiffs, pursuant to the

19  stipulations contained herein, signature being waived,

20  in accordance with the Federal Rules of Civil

21  Procedure, before Kelly D'Amico, RPR, Certified Court

22  Reporter and Notary Public, at 1960 Satellite

23  Boulevard, Suite 4000, Duluth, Georgia, on the 2nd day

24  of February, 2022, commencing at 10:27 a.m.

25
                                                          2

```
 1                A P P E A R A N C E S

 2
    On behalf of Plaintiffs:
 3

 4              PATRICK MCDONOUGH
                JONATHAN TONGE
 5              Attorneys at Law
                Andersen, Tate & Carr, P.C.
 6              1960 Satellite Boulevard
                Suite 4000
 7              Duluth, Georgia  30097
                T:  (770) 236-9751
 8              E:  pmcdonough@atclawfirm.com
                E:  jtonge@atclawfirm.com
 9

10              TIANA SCOGIN MYKKELTVEDT
                JULIANA MESA (via videoconference)
11              SAMANTHA GIRSCHICK (via videoconference)
                MICHAEL ROSEN BAUMRIND (via videoconference)
12              Attorneys at Law
                Bondurant Mixson & Elmore, LLP
13              1201 West Peachtree Street, NW
                3900 One Atlantic Center
14              Atlanta, Georgia  30309
                T:  (404) 881-4100
15              E:  mykkeltvedt@bmelaw.com
                E:  mesa@bmelaw.com
16              E:  girschick@bmelaw.com
                E:  baumrind@bmelaw.com
17

18   On behalf of Defendants Red Roof Inns, Inc., FMW RRI
     NC, LLC, Red Roof Franchising, LLC, RRI West
19   Management, LLC, RRI III, LLC, and Westmont
     Hospitality Group, Inc.:
20

21              ADI ALLUSHI
                Attorney at Law
22              Lewis Brisbois Bisgaard & Smith, LLP
                1180 Peachtree Street, N.E.
23              Suite 2900
                Atlanta, Georgia  30309
24              T:  (404) 348-8585
                E:  adi.allushi@lewisbrisbois.com
25
```
                                                          7

```
1               A P P E A R A N C E S (Continued)

2

3    On behalf of Plaintiff E.F. :

4
               DAVID HOLMES BOUCHARD (via videoconference)
5              Attorney at Law
               Finch McCranie, LLP
6              225 Peachtree Street, NE
               Suite 1700, South Tower
7              Atlanta, Georgia  30303
               T:  (404) 658-9070
8              E:  david@finchmccranie.com

9
     On behalf of Defendants Varahi Hotel, LLC and
10   SAI National Hospitality Ventures, LLC:

11
               SHANE KEITH (via videoconference)
12             Attorney at Law
               Hawkins Parnell & Young, LLP
13             4000 SunTrust Plaza
               303 Peachtree Street, N.E.
14             Atlanta, Georgia  30308
               T:  (404) 614-7400
15             E:  skeith@hpylaw.com

16
     On behalf of Defendant HJA Enterprises:
17

18             LEAH FOX PARKER (via videoconference)
               Attorney at Law
19             Swift, Currie, McGhee & Hiers
               1355 Peachtree Street, N.E.
20             Suite 300
               Atlanta, Georgia  30309-3238
21             T:  (404) 874-8800
               E:  leah.parker@swiftcurrie.com

22

23   Videographer:

24
               STYLES CALDWELL
25
                                                            8
```

1              A P P E A R A N C E S (Continued)

2

3    Also present:

4

5              BETH RICHARDSON (via videoconference)

6

7                        - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1  Roof Inn?

2       A       I did.

3       Q       And that was the Red Roof Inn at 1960

4  North Druid Hills in Atlanta?

5       A       That's correct.

6       Q       All right.  And we have other attorneys

7  on here that represent other properties so I just want

8  to confirm upfront, you did not ever work at the

9  Fulton Industrial Red Roof Inn?

10      A       I did not.

11      Q       And you did not ever work at the Old

12 National Red Roof Inn?

13      A       I did not.

14      Q       And you did not ever work at the Smyrna

15 Red Roof Inn?

16      A       I did not.

17      Q       Okay.  So if I refer to the Red Roof Inn

18 today, whether we refer to it as North Druid Hills or

19 Buckhead, I'm talking about the North -- the one at

20 1960 North Druid Hills.  Okay?

21      A       Okay.  Uh-huh (affirmative).

22      Q       And when you worked there in 2012, was

23 that corporately owned?

24      A       It was.

25      Q       So it was not a franchisee?

15

1   have gone around and been outside and seen the rooms.

2   Did you ever go around the building when you worked as

3   a front desk or a night auditor?  Did you get outside?

4       A       Several times, yes, sir.

5       Q       Okay.  And why would you do that?

6       A       Well, working overnight it could be for a

7   variety of reasons.  It could be just to stretch or be

8   nosy, see what's going on on the property, you know,

9   kind of check things out, see what's happening.

10      Q       And so let's talk a little bit about what

11  training you received.  Did they train you on, you

12  know, how to run the computers, or what kind of

13  training did you get about running the office being a

14  night auditor and front desk?

15      A       My training was more or less, like you

16  said, computer, learning how to close out credit card

17  batches, settle the accounts, do the deposits, make

18  sure the inventory is accurate, make sure, you know,

19  no one is being overcharged, that sort of thing, yes,

20  sir.

21      Q       Okay.  So you did get training related to

22  revenue and how to like take money and what to do with

23  the money?

24      A       I got training in cash handling

25  procedures, yes, sir.

                                                        24

1   anything.

2       Q       Okay.  All right.  I want to talk a

3   little bit about during that year what you were able

4   to observe.

5               Did you observe what you believed to be

6   girls selling themselves for sex?

7       A       Yes, sir.

8               MR. ALLUSHI:  Objection.

9   BY MR. MCDONOUGH:

10      Q       All right.  Tell me about what you saw

11  and why you thought that.

12      A       Well, I've been working in hotels a long

13  time, so anytime you work at a hotel and you have a

14  lot of high-volume traffic at night where it's pretty

15  much gentlemen going to a certain door or certain

16  doors, you know kind of pretty much what's going on.

17  If you have two or three visitors come in the room at

18  night, you kind of come to the conclusion that nine

19  times out of ten they're either doing prostitution or

20  something that's drug related, yes, sir.

21      Q       Okay.  And during that time how many

22  girls do you think were engaged in that?

23      A       A lot.  My personal opinion, Red Roof had

24  a revolving door, like in and out.  Off the top of my

25  head maybe five or six.

                                                    27

1    when she come walking past the front with that little

2    box and them flip-flops, we know what it is.  She's

3    fixing to turn a trick.  She wants us to hold her

4    money until she gets through so she don't get robbed

5    pretty much.

6         Q       And did she have anybody with her?

7         A       She had some young people with her.  I

8    remember there was a little black girl.  I think she

9    was maybe 14, 15, real young.

10        Q       And do you think she was turning tricks

11   or...

12        A       Yes, sir.

13                MR. ALLUSHI:  Objection.

14   BY MR. MCDONOUGH:

15        Q       Tell me why you think that.

16        A       I think that because they're in the room

17   together and a lot of times when the lady would come

18   out and a gentleman would come in she would kind of

19   come talk to us in the lobby for a couple of minutes

20   or kind of stand outside, walk, smoke a cigarette

21   until their business was done.

22        Q       And did you see high traffic to that

23   room?

24        A       Yes, sir.  And they would come, you

25   know -- it just depends on the day.  Sometimes the

32

1      Q       Did you ever see pimps like drop girls

2  off or pick them up or --

3      A       One of them I -- you know, I can't think

4  of his name.  Obviously it's been a while ago, but it

5  stands out because of the fact that he was in a

6  wheelchair and I thought that it was so interesting

7  that this guy in a wheelchair could be a pimp.  Just,

8  you know, so I'm not sure where he came from, but he

9  was a regular.

10              And normally when he came he would bring

11  girls from somewhere else.  So I don't know if he was

12  bringing them for out of town or where they were

13  coming, but it was -- it appeared as if they were

14  maybe being traded out, if you will, meaning maybe he

15  would bring some to that room and then the ones that

16  were at that room would leave from him -- would leave

17  with him, kind of like a pick-up and dropoff type

18  thing.  So yes, sir.

19      Q       And did that happen the entire time you

20  were there?

21      A       Uh-huh (affirmative).  And I think he

22  actually might have knew Kim or had maybe established

23  some type of relationship, if you will, because if --

24  like I say, if something happened and he wasn't there

25  to pay for it, she would override it to be like, okay,

34

1  he rotated them out?

2      A        No, they was different.  Like he might

3  show up with two people and then they might go in that

4  room, but it's paid for, you know, so I couldn't

5  really say anything.  And them two that might have

6  been in there, he might have done took them off

7  somewhere else or whatever.

8              But yeah, he was a regular face.  He

9  would do the same thing, you know.  Sometimes his

10  buddies and stuff would come and they would congregate

11  in the parking lot sometimes at night, you know, doing

12  what they do or whatever.  So he -- he was a regular

13  face, yes, sir.

14      Q        And did you see traffic going in and out

15  of that room --

16      A        Yes, sir.

17      Q        -- where he dropped these young girls

18  off?

19      A        Yes, sir.

20              MR. ALLUSHI:  Objection.

21      A        The rooms that he normally paid for were

22  normally the rooms -- sorry, excuse me -- that they

23  were prostituting out of.

24  BY MR. MCDONOUGH:

25      Q        Okay.

                                                    36

Michael Thomas - February 2, 2022

```
1        A        And it didn't take a rocket scientist.
2   You know when somebody is prostituting.  It's common
3   sense.  I've been working in hotels now for almost 20
4   years.  You know when somebody is doing it and you
5   can't say that you don't.
6        Q        And did he --
7        A        I'm sorry.
8        Q        I'm sorry.  Did he pay for the room?
9        A        Yes, sir.
10       Q        Did any of those young girls ever come in
11  to extend the room or --
12       A        They did.  They would come in with cash
13  in their hands a lot of times.  Maybe it might be 9:00
14  or 10:00 in the morning.  Checkout is at 11:00.  You
15  might have a situation where they might make some
16  money in the morning and come down half dressed to put
17  the money on the bill so that we don't harass and call
18  them and ask them, you know, "Are y'all checking out,
19  are y'all going to pay," sort of thing.  So that was
20  something that was regular.
21       Q        So you didn't need an ID or something to
22  extend past the first day?
23       A        No, sir.
24                MR. ALLUSHI:  Objection.
25  BY MR. MCDONOUGH:
```

37

Michael Thomas - February 2, 2022

1      A         Yeah, for some of them that might have

2   stayed for a certain amount of time like past 30 days,

3   she might take their taxes off.  For some of them that

4   she might have knew, she might have gave a preferred

5   rate because of their consistency.

6      Q         Okay.  I want to go back to the person

7   that you described as a pimp that dropped these young

8   girls off that were there on and off.

9      A         Uh-huh (affirmative).

10     Q         Did you ever receive complaints about

11  them?

12     A         Yes, yes.

13     Q         Tell me how that worked.

14     A         Well, it came to a point to where we got

15  so many complaints either by -- it was either because

16  of the noise or the noise that was coming from their

17  room or altercations with them being loud or their

18  company outside or people actually hearing the

19  activities of them doing what they were doing.  So Jay

20  devised a plan to where he was like, well, what we'll

21  basically do, because, you know, they -- they're

22  paying so we can't just turn them away and say you

23  can't be here, so what we did was some of the

24  questionable guests or some of the ones that I guess

25  you would say had riffraff, we put them on the back

                                                           40

1   side of the building, in the back far side toward the

2   corner with -- maybe like that little block.  I think

3   it was like five or six rooms.

4          We would put them on the back side just

5   to kind of calm it down some so it would kind of

6   change like some of the negative feedback and reviews

7   we were getting so I don't have to check anybody out

8   and hear them talk about how they saw the nightwalker

9   walking past their rooms soliciting their husbands

10  sort of thing.  So what we did was we put them on the

11  back side and the regular family-oriented individuals

12  we would, you know, put in the rest of the hotel for

13  the front.

14     Q      And you said Jay.  Is that Jay Moyer is

15  the one who told you to do that?

16     A      Yes, sir.

17            MR. ALLUSHI:  Objection.

18  BY MR. MCDONOUGH:

19     Q      And just so I'm clear, because you were

20  talking about particularly this gentleman that dropped

21  off these young girls that you thought were being sold

22  for sex, there were complaints about them, the young

23  girls?

24     A      Yes, sir.  There were complaints about

25  prostitution in general --

                                          41

1  what was going on?  Did they get out on the property?

2       A       If you're a general manager, an

3  operations manager or a district manager even for that

4  much, there's no way you don't know what's going on

5  with your property.  You know the ins and outs of it.

6  You come, you walk your property.  You're doing stuff

7  with your engineers outside with lawning and

8  electrical.  You know what's going on with your

9  building.

10             And particularly during this time, if I'm

11  not mistaken, we had begun to do a renovation.  So he

12  was there a little bit more because he was in and out

13  of the rooms.  They were ordering floors and TVs and

14  doing a couple of things.  Jay knew what was going on.

15  As far as with the young girls, prostitution, there's

16  no way that he couldn't have.  I think that it was a

17  matter of the fact that they were paying guests --

18             MR. ALLUSHI:  Objection.

19       A       -- and that he was making revenue and

20  that maybe in his mind he thought putting them on the

21  back side would kind of solve the situation where

22  would it be a win-win for both and we would still hit

23  our numbers and everything would be okay.  I think

24  that's probably what maybe he was trying to do.

25  BY MR. MCDONOUGH:

45

Michael Thomas - February 2, 2022

1       Q       And regardless of what he may or may not

2   have thought, when you told him about that, he

3   directed you to move them to the back?

4       A       Yes, sir.

5               MR. ALLUSHI:   Objection.

6   BY MR. MCDONOUGH:

7       Q       You indicated that you talked to them

8   when they came to the front desk, these young girls,

9   and they paid for extensions, I believe; right?

10      A       Yes, sir.

11      Q       Were there any other times that you

12   interacted with the -- any of the young people that

13   were being sold for sex?

14      A       No, sir.  Just seeing them in passing,

15   meaning on my way to work.  I might say hi if I see

16   you standing up there because you see me walking in;

17   but no, no, sir.

18      Q       And did you see any -- I think you

19   described it a little bit earlier, but did you see any

20   violence associated with the pimps and the girls?

21      A       Yeah, you know, they have altercations.

22   They might, you know, fight in the parking lot or

23   something is going on and he might drag her in the

24   room, you know.  It's -- it's tricky because you

25   really -- there's only so -- you really can't do

46

1    anything about some things.  So it kind of puts you in

2    a really weird position when you see stuff, yeah.  But

3    I've seen where it was them arguing or fighting or...

4         Q       And when you saw somebody getting drug in

5    the room, arguing or fighting, again, were these

6    things you reported to -- to your general manager?

7         A       Yes, sir.  That's considered a

8    disturbance.

9         Q       Okay.  So you reported all of that?

10        A       Yes, sir.

11        Q       All right.  Did they ever direct you to

12   call the police?

13        A       No, sir.

14        Q       And did you ever call the police?

15        A       No, sir.

16        Q       And why didn't you call the police?

17        A       Well, a couple of reasons.  I look at it

18   from the standpoint of if I'm the front desk agent and

19   you're the general manager or the district manager, if

20   I bring to you what's going on, whatever you say is a

21   solution is what it is.  I don't -- it's not -- I feel

22   like that's kind of overstepping my bounds to go call

23   the police and I'm not the manager of their property,

24   if my life is not directly involved.

25              From what I know I don't recall being

47

1   trained on any policies or procedures being in place

2   where they said, well, if this sort of thing happens

3   you're supposed to call the police.  To the knowledge

4   and training that I had, everything was you inform

5   your immediate supervisor as to what's going on and

6   they deal with it and that's what happened.

7        Q        And the Moyer plan was if there's a

8   problem, put it in the back?

9                 MR. ALLUSHI:  Objection.

10       A        That is correct.

11  BY MR. MCDONOUGH:

12       Q        Any question in your mind based on your

13  experience and your observations that there were

14  basically children being sold for sex out of that

15  hotel?

16                MR. ALLUSHI:  Objection.

17       A        Huh-uh (negative).  They were young.

18  BY MR. MCDONOUGH:

19       Q        Any question in your mind that there were

20  pimps involved with these children that were being

21  sold for sex?

22                MR. ALLUSHI:  Objection.

23       A        No, sir.

24  BY MR. MCDONOUGH:

25       Q        Any question in your mind that your

48

1  looking for.

2      Q        And --

3      A        And my phone number hasn't changed.  My

4  phone number has been the same for years.

5      Q        Is it the same phone number you had when

6  you worked at the Red Roof?  And just to clarify, you

7  worked at the Red Roof Inn Buckhead as you testified

8  earlier in 2012 you said; correct?

9      A        The Red Roof Inn Buckhead that's located

10 at North Druid Hills; that's correct.

11     Q        And when did you start working there?

12     A        I'm not sure of the start date.  You guys

13 would be able to verify that by looking into your

14 records.

15     Q        Was it within that one year, 2012?

16     A        Uh-huh (affirmative).

17     Q        Is it fair to say that it was sometime

18 between May 2012 and October of 2012?

19     A        I'm not sure.  I can't say yes or no.

20     Q        Okay.  But you -- you were there -- were

21 you there six months, were you there eight months,

22 were you there four months?

23     A        I was there longer than six months,

24 longer than eight months, yes.

25     Q        So you think you were there the whole

56

1      A        Uh-huh (affirmative).

2      Q        That was the policy at the time; correct?

3      A        Yeah, if something -- you know, if

4    something happens, you inform your supervisor.

5      Q        And you did that?

6      A        I did.

7      Q        Do you know what a do-not-rent list is?

8      A        Uh-huh (affirmative).

9      Q        And what's your understanding of what

10   that is?

11     A        A do-not-rent list is a list that we put

12   people that we are -- don't want to entertain anymore,

13   people that we refuse to service.

14     Q        Yeah.  Did you ever put anybody on the

15   do-not-rent list while you were there?

16     A        I'm pretty sure I put a whole bunch of

17   people on it.  Now, if they followed and observed it

18   is a question that you should ask.  I put a whole

19   bunch of people on the do-not-rent list, but that

20   don't necessarily mean that they're going to follow

21   that.

22              I might put somebody on the do-not-rent

23   list and come check -- come clock in at work and

24   they're in a room in the hotel, and so even though I

25   put somebody on the do-not-rent list, that's not -- I

96

1    might put them on there, but that's still a manager's

2    discretion as to if they're going to rent to them or

3    not.  And if I put somebody on the do-not-rent list

4    and the managers are still going to rent to them, I

5    don't have anything to say about that.

6        Q       And did you put any of the -- this

7    alleged pimp that you testified earlier on the

8    do-not-rent list?

9        A       I did, one in particular, because he came

10   and charged me up one night talking about he had some

11   money missing out of his room.  And I had nothing to

12   do with it because I'm working at the front desk, but

13   I'm -- yeah, uh-huh.

14       Q       Okay.  And --

15       A       And he still was allowed to stay there.

16   And after that incident happened, it don't -- you

17   know, it doesn't really pay to do it because it's not

18   going to be adhered to.

19       Q       And who was not adhering to it?

20       A       Management, I would imagine.  They see

21   the list.  They know who is on the list, you know.

22   Just because they management don't mean that they

23   don't do check-ins and check-outs.  They know exactly

24   everything that's going on at the property.

25       Q       So --

                                                      97

1       A          Uh-huh (affirmative).

2       Q          I just want her to take down the entire

3    question.

4                   There's no law or rule or regulation not

5    allowing somebody to have an underage person staying

6    at the hotel whether it could be their daughter, it

7    could be their niece; correct?  And then you testified

8    earlier that there were people in the hotel, families

9    staying; correct?

10      A          There were families staying, but these

11   individuals to whom we were referring to were the

12   individuals that were getting dropped off that had men

13   coming out -- in and out of their rooms.  These

14   individuals that we're referring to are the ladies

15   that would come downstairs half dressed to pay on

16   their rooms or the ladies that I would see coming to

17   work that's hanging on the balcony in a negligee.

18   These were the ones that you're referring to.  They

19   weren't -- these weren't those type of individuals.

20      Q          Now, do you know what the law is as far

21   as discriminations against somebody based on their --

22   on their appearance or, you know, not allowing them

23   into the property based on their appearance?  Do you

24   know what the discrimination law is?

25      A          I know that -- yes, sir.  I know that I

103

1              C E R T I F I C A T E

2

3              I hereby certify that the foregoing
transcript was reported, as stated in the caption;
4   that the witness was duly sworn and elected to waive
signature in this matter; that the colloquies,
5   questions and answers were reduced to writing under my
direction; and that the foregoing pages 1 through 132
6   represent a true, correct, and complete record of the
evidence given.

7

8              I further certify that I am not
disqualified for a relationship of interest under
O.C.G.A. 9-11-28(c); that I am a Georgia Certified
9   Court Reporter here as a representative of D'Amico &
Associates; that I/D'Amico & Associates was contacted
10  by the party taking the deposition to provide court
reporting services for this deposition; that I will
11  not be taking this deposition under any contract that
is prohibited by O.C.G.A. 15-14-37(a) and (b) or
12  Article 10.B of the Rules and Regulations of the
Board; and by the attached disclosure forms I confirm
13  that I/D'Amico & Associates is not a party to a
contract prohibited by O.C.G.A. 15-14-37 (a) or (b).

14

15             The above certification is expressly
withdrawn and denied upon the disassembly or
photocopying of the foregoing transcript, unless said
16  disassembly or photocopying is done under the auspices
of D'Amico & Associates and the signature and original
17  seal is attached thereto.

18             This, the 21st day of February, 2022.

19

20

21

22  _____
        KELLY D'AMICO, RPR, CCR-B-1322
23

24

25
                                                   133