Deposition of:

**PL Sum. J.**

**Ex.** __019__

# Forrest Castille

Date: October 22, 2021
Case: W.K., et al v. Red Roof Inns, et al
No.:  1:20-cv-5263-MHC

Reported by: Kelly D'Amico



**770.645.6111**
www.DamicoAssociates.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


| | | |
|---|---|---|
| W.K., E.H., M.M., R.P., | ) | |
| M.B., D.P., A.F., C.A., | ) | |
| R.K., K.P. and T.H., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO. 1:20-cv-5263-MHC |
| | ) | |
| RED ROOF INNS, INC., FMW | ) | |
| RRI NC, LLC, RED ROOF | ) | |
| FRANCHISING, LLC, RRI WEST | ) | |
| MANAGEMENT, LLC, VARAHI | ) | |
| HOTEL, LLC, WESTMONT | ) | |
| HOSPITALITY GROUP, INC., | ) | |
| and RRI III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| J.A., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO. 1:21-cv-03655-TWT |
| | ) | |
| RED ROOF INNS., INC., RED | ) | |
| ROOF FRANCHISING, LLC and | ) | |
| VARAHI HOTEL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


VIDEOTAPED DEPOSITION OF FORREST CASTILLE

October 22, 2021

Page 2

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3
     JANE DOE 1, JANE DOE 2,    )
 4   JANE DOE 3 and JANE DOE 4, )
                                )
 5            Plaintiffs,        )   CIVIL ACTION FILE
                                )
 6        vs.                    )   NO. 1:21-cv-04278-WMR
                                )
 7   WESTMONT HOSPITALITY        )
     GROUP, INC., RED ROOF INNS,)
 8   INC.; FMW RRI NC, LLC, RED )
     ROOF FRANCHISING, LLC, RRI )
 9   WEST MANAGEMENT, LLC and    )
     VARAHI HOTEL, LLC and RRI   )
10   III, LLC,                   )
                                )
11            Defendants.        )
     _____)
12   E.F.,                       )
                                )
13            Plaintiff,         )   CIVIL ACTION FILE
                                )
14        vs.                    )   NO. 1:20-CV-04373-SDG
                                )
15   RED ROOF INNS., INC., RED   )
     ROOF FRANCHISING, LLC, HJA )
16   ENTERPRISES, INC., and SAI )
     NATIONAL HOSPITALITY        )
17   VENTURES, LLC,              )
                                )
18            Defendants.        )
     _____)

19

20

21       VIDEOTAPED DEPOSITION OF FORREST CASTILLE

22                  October 22, 2021

23

24

25
```

Page 8

1                    A P P E A R A N C E S

2

3    On behalf of Plaintiffs W.K., E.H., M.M., R.P., M.B.,
     D.P., A.F., C.A., R.K., K.P. and T.H.; Plaintiff J.A.;
4    Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane
     Doe 4; and Plaintiff E.F.:

5

6             PATRICK MCDONOUGH
              JONATHAN TONGE
7             Attorneys at Law
              Andersen, Tate & Carr, P.C.
8             1960 Satellite Boulevard
              Suite 4000
9             Duluth, Georgia  30097
              T:  (770) 236-9751
10            E:  pmcdonough@atclawfirm.com
              E:  jtonge@atclawfirm.com
11

12   On behalf of Plaintiffs W.K., E.H., M.M., R.P., M.B.,
     D.P., A.F., C.A., R.K., K.P. and T.H.; Plaintiffs Jane
13   Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4:

14
              MICHAEL ROSEN BAUMRIND (via videoconference)
15            Attorney at Law
              Bondurant Mixson & Elmore, LLP
16            1201 West Peachtree Street, NW
              3900 One Atlantic Center
17            Atlanta, Georgia  30309
              T:  (404) 881-4100
18            E:  baumrind@bmelaw.com

19   On behalf of Plaintiff J.A.:

20

21            DENISE D. HOYING
              Attorney at Law
22            Law & Moran
              563 Spring Street, NW
23            Atlanta, Georgia  30308
              T:  (404) 814-3700
24            E:  denise@lawmoran.com

25

Page 9

```
1            A P P E A R A N C E S (Continued)

2

3    On behalf of Plaintiff E.F. :

4
             DAVID HOLMES BROUCHARD (via videoconference)
5            Attorney at Law
             Finch McCranie, LLP
6            225 Peachtree Street, NE
             Suite 1700, South Tower
7            Atlanta, Georgia  30303
             T:  (404) 658-9070
8            E:  david@finchmccranie.com

9
     On behalf of Defendants Red Roof Inns, Inc., FMW RRI
10   NC, LLC, Red Roof Franchising, LLC, RRI West
     Management, LLC, RRI III, LLC, and Westmont
11   Hospitality Group, Inc.:

12
             ADMIR "ADI" ALLUSHI
13           P. MICHAEL FREED
             Attorneys at Law
14           Lewis Brisbois Bisgaard & Smith, LLP
             1180 Peachtree Street, N.E.
15           Suite 2900
             Atlanta, Georgia  30309
16           T:  (404) 348-8585
             E:  adi.allushi@lewisbrisbois.com
17           E:  michael.freed@lewisbrisbois.com

18
     On behalf of Defendant Varahi Hotel, LLC; and
19   Defendant SAI National Hospitality Ventures, LLC:

20
             SHANE KEITH
21           Attorney at Law
             Hawkins Parnell & Young, LLP
22           4000 SunTrust Plaza
             303 Peachtree Street, N.E.
23           Atlanta, Georgia  30308
             T:  (404) 614-7400
24           E:  skeith@hpylaw.com

25
```

Page 10

1            A P P E A R A N C E S (Continued)

2

3    On behalf of Defendant HJA Enterprises:

4
             LEAH FOX PARKER (via videoconference)
5            Attorney at Law
             Swift, Currie, McGhee & Hiers
6            1355 Peachtree Street, N.E.
             Suite 300
7            Atlanta, Georgia  30309-3238
             T:  (404) 874-8800
8            E:  leah.parker@swiftcurrie.com

9
     Videographer:
10

11           Eric Lucas

12
     Also present:
13

14           Kristina Iakounina

15

16                    - - -

17

18

19

20

21

22

23

24

25

W.K., et al v. Red Roof Inns, et al                    Forrest Castille  10/22/2021

Page 17

1     A     Okay.

2     Q     -- and take a break.

3     A     Okay.

4     Q     It is a very easy thing too also for me

5   to ask the question and you think, oh, I've got the

6   answer and you're going to start talking.  So just so

7   the court reporter can take it down, try to let me

8   finish the question and then -- or the other attorney

9   that might be asking and then answer the -- answer,

10  okay?

11    A     Okay.

12    Q     And some of the other attorneys may have

13  some questions.  All right?

14    A     (Nods head up and down.)

15    Q     Okay.  So just tell me when -- did you

16  work for Red Roof?

17    A     I worked for Red Roof Inns from 2008

18  until 2016.

19    Q     Okay.  And was that here in Atlanta?

20    A     Uh-huh (affirmative), off of Windy Hill

21  Road.

22    Q     Okay.  And was that the -- your first job

23  when you came to Atlanta or had you been --

24    A     It was.  That was my first job when I

25  came to Atlanta.

Page 21

1  what you observed when you were working there during

2  those four years as far as crime.

3       A      It was always a high-crime area, always

4  something going on in that area with -- but it wasn't

5  as bad, but it was always something going on.  People

6  always sold drugs, people always -- prostitution.  It

7  was always something going on.

8       Q      Okay.  And when you say "that area,"

9  you're talking specifically the hotel?

10      A      That Windy Hill area and that hotel.

11      Q      Okay.  And so tell me, did you actually

12  observe yourself what you believed to be prostitutes?

13      A      I did.

14      Q      And why do you think they were

15  prostitutes?

16      A      Because I got to know them.  Like I said,

17  I was there from first to second shift and there was

18  always somebody walking and somebody coming in to

19  drink coffee, maybe they wanted change.  You know what

20  I mean?  And it was so -- I was so familiar with the

21  people there because, like I said, they came in and

22  talked to me and they would be -- and I would either

23  smoke with them or, you know, just laugh and talk

24  about the day.  So I was very much aware of what was

25  going on, who was there and the reason they was there.

Page 22

1   Whether they were pimps or prostitutes or if they were
2   salesmen, I basically knew.
3        Q      Okay.  So tell me -- you said pimps.
4   Tell me about that.  What -- did you see pimps there?
5        A      Uh-huh (affirmative).  They would tell me
6   what they were -- they would tell me they were pimps.
7   You know, I would know what they were doing.  They
8   would tell me personally.  You know, the pimps would
9   tell me, the girls would tell me and I just knew.  I
10  knew what it was because they would tell me what they
11  were doing.
12       Q      So tell me about what -- well, tell me
13  this:  How many -- during this time period on average,
14  like how many pimps were at this hotel?
15       A      8 to 10, maybe 15 to 20 girls.  It was
16  always someone there.  It was always someone there
17  pimping, prostituting, selling drugs.
18       Q      Okay.  And the pimps, how many girls did
19  they have working for them?
20       A      It all depends.  Some of them have up to
21  about four, some of them would just have one girl, two
22  girls.  It just all depends, you know what I mean, how
23  long they could keep them under subjection.  It
24  depends on how many they had and how popular of a pimp
25  they were, if they were the man.

W.K., et al v. Red Roof Inns, et al                    Forrest Castille 10/22/2021

Page 23

1    Q        So you said "subjection."  So tell me
2    about that.  Like, what do you mean by that?  What did
3    the pimps do with the people that --
4    A        They controlled their whole lives, some
5    of them their whole lives, especially the young girls.
6    They -- like I said, they would feed them when they
7    got ready, they would advise them to do things when
8    they got ready.  And this was personally told to me.
9    They would -- and like I said, they controlled the
10   money.  They always had the money.
11            The pimps always paid for the rooms.  It
12   was -- the girls really didn't pay for the rooms
13   unless they were independent girls, they didn't have a
14   pimp.  But the pimps paid for the rooms.  They
15   should -- they would -- I guess they -- well, they fed
16   them when they got ready, some of them.  It all just
17   depends on -- they were in control of every single
18   aspect of that girl's life.
19   Q        And did they get the money from what the
20   girls did?
21   A        The girls always gave them the money.
22   The girls, they would have to ask them for their
23   money.
24   Q        So just explain to me how the -- kind of
25   pimps and girls.  Like, how did it work?  How did --

Page 24

1   how did -- what did you observe and how did this whole
2   thing work?
3                MR. KEITH:  Objection.
4                MR. ALLUSHI:  Same objection.
5   BY MR. McDONOUGH:
6        Q      Okay.  Just you had mentioned pimps and
7   that they had controlled 20 to 30 girls.  Tell me what
8   you observed.
9        A      The -- there was like a system.  Like if
10  the girls -- like if they were waiting on their dates,
11  the johns or the buyers or whatever you want to call
12  them, they would call them to the hotel, but they
13  wouldn't give them their room number until they got
14  there.  And like the pimps would all be all outside on
15  the balconies and they would check them out, you know
16  what I mean, and then they would give them the room
17  number to go in them.
18       Q      Okay.  Into the rooms?
19       A      Into the rooms, uh-huh (affirmative).
20       Q      And how like --
21       A      Because I was out smoking.
22       Q      How often was this going on?
23       A      It happened from the time -- all day, all
24  night.  It just depends on -- it never was a set time.
25  It was continuously happening -- happening.

W.K., et al v. Red Roof Inns, et al                    Forrest Castille  10/22/2021

Page 26

1    buyers coming in and out of the room?

2         A       Uh-huh (affirmative).  You could -- it

3    was obvious, you know what I mean, because they had

4    time limits.  They were on time limits.  They might be

5    there for $30 -- I mean, for 30 minutes, they might be

6    there for an hour.  Some of them sometimes they would

7    date you for hours.  It just depends on how much money

8    was involved, and I learned this from a lot of the

9    girls and the -- and the pimps.

10        Q       Okay.  So did you know the pimps?

11        A       Uh-huh (affirmative).

12        Q       Okay.  And what did you learn from the

13   pimps?

14        A       Pretty much to be quiet, mind my own

15   business.  Because they were in control of those girls

16   and they -- some of them people -- and all of them

17   were not nice people anyway, you know what I mean.

18   Some of them would do some awful things to those girls

19   to keep them where they needed to keep them mentally.

20        Q       And did you witness any of that?

21        A       Oh, I've seen them get beat, I've seen

22   them lock them out of the rooms.

23        Q       Tell me a little bit more about that when

24   you saw them get beat.  Tell me about it.

25        A       They would beat them.  I've seen them

W.K., et al v. Red Roof Inns, et al                Forrest Castille 10/22/2021

Page 28

1          MR. ALLUSHI:  Objection to form.
2    BY MR. McDONOUGH:
3        Q      Did you see -- let me rephrase that.
4               Did you see young girls that were being
5    controlled by these pimps you described?
6        A      Some of them I knew personally that were
7    being controlled and they were underage.
8        Q      Like what age?
9        A      17.  Like I said, 17, 16.
10       Q      And throughout this entire time did you
11   see young girls like that?
12       A      Uh-huh (affirmative), the whole time.  It
13   never changed.  It never stopped.  It never stopped
14   from corporate to the franchise.
15       Q      And so you were renting rooms to these
16   pimps?
17       A      Uh-huh, uh-huh (affirmative).
18       Q      And you knew they were pimps?
19       A      Uh-huh (affirmative).
20       Q      All right.  And were you renting rooms to
21   other criminals?
22       A      Uh-huh (affirmative).
23              MR. TONGE:  Make sure he says "yes."
24       A      Yes.  I'm sorry, yes.  I'm sorry, yes.
25   I -- like I said, I was there so much.  I was there

Page 37

1   Waffle House or Wendy's to get something to eat.

2            But they had to stay there and watch the

3   girls and watch the other pimps so the other pimps

4   wouldn't steal the girls.  Because they would steal

5   girls, they would steal dates.  It's very cutthroat.

6        Q      And just so I understand, you said

7   there's -- I don't know -- 10 pimps, 10 to 20 girls at

8   times so -- and they're seeing ten johns or buyers a

9   day.  So --

10       A      It never stopped.  It's not like you have

11  three shifts.

12            MR. KEITH:  Object.

13  BY MR. MCDONOUGH:

14       Q      Tell me how many buyers you saw coming in

15  on average.

16       A      It all depended on -- it all depends.

17  10, 15, 20.  It just all depended on how the money was

18  going, how much money they were making.

19       Q      Not just individual.  I mean the whole

20  hotel for one day.  What was like the amount of buyers

21  that were coming in a day?

22       A      Sometimes it had to be over 50, 60 men a

23  day.

24       Q      Okay.

25       A      If you got -- because if you got 20

W.K., et al v. Red Roof Inns, et al                    Forrest Castille 10/22/2021

Page 42

1   supposed to have been over Red Roof Windy Hill,

2   Kennesaw, and Druid Hills.  I believe that was his

3   area.  Oh, and I think Morrow.  I think -- not Morrow,

4   Norcross.  I was going to say that was his four or

5   five hotels that he was in charge of.

6        Q      Okay.  And how often did he come to the

7   Red Roof Smyrna when it was corporate?

8        A      I think it would be -- I would think it

9   would be like just about every quarter.  They would

10  come and inspect and make sure that the rooms were in

11  shape and they were making money or -- just a general

12  inspection.  That's it.  That's all he came for.

13       Q      And did -- when he came was it the same

14  scene that you (overspeak) --

15              MR. ALLUSHI:  Object to the form.

16       A      It was the same thing.

17              MR. KEITH:  Objection.

18  BY MR. MCDONOUGH:

19       Q      Tell me what you saw when you were with

20  him.

21       A      The same thing.  It was -- it wasn't on

22  such a wide scale, but it was the same thing.  It was

23  never a minute that I worked at Red Roof Inn, never a

24  year I worked at Red Roof Inn that there was not

25  prostitution going on in there.  There was not a time

W.K., et al v. Red Roof Inns, et al                    Forrest Castille 10/22/2021

Page 43

1   when people wouldn't complain.  People complained and

2   they would claim -- I would tell them to call

3   corporate or -- you know what I mean.  That's all that

4   I could tell them to do.

5           And like I said, I would go to -- I went

6   to Ohio twice, but that had nothing to do with

7   pimping, prostitution.  It was about scores and

8   revenue and how to make a customer feel better.

9       Q       Did you go to Ohio when corporate owned

10  it or was that after it was sold?

11      A       After corporate owned it.

12      Q       After?

13      A       Uh-huh (affirmative).

14      Q       After it was sold?

15      A       Uh-huh (affirmative).

16      Q       Okay.  So prior to it being sold, were

17  you ever trained about safety or -- while working at

18  this hotel?

19      A       Huh-uh, no safety training.

20      Q       Were you ever trained on sex trafficking

21  while it was corporately owned during this time?

22      A       Nothing, nothing like that, nothing like

23  that.  We never had a class on what to do.  Because I

24  really just learned terminology -- terminology of what

25  a sex trafficker was.  I always just said it was

Page 45

1   rooms at Windy Hill.  Well, we didn't rent the rooms;

2   he didn't stay there.

3       Q       When you were with him and walking out,

4   were there pimps that you saw?

5       A       They were always -- they always standing

6   out there.  They always standing out with white

7   beaters on, T-shirts on, you know, dapping it up and

8   it just looked suspect.  Like I said, it looked

9   suspect and everybody, you know what I mean -- not

10  everybody.  I can't just say for everybody, but if you

11  came around enough to Windy Hill, you knew what was

12  going on.

13      Q       Right.  And were you --

14      A       It was obvious.

15      Q       When you were with him, did you see other

16  minor victims?

17              MR. ALLUSHI:  Objection.

18      A       It was always young -- it was always

19  young girls, old girls, prostitutes, pimps, all ages,

20  all colors.

21  BY MR. McDONOUGH:

22      Q       And when you were with Jay Moyer, was

23  there still high traffic of cars coming in and johns?

24      A       It's still high traffic.  That -- it was

25  always what it -- what it was.  It was always like

W.K., et al v. Red Roof Inns, et al                    Forrest Castille  10/22/2021

Page 47

1   You know, if you're walking around doing an

2   inspection, you could smell it coming out of the

3   rooms.  They would sit out there and smoke it.

4        Q      And what was Red Roof Inn telling you?

5   Were they telling you that you had to rent rooms or

6   were they pushing revenue?

7                MR. ALLUSHI:  Objection.

8        A      They never -- they never ever said

9   anything about prostitution.  And most of the times

10  when you're working at a hotel it's about how many

11  beds you can sell, how many heads you can lay in the

12  bed.  It's always about -- it's about revenue and

13  trying to keep the customers happy.  That was the only

14  training that we had.

15               It was never about safety.  It was never

16  about what should I do if a dope dealer or drug dealer

17  or prostitute, none of that.  No kind of training

18  about that at all.

19  BY MR. McDONOUGH:

20       Q      Was there ever a security guard when you

21  were there?

22       A      Just without a gun, just a regular

23  security guard, nothing that -- nothing that could

24  really protect nobody.

25       Q      And did you interact with him or did --

Page 71

1   franchise.

2   BY MR. McDONOUGH:

3        Q       And so -- and did you know these pimps as

4   well?

5        A       Uh-huh (affirmative).  It didn't change.

6   Some of them never changed.  Some of them changed,

7   some of them came back in.  Basically it was the same

8   people.  Sometimes it was the same people from when I

9   started until when I left doing the same thing.

10       Q       And were you hanging out with them?

11       A       I smoked blunts with them, I drank beer

12   with them, they had barbecues.  Yes, I did.

13       Q       And you rented rooms to them?

14       A       I rented rooms to them.

15       Q       All right.  And did you witness girls

16   that were being controlled by these pimps?

17       A       Yes, sir.  Like I said, and I'll say

18   it -- I'll keep saying it, it was the -- nothing

19   changed but the ownership, the ownership of the Red

20   Roof Inn.

21       Q       And when you --

22       A       It was still the same pimping, pandering,

23   whatever you want to call it, dope selling.

24       Q       And did you see girls that were -- had

25   bruises or injured?

W.K., et al v. Red Roof Inns, et al                    Forrest Castille  10/22/2021

Page 76

1   blood, crack pipes, condom wrappers, just a "lube" or

2   whatever.  Just whatever it takes for them to do their

3   job and for them to get high or drinking.

4        Q       And did the pimps turn their cars

5   backwards so the police couldn't see their tags?

6        A       And that's when sometimes the police

7   would get out and walk because everybody would be

8   parked in the -- you know, parked where you couldn't

9   see the tags.  And like I said, sometimes it was

10  darker in the back and some people just preferred the

11  back because it was darker back there.  It was more

12  secluded.

13       Q       And so you were -- while you were working

14  for them during this time period, you would rent to

15  the pimps?

16       A       They were the customers that we had.

17  They were the customer base at that time.

18       Q       And tell me like what's the -- just

19  ballpark, how much customer base was it during this

20  time frame?

21       A       I would still say 50 -- it was really

22  50/50 then, like I said, during -- because sometimes

23  during the slow season -- the slow season is between

24  November -- like Thanksgiving to the first of the

25  year, to January the 1st, as a matter of fact, or New

W.K., et al v. Red Roof Inns, et al                    Forrest Castille  10/22/2021

Page 117

1      A       No more than their system, how to use the

2   system.

3      Q       What do you mean, "their system?"

4      A       Their computer system.

5      Q       Checking --

6      A       Like there's different brands.  Different

7   chains have different computer systems they use.

8      Q       Did you receive any training on safety

9   and security?

10      A       Never.

11      Q       Did you receive any training on

12   prostitution?

13      A       Never.

14              MR. ALLUSHI:  Can I have some exhibit

15          stickers?

16              (Thereupon, an off-the-record discussion

17          was held.)

18              MR. MCDONOUGH:  Do you just want to keep

19          it marked as what it was before?  Is that the

20          same one?

21              MR. ALLUSHI:  Well, it's the same one

22          from Vanessa Cole's deposition.  Do you want me

23          to just refer to it as 1 or should we --

24              MR. TONGE:  Yeah, let's just use the

25          same.

W.K., et al v. Red Roof Inns, et al                    Forrest Castille  10/22/2021

Page 125

1   report -- did you ever call the police to report any
2   criminal activity at all at the Red Roof while you --
3        A      Maybe if they got to fighting or
4   something, or something like that, but I wouldn't just
5   call the police for -- telling them, oh, we got
6   prostitution in here.  I never did that.
7        Q      Why not?
8        A      Look, it was going on before I got there
9   and it was going on after I left.  I was not there to
10  police the Red Roof Inn.  I was there to get a
11  paycheck every other Friday.  That was my main
12  concern.  It's the way I had to maintain and the way I
13  had to live.  I was not the prostitute police or the
14  pimp police.
15       Q      How do you know it was going on before
16  you got there?
17       A      Because the same people, they had been
18  coming for years.  They had told me they had already
19  been coming.
20       Q      And how do you know --
21       A      They told me they were already guests.
22  They told me they had been coming to this Red Roof
23  Inn.  This is where they came.
24       Q      And how do you know that it was occurring
25  after you left?

Page 127

1   for, you know, people fighting?

2       A       I said that.  I've already said that.  I

3   did.

4       Q       But you wouldn't call the police to

5   report prostitution?

6       A       Why would it be my job to call and report

7   something that has been happening repeatedly year

8   after year?  Why -- why would I do that?  It wouldn't

9   change anything, it wouldn't stop anything.

10      Q       It wasn't your job to make sure that the

11  hotel was safe and secure?

12      A       It was my job to make sure that I was

13  most safe and secure than anybody.  I came before that

14  hotel and my safety came before the hotel.

15              (Interrupting noise in the proceedings.)

16              MR. KEITH:  Somebody is here.

17  BY MR. ALLUSHI:

18      Q       Do you know if anybody else that worked

19  with you at the time called the police to report

20  criminal activity?

21      A       Nobody that -- nobody that I really know.

22  I can't say they called the police or -- if they did,

23  that was on their shift and maybe something happened

24  on that shift, but everything else that was going on

25  it was so rampant and everybody knew from -- from the

W.K., et al v. Red Roof Inns, et al                    Forrest Castille  10/22/2021

Page 128

1    higher-ups.  We were the low -- we were low on the
2    totem pole.  And, like I said, everybody was just
3    trying to make ends meet.
4         Q       Did you report the prostitution and
5    alleged criminal activity to your supervisor?
6         A       Say the right -- say -- I'm trying to
7    figure out the right way to say it.  Because they knew
8    prostitution was there.  I didn't have to report what
9    was already known.
10        Q       I'm asking, did you report the alleged
11   prostitution and --
12        A       We talked.  We talked about it and
13   everybody knew each time.  Each corporate or franchise
14   knew that there was prostitution going on.
15        Q       You told me --
16        A       So you didn't have to keep reporting
17   what's already going on if it happened repeatedly.  So
18   every day I'm supposed to say there's a prostitute
19   here, there's a prostitute here, these are prostitutes
20   right here and some repeat prostitutes or repeat
21   customers.  So I didn't feel the need, but I had to
22   really be overly concerned about reporting stuff.  I
23   did what I could do to help some of those young
24   ladies, but as far as me being a safety -- the police
25   or security guard, no.

W.K., et al v. Red Roof Inns, et al                  Forrest Castille 10/22/2021

Page 131

1   familiar with the pimps and the girls.

2        Q        And if you knew they were pimps, why

3   would you give them rooms?

4        A        They had been given to them.  Why would I

5   not?

6        Q        Do you have -- do you have an answer to

7   my question?

8        A        I said nobody told me not to rent to

9   them.  And they knew they were pimps, they knew they

10  were prostitutes.  The management didn't tell me not

11  to rent to them.

12               MR. KEITH:  Objection.

13  BY MR. ALLUSHI:

14       Q        Mr. Castille, you knew that these -- the

15  pimps were illegally in the property.

16       A        I --

17       Q        Why did you -- why did you give them

18  rooms?

19               MS. HOYING:  Objection.

20       A        Hold on.  First of all, I'm not a

21  policeman.  I didn't work for the police department.

22  It is not my business to control illegal activ- --

23  activity and moral activities.  That was not my job.

24  My job was to check them in, greet them, make sure

25  they paid their money; but my job was not going around

W.K., et al v. Red Roof Inns, et al                    Forrest Castille  10/22/2021

Page 132

1   saying, oh, you're a pimp, you can't stay at the Red
2   Roof Inn.  Nobody else told them they couldn't stay.
3   BY MR. ALLUSHI:
4        Q       And the same question for the prostit- --
5   for the prostitutes, the alleged prostitutes.  You
6   knew they were prostitutes; correct?
7        A       Of course.  And like I said --
8        Q       And why would you check them in?
9        A       Like I said, it was not my job to
10  basically -- checking them in on their work history or
11  their job description.
12       Q       So your understanding of your job was
13  just to check people in and not worry about --
14       A       And make sure everything else --
15       Q       Let me finish my question.
16       A       Okay.
17       Q       -- and not be aware or be alert of any
18  criminal activity?
19             MS. HOYING:  Objection.
20       A       Sir, it was not my job to police the
21  hotel.  You can ask this question about the pimps and
22  the prostitutes, but it was not my job.  That wasn't
23  my job to do.  You can ask this a thousand times.
24             I don't remember seeing this paper about
25  nothing.  And like I said, most of the time people

W.K., et al v. Red Roof Inns, et al                    **Forrest Castille  10/22/2021**

Page 142

1      Q       So you're saying ████████ is lying?

2      A       She's lying, and I'd tell her in her face

3   she's lying.

4      Q       Did they give you any weed?  Did Mario

5   give you weed?

6      A       I bought weed from them and they gave me

7   weed and we smoked weed.

8      Q       So you purchased weed from him; he also

9   gave you free weed?

10      A       Yeah, we smoked together, he gave it to

11   me.

12      Q       Okay.  You were testifying earlier, you

13   said that you got fired from the Red Roof Inn

14   Smyrna --

15      A       Uh-huh (affirmative).

16      Q       -- when Varahi was the franchisee for

17   speaking to the -- to a newspaper; right?

18      A       Uh-huh (affirmative).

19      Q       And you stated that you had told this

20   newspaper that you were trying to clean up the hotel;

21   is that correct?

22      A       Not that I was trying to.  They were --

23   that we were taking steps or that Red Roof Inn was

24   taking steps to try to make things better because it

25   was -- it was known what was going on.

W.K., et al v. Red Roof Inns, et al                    Forrest Castille 10/22/2021

Page 162

1   Q      You smoked weed with them?

2   A      Uh-huh (affirmative).

3   Q      They gave you weed?

4   A      They didn't really give me a whole lot of

5   weed.  We smoked weed together.  I bought weed from

6   them, but...

7   Q      And you also wanted to have sex with

8   them?

9   A      Hmmm?  No, I said I would have, but no, I

10  didn't want to have sex with them.  But I would have

11  if the opportunity presented itself perhaps.

12  (Overspeak.)

13  Q      But you never took any money from them?

14  A      No, they didn't give me any money.

15  Q      You never served as a lookout?

16  A      Never was a lookout.

17  Q      You also testified earlier, Mr. Castille,

18  that back during your employment there the term "sex

19  trafficking" wasn't familiar to you; correct?

20  A      Not at all.

21  Q      So did you back then think that the girls

22  were just prostitutes?

23  A      That's all I knew about, prostitution.

24  Q      And when was the first time you

25  familiarized yourself with sex trafficking, the actual

Page 245

C E R T I F I C A T E

1

2

3          I hereby certify that the foregoing
transcript was reported, as stated in the caption;

4    that the witness was duly sworn and elected to reserve
signature in this matter; that the colloquies,

5    questions and answers were reduced to writing under my
direction; and that the foregoing pages 1 through 244

6    represent a true, correct, and complete record of the
evidence given.

7

8          I further certify that I am not
disqualified for a relationship of interest under

9    O.C.G.A. 9-11-28(c); that I am a Georgia Certified
Court Reporter here as a representative of D'Amico &

10   Associates; that I/D'Amico & Associates was contacted
by the party taking the deposition to provide court

11   reporting services for this deposition; that I will
not be taking this deposition under any contract that

12   is prohibited by O.C.G.A. 15-14-37(a) and (b) or
Article 10.B of the Rules and Regulations of the

13   Board; and by the attached disclosure forms I confirm
that I/D'Amico & Associates is not a party to a

14   contract prohibited by O.C.G.A. 15-14-37 (a) or (b).

15          The above certification is expressly
withdrawn and denied upon the disassembly or

16   photocopying of the foregoing transcript, unless said
disassembly or photocopying is done under the auspices

17   of D'Amico & Associates and the signature and original
seal is attached thereto.

18          This, the 1st day of November, 2021

19

20



21

22   _____

23   KELLY D'AMICO, RPR, CCR-B-1322

24

25