R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION
3    W.K., E.H., M.M., R.P., M.B.,)
     D.P., A.F., C.A., R.P., K.P.,)
4    and T.H.,                    )
          Plaintiffs,            )
5                                 )CIVIL ACTION NO:
     V.                           )1:20-CV-05263-VMC
6                                 )
     RED ROOF INNS, INC., et al., )
7          Defendants.           )
8    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
9    JANE DOE 1-4,                )
          Plaintiffs,            )
10                                )CIVIL ACTION NO.
     V.                           )1:21-CV-04278-WMR
11                                )
     RED ROOF INNS, INC., et al., )
12         Defendants.           )
     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
13
14            VIDEOTAPED ORAL DEPOSITION OF
15                 Taken May 6, 2022
16
       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
17
       VIDEOTAPED ORAL DEPOSITION OF
18           , produced as a witness at the instance of
     the Defendant Red Roof Inns, and duly sworn, taken
19   in the above-styled and numbered cause on May 6,
     2022, from 9:13 a.m. to 7:45 p.m., before Julie
20   Greene, CSR No. 2847, in and for the State of
     Texas, reported by machine shorthand method at the
21   offices of The Turley Law Firm, 6440 N. Central
     Expressway, 10th Floor, Dallas, Texas, pursuant to
22   the Federal Rules of Civil Procedure.
23
24
25   Job Number: 5213695
```

PL Sum. J.
Ex.  022

R. K.                                                          May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                          Page 2

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
             Tiana S. Mykkeltvedt, Esq.
 3           BONDURANT, MIXSON & ELMORE
             1201 West Peachtree St. NW, Suite 3900
 4           Atlanta, Georgia 30309
             404-881-4144
 5           mykkeltvedt@bmelaw.com
 6   FOR DEFENDANT RED ROOF INNS:
             Adi Allushi, Esq.
 7           -and-
             Lillian Henry, Esq.
 8           LEWIS, BRISBOIS, BISGAARD & SMITH
             600 Peachtree Street NE, Suite 4700
 9           Atlanta, Georgia 30308
             404-348-8585
10           Adi.Allushi@lewisbrisbois.com
             Lillian.Henry@lewisbrisbois.com
11
     FOR DEFENDANT VARAHI HOTEL, LLC
12   (attending remotely):
             Elliott Ream, Esq.
13           HAWKINS, PARNELL & YOUNG
             303 Peachtree Street NE, Suite 4000
14           Atlanta, Georgia 30308
             404-614-7400
15           eream@hpylaw.com
16   ALSO PRESENT (attending remotely):
             Ms. Beth Richardson
17
     THE VIDEOGRAPHER:
18           Mr. Norm Harris
19
20
21
22
23
24
25
```

R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 18

1   your relatives or anything like that?

2       A.   Yes.

3       Q.   Okay.  And who does she know?

4       A.   She knows my mom and my dad and my three

5   brothers.

6       Q.   And we'll talk about your family in just a

7   little bit.  And did she know them since high

8   school when you-all were friends?

9       A.   Yes.

10      Q.   Okay.  We'll flip to the next page.  The

11  next -- The next person disclosed here is ███████

12  █████  or Bless; is that correct?

13      A.   Yes.

14      Q.   And Bless was one of your alleged

15  traffickers, right?

16      A.   Yes.

17      Q.   Now, you've had -- You allege to have been

18  trafficked between 2009 and 2013; is that correct?

19      A.   As far as I can remember, yes.

20      Q.   Okay.  And do you remember that, or you're

21  just kind of guessing the timeline?

22      A.   As far as the timeline beginning, I'm

23  unsure if it was 2009 or 2010.

24      Q.   Okay.  And we'll talk a little bit more

25  about that.  But let me just -- So whether it's

R. K.

May 6, 2022

W.K., et al v. Red Roof Inns, Inc., et al

Page 19

```
1   2009 or 2010 through 2013, you've had three people
2   that you allege trafficked you, correct?
3        A.   Yes.
4        Q.   And one of them is Bless, right?
5        A.   Yes.
6        Q.   And then I'm sure we'll come to the other
7   name, but I'm just going to state them for the
8   record real quick.  The other person that initially
9   got you started in this life, right, his name was
10  Lee -- ███████████████  or ████████  or --
11       A.   One of his names, he was known as Base
12  Cleff.
13       Q.   ████████████.  Was that his nickname or
14  his --
15       A.   I guess.  I'm not sure.
16       Q.   And the other one was Bagz, right, ███████
17  ████████████████████?
18       A.   Yes.
19       Q.   And those are the only three people that
20  allegedly trafficked you, correct?
21       A.   Yes.
22       Q.   How do you know Bless's name is ████████
23  ████, real name?
24       A.   From Facebook.  That's what his name was
25  on Facebook.
```

Page 37

1    crazy or something or...

2         A.    I honestly do not know.

3         Q.    And do you know -- Do you know his real

4    name?

5         A.    No.

6         Q.    And he was also one of the -- It says here

7    he was also an associate of -- And when you say "an

8    associate of the traffickers," are you referring to

9    Bless or Bagz?

10        A.    Both.

11        Q.    Okay.  Was he an associate of ███████?

12        A.    No.

13        Q.    And -- But he wasn't one of your

14   traffickers, right?

15        A.    No.

16        Q.    "No" meaning he was not one of your

17   traffickers, correct?

18        A.    Not one of mine, no.

19        Q.    The next -- Can you describe Kuuk?

20        A.    We weren't really allowed to look at them

21   very much.  If they were around, we had to keep our

22   heads down.  So the best I could say is that he was

23   a black man, and I think he was tall and thin.

24        Q.    Do you recall how old he may have been at

25   the time?

R. K.                                                          May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 72

1      Q.   And what's your relationship like with
2    your grandparents, ████ and ████?
3      A.   It's wonderful.
4      Q.   Okay.   Was it wonderful the entire time,
5    --
6      A.   No.
7      Q.   -- since you were a child?
8      A.   I think it was typical when I was a child,
9    typical grandparent relationship.   And then it was
10   kind of nonexistent for a while, and now it's
11   great.
12     Q.   And when was it nonexistent?
13     A.   When I was in Georgia.
14     Q.   And that's during your alleged
15   trafficking?
16     A.   Yes.
17     Q.   Did they know about that?
18     A.   No.
19     Q.   And why -- How did you went from being a
20   wonderful relation to no relationship and -- Tell
21   me that.
22     A.   It went from being a typical
23   relationship --
24     Q.   Typical.
25     A.   -- to a nonexistent relationship.   I

R. K.                                              May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 73

1   just -- When I moved to Georgia and I was with

2   Bagz, I -- I had already thought that my family was

3   better off without me, and Bagz played on that and

4   manipulated my mind to making me think that they

5   truly did not want anything to do with me, so I did

6   not have a relationship with my family.

7        Q.   Okay.  And so it was basically your choice

8   to cut them off, right?

9        A.   No.

10            MS. MYKKELTVEDT:  Object to the form.

11   Go ahead.

12            THE WITNESS:  No.  It was not my

13   choice.  I was manipulated into thinking that they

14   wanted nothing to do with me.

15       Q.   (By Mr. Allushi)  I understand that.  But

16   you cut them off, right?  You were the one -- I

17   understand you're saying you were manipulated, but

18   you cut them off, right?

19       A.   I was also not allowed to make phone calls

20   to my family unless I had permission, and he was

21   right there listening to the phone calls.

22       Q.   And how long were the phone calls usually?

23       A.   Not very long.

24       Q.   And when you say "not very long," more

25   than five minutes, less than ten minutes?

R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 76

1      Q.   Okay.  Tell me about it.

2      A.   I just simply don't believe the things I

3    used to believe as a religious person.

4      Q.   Okay.  You believe in God?

5      A.   In a way, yes.

6      Q.   Okay.  Well, let me ask you this:  What

7    triggered the change from a religious person to a

8    nonreligious person?

9      A.   I believe a number of things did.  One --

10   One thing I see a lot of in Christian groups and

11   religious groups is women are treated more as more

12   second -- like second class, you know.  We're

13   supposed to be submissive to men.  And Bagz would

14   often use the Bible to try to manipulate us into

15   being submissive.  And I noticed that a lot of men

16   in Christian religion do that, as well.  So that's

17   one reason among many more.

18     Q.   And what are some of the other reasons?

19     A.   Just freedom of spirituality, also.  Not

20   necessarily having to follow, I guess, a book to be

21   spiritual.

22     Q.   And when did this triggered event occur?

23   When were you like -- When did you decide that you

24   weren't going to be a believer in Christianity

25   anymore?

R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 83

1    media?

2         A.   Not that I can recall.

3         Q.   And what about your dad, ████?  Did you

4    speak to him throughout your alleged trafficking?

5         A.   I did, but there was a certain point where

6    I wasn't allowed to speak to him anymore.

7         Q.   Okay.  And why is that?

8         A.   There was a time where I was talking to my

9    dad, and I called him Daddy.  And I got in trouble

10   for that, and I wasn't allowed to speak to him

11   anymore.

12        Q.   And you got in trouble from?

13        A.   Bagz.

14        Q.   With Bagz or Bless?

15        A.   Bagz heard me call him that, and he didn't

16   like it, so he made it where I couldn't call him

17   anymore.

18        Q.   And during the entire time that you

19   were -- well, strike that.  I'll ask you that in a

20   second.

21             And do you still have a relationship

22   with your mother, ████?

23        A.   Yes.

24        Q.   Is it a good one?

25        A.   Yes.

R. K.                                                          May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 96

1   in it.

2       Q.   And with an ad, you mean like an ad

3   advertising the sale of sex?

4       A.   Yes.

5       Q.   And so then he sent somebody to get you?

6       A.   Yes.

7       Q.   Who?

8       A.   A friend.  I can't remember who came to

9   get me.  I can't remember who it was.

10      Q.   And do you remember when that was?

11      A.   I don't.

12      Q.   Okay.  And so -- And we'll talk about that

13  in a little bit.  Was he mad?  Was ████ mad at

14  what was going on, what you were doing?

15      A.   He was heartbroken.

16      Q.   Okay.  And you said you stayed with him

17  for some time, and that's when you left and went to

18  ████████?

19      A.   Yes.

20      Q.   And that's the episode where Bless bought

21  you-all tickets and flew to Georgia, right?

22      A.   Yes.

23      Q.   And you have put in your interrogatories

24  that that was in 2009, right?

25      A.   That's what I believed.

R. K.                                                    May 6, 2022

W.K., et al v. Red Roof Inns, Inc., et al

Page 183

1      Q.   Okay.  Did you -- Did you tell ████,

2  hey, come to Georgia with me, I've got this guy and

3  he's going to take care of us?

4      A.   Yes.  She was right there with me reading

5  the messages as they came and -- came and went.

6  She was right there at her computer.

7      Q.   How many messages did you-all -- did

8  you-all exchange?

9      A.   I honestly don't know.

10      Q.   It was more than one, though, right?

11      A.   Yeah.  It was a little bit back and forth.

12      Q.   And so it's sometime September 2010, and

13  you were exchanging the messages.  And then did he

14  send you guys tickets; do you recall?

15      A.   Yes.

16      Q.   Plane tickets?

17      A.   That's also part of why we bought into the

18  illusion of this rich rapper, because he said, you

19  know, I've got it, I'll buy y'all's tickets and fly

20  y'all out here.  He just made it seem, you know,

21  like this baller, this rich rapper-style guy, and

22  it was easy for our young naive brains to buy into

23  it, I guess.

24      Q.   And Bless didn't force you to get on the

25  plane and go to Georgia, right?

R. K.                                                                  May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 184

1       A.   He definitely manipulated us into getting

2    on those planes.

3            MR. ALLUSHI:   Objection,

4    nonresponsiveness.

5       Q.   (By Mr. Allushi)  Did Bless force you to

6    get in a plane to come to Georgia?  You can answer

7    with a yes or no, and then explain whichever way

8    you'd like, ██████████████.

9       A.   No.  He didn't physically force us to get

10   on a plane, but he definitely used manipulation of

11   our minds to get us on there.  Had we known what we

12   were flying to, we would not have gone.

13      Q.   Okay.  And when you say manipulative,

14   you're talking about promising you the life, right?

15      A.   Yes.

16      Q.   The luxury life?

17      A.   Yes.

18      Q.   He didn't coerce you in any way?  He

19   didn't say I'm going to kill your little brother if

20   you don't come to Georgia, right?

21      A.   No.  He did not use any kind of

22   threatening language at the time.

23      Q.   Okay.  So then you get -- you get to

24   Georgia, and I guess -- Was it September, or was it

25   October by that time, 2010?

R. K.                                                          May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 194

1        A.    I think I was watching like YouTube videos

2   about conspiracy theories and stuff like that.

3        Q.    Was that Pizzagate?

4        A.    Yes.

5        Q.    Okay.

6        A.    That was some of it, yes.

7        Q.    Okay.  We'll talk about that in a little

8   bit.  But -- So at the time, I guess, he didn't use

9   the word trafficking, right?  So he came in and --

10   Bless came in and just basically said that you-all

11   were going to have sex for money, right?

12        A.    Yeah, more or less.  He didn't say that

13   exactly, and I honestly can't remember what he told

14   us.  The whole situation, it was just very dark,

15   very scary, nothing like what we expected, and it

16   was terrifying.

17        Q.    Okay.

18        A.    I don't know how else to explain.  It

19   wasn't anything like what we expected.

20        Q.    Why was it scary at this time?  He hadn't

21   done anything by this time, right?  You'd just got

22   to the hotel.

23        A.    Yeah.  But we were expecting a certain

24   situation, and next thing we know we're at a dingy

25   hotel with really sketchy people, and not to

R. K.                                                     May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                          Page 195

1    mention ████████ looked, like, miserable, and it

2    just -- it was not -- it was -- we were young,

3    young small females, and it was just not -- it

4    didn't feel like a safe situation to be in.

5        Q.   Okay.  So he said you-all are going to,

6    not in specific words, but you understood at the

7    time that you were going to have sex for money?

8        A.   We --

9        Q.   Go ahead.

10       A.   I'm sorry.  We were -- We understood at

11   that time that we were expected -- that we were

12   going to have sex for money for him.

13       Q.   And you had done that before, though, with

14   Lee, right?

15       A.   Yes, briefly.

16       Q.   Okay.  But ████████ had never done that

17   before, right?

18       A.   Not to my knowledge, no.

19       Q.   Okay.  Was ████████ shocked?  I mean, was

20   she, like, what the hell's going on here?

21       A.   Yes.

22       Q.   And -- But you had done it before, right,

23   so you kind of knew what was going down, right?

24       A.   Well, I didn't know -- I didn't know that

25   that's what I was going to be doing prior to this,

R. K.                                                          May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                              Page 196

```
 1   no.

 2        Q.   When you learned it was my question.

 3        A.   Yes.  But I didn't agree to it.

 4        Q.   Okay.  Did you tell Bless no, I don't want

 5   to do this, I'm going to leave?

 6        A.   No.  I did not.  I was too scared to say

 7   that.  And then not much longer after that, he took

 8   ███████  into the bathroom of the hotel and, like,

 9   beat the crap out of her.  It was very, very loud

10   and like it was at that point the most terrifying

11   thing I'd ever heard.  And that was enough to scare

12   us into submission.

13        Q.   But when he said and you understood -- You

14   said after he had already explained what y'all were

15   going to do is when he beat ██████, right?

16        A.   I can't remember if it was the exact same

17   day or before or after.  I just remember it was

18   right there in that time, in that timeframe.

19        Q.   So when he told you that you were going to

20   have commercial sex, did you say -- I know you said

21   you didn't say no to him, but did he threaten you

22   in any way?

23        A.   I don't -- I don't know if he did in the

24   very beginning.  But like I said, the violent

25   situation with ██████ was very early on, and that
```

R. K.                                              May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 202

1    Bless.

2        Q.   The two Extended Stays?

3        A.   Yes.

4        Q.   Okay.  And during those two weeks that

5    you-all switched between these two hotels, was --

6    was Bless ever violent during those first two

7    weeks?

8        A.   Yes.

9        Q.   When did he start being violent with you?

10       A.   Well, he wasn't violent with me.  He was

11   extremely violent with ███████.

12       Q.   And who -- Are you speaking of ████████

13   ████████ or --

14       A.   No.  The ████████ that's in that photo.

15       Q.   Photograph?

16       A.   Yes.  I don't know her last name.

17       Q.   And was he ever violent with you during

18   those two weeks?

19       A.   No, not yet.

20       Q.   Okay.  Did he ever threaten you during

21   those two weeks?

22       A.   Yes.

23       Q.   Saying what?

24       A.   Just that he'd beat the crap out of me and

25   just -- just a very aggressive overall way of

R. K.                                                               May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 219

1      Q.   So even back then you didn't ask for help,

2   right?

3      A.   No.

4      Q.   How long were you with Bless?

5      A.   I would say probably under two months.

6      Q.   And did you ever stay with Bless at the

7   North Druid Hills location?

8      A.   I don't believe so, no.

9      Q.   And then you met Bagz, right?

10     A.   Yes.

11     Q.   And how did you meet Bagz?

12     A.   Well, the first time I met Bagz, we were

13  actually outside of -- We were in a van, and me and

14  ████████ were in the back, and we had gone to pick up

15  Bagz.  And we were outside of that Hilton hotel

16  that I can't remember the name of it, and that's

17  the first time I met Bagz, and he turned around and

18  introduced himself.

19            And I had -- I remember, because I had

20  gotten in a lot of trouble with Bless for that,

21  because I was not supposed to be looking anyone in

22  the -- especially any other pimp in the eye, let

23  alone touching them and talking to them; so...

24     Q.   Did you ever have sex with Bless?

25     A.   Yes.

Page 220

1     Q.   Was it the first night you got to Georgia?

2     A.   I don't think so.

3     Q.   It was at some time during those couple

4  weeks you were with him, right?

5     A.   Yes.

6     Q.   How many times did you have sex with him?

7     A.   I'm not sure.  Not many.

8     Q.   Did he force you to have sex?

9     A.   No.  But it was understood that when you

10  were a pimp's girl, you were basically their

11  property, and it was -- You were -- You had to have

12  sex with them if that's what they wanted.

13     Q.   Did you ever have a threesome with him and

14  you and ██████████?

15     A.   No.  I don't think so.

16     Q.   Did you ever have any -- Do you know if

17  ██████████ had sex with him or not?

18     A.   I don't think so.

19     Q.   You don't think you know, or you don't

20  think she had sex with him?

21     A.   I don't think she had sex with him.

22     Q.   Do you think she ever performed oral sex

23  on him?

24     A.   I don't believe so.

25     Q.   You never witnessed Bless performing -- or

R. K.                                                                          May 6, 2022

W.K., et al v. Red Roof Inns, Inc., et al

Page 223

1    that's when me and ████ were sitting behind

2    Bless, and we were supposed to keep our heads down,

3    and I had just learned that.  And then I guess a

4    few hours later, I remember Bagz's girls, ████

5    and ██, who those were his girls at the time,

6    came in and gave him big wads of cash, and they

7    seemed really happy and happy to see him, meaning

8    Bagz.  And he was, like, expressing, you know, what

9    seemed like gratitude to them, like -- like -- or

10   telling them that they did a good job and all that,

11   and so I just remember that memory sticking out in

12   my mind.

13        Q.   And you say that you went to this music

14   studio, right?

15        A.   Yes.

16        Q.   Was that -- Was it PIVIP by then, or not?

17        A.   It may have been.

18        Q.   And what's PIVIP for the record stand for?

19        A.   I believe it's called -- it stands for

20   Pimps In Very Important Places.

21        Q.   Okay.  And so what was that?  What was

22   PiviP?  Was it a gang?

23        A.   I think they were trying to make a

24   music -- Like, have you ever heard of YMCMB?

25        Q.   No

R. K.                                                                        May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 227

1    your own and letting the girls bring their own.

2    And it didn't happen very often, but -- And he

3    would act like that was a Bottom Bitch privilege.

4         Q.   It's not like the Bottom Bitch could keep

5    the money, though, right?

6         A.   No.  Of course not.

7         Q.   You still had to give it to Bagz?

8         A.   Yes.

9         Q.   Or the pimp -- whoever the pimp was?

10        A.   Yes.

11        Q.   And were you ever Bless's Bottom Bitch?

12        A.   No.

13        Q.   Were you at some time then later on Bagz's

14   Bottom Bitch?

15        A.   Sorry.  Could you repeat the question.

16        Q.   Were you at some time during the alleged

17   trafficking with Bagz, Bagz's Bottom Bitch?

18        A.   I was made to believe that, yes.

19        Q.   Okay.  And so you're on this trip.  But in

20   October 2010, you were on this trip and the girls

21   are trying to convince you to switch to Bagz, and

22   so how did it happen, then?  What happened?  How

23   did you make the transition?

24        A.   When we -- When all of the girls got back

25   to the hotel, Bagz's girls, I guess, told him that

Page 228

```
 1   I wanted to.  And then the pimps lined up in the
 2   hallway, and the girls basically -- I said what the
 3   girls told me to say to Bagz.  And, yeah, at that
 4   time Bless was trying really hard to get me to
 5   stay, and he was threatening me behind Bagz's back.
 6   Bagz was here and Bless was here.  And he was,
 7   like, pulling out his gun and subtly pointing it at
 8   me.  And it was really scary, but all I could think
 9   at that time was I have to get away from him.  And
10   it felt like Bagz was my escape at the time and a
11   better situation.
12       Q.   Okay.  So let me just understand this
13   right.  So you're in Texas.  You're in Dallas,
14   right?  Near your home town, right?
15       A.   Yes.
16       Q.   And you're here with Bless, and Bagz is
17   there.  And you think that switching to Bagz is the
18   safe thing to do versus, like, calling ███████,
19   calling your dad, calling your mom, seeking help
20   from all these people that loved you all your life,
21   right?
22       A.   Yes.  I did think it was the better
23   option, because I did not know how I would even
24   explain the situation to my parents.  I mean...
25       Q.   But there was nothing stopping you from
```

R. K.                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                          Page 229

 1    doing that at the time, right?  There was no
 2    physical restraint, was there?
 3         A.   Just the intimidation and the fear.
 4         Q.   Psychological, right?
 5         A.   Yes.
 6         Q.   And was this like a ritual, what y'all
 7    were doing in this hotel, like walking out to --
 8    What did you do?  You walked up to Bagz and you
 9    said I choose up, I choose you, or something like
10    that?
11         A.   Yeah.  It does seem like a ritual, looking
12    back at it.  It seems ritualistic.  It was --
13    That's just the code of, like, pimps and their
14    girls, I guess.
15         Q.   Which hotel was this at, ████████████?
16         A.   I'm not sure.  I can't remember what hotel
17    we stayed in.
18         Q.   Dallas?
19         A.   Yes, in Dallas.
20         Q.   Do you know if it was a La Quinta, or you
21    can't recall at all?
22         A.   No.  It was a nicer hotel.  It was one of
23    the higher-end hotels.
24         Q.   Like a Marriott, a Hyatt or something like
25    that?

R. K.                                                              May 6, 2022

W.K., et al v. Red Roof Inns, Inc., et al

Page 230

1      A.   Yeah.  It was pretty tall, I remember,

2   because we were pretty high up.

3      Q.   And you haven't sued that hotel, right?

4      A.   I can't remember what hotel it was.

5      Q.   But this was the hotel where your

6   transition from Bless to Bagz happened, right?

7      A.   Yes.

8      Q.   Important hotel, wouldn't you say?

9      A.   Well, I mean, the hotel really wasn't that

10   important to me at the time.

11      Q.   Well, did they -- Was this ritual inside a

12   room, or was it in the hallway?

13      A.   It was in the hallway.

14      Q.   So did any of the employees see you guys

15   do this thing?

16      A.   I'm not sure.

17      Q.   Okay.  Should they have seen you?  I mean,

18   you're doing a ritual, pimps lined up and the girls

19   as you described them lined up, right?

20      A.   It was just me.

21      Q.   Okay.  It was just you, Bagz, and Bless?

22      A.   And I believe Kuuk and Nitty were also

23   lined up outside.

24      Q.   So should the hotel have seen and done

25   something about it, saved you?

Page 231

1       A.    If there were cameras, they should have

2    seen and, yes, I do feel like they should have

3    stepped in or at least called the cops, because the

4    situation was very sketchy.

5       Q.    And that was a bigger hotel, right?  It

6    wasn't like the motels like Red Roof or Suburban

7    Extended Stay or those places, right?

8       A.    No.  It wasn't.  It was a nicer hotel.

9       Q.    Do you know if they had inhouse security?

10   Big hotels usually have inhouse security.

11      A.    They may have.

12      Q.    Okay.  And so you're in -- So then you

13   went with Bagz, right?  After you said choose up,

14   that was it, right?  You went with Bagz?

15      A.    Yes.

16      Q.    And how long were you-all -- Were you

17   having sex for money at that hotel where you chose

18   up Bagz?

19      A.    I don't believe so.

20      Q.    How long were you-all at that hotel?

21      A.    It was brief.  This whole visit was really

22   random to me at the time.  Looking back now, I

23   almost feel like it was -- they were on a mission.

24   The pimps were on a mission of some sort.

25      Q.    What mission was that?

R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 232

1     A.   I believe they were trying to find ████████

2     again.

3     Q.   Did they?

4     A.   No.  I don't think so.

5     Q.   You didn't bring ████████ back, or ████████

6     didn't come back with you on this trip, right?

7     A.   I'm not sure.  I don't believe she came

8     back on this trip specifically, but she did come

9     back pretty -- pretty soon after I started being

10    with Bagz.

11    Q.   And how did that happen; do you remember?

12    A.   I don't remember.  I don't remember.

13    Q.   So you were with Bagz from October 2010

14    until the end of your alleged trafficking, right,

15    2013 when you went to jail, prison?

16    A.   Yes.

17    Q.   When did you go to prison?  Was it --

18    A.   It was in March of 2013.  I got arrested

19    in Texas, actually, because I was violating

20    probation by being out of the state without

21    permission.

22    Q.   And we'll talk a little bit about the

23    arrest, ████████████.  Let me just try to

24    understand.  So from -- So Bagz, you were allegedly

25    trafficked from October 2010 through March 2013,

R. K.                                                            May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 233

1   right?

2        A.    Yes.

3        Q.    That's two and half years roughly?

4        A.    Yes.

5        Q.    And so you got back to Georgia shortly

6   thereafter the whole choose up hotel thing?

7        A.    I believe so.

8        Q.    Did you go into any other states?

9        A.    I think we stopped in some states on the

10  way back to Georgia.  I just cannot remember.  But

11  I feel like I remember stopping in some states, but

12  I don't know which ones.  Probably Louisiana.

13       Q.    Did Bless ever take you out of state?

14       A.    This visit.  Just this visit to -- going

15  to Dallas.

16       Q.    And on the way, did you-all stop to have

17  commercial sex anywhere on the way?

18       A.    It's possible, but I don't -- I don't

19  remember.

20       Q.    And which states did Bagz allegedly

21  traffic you aside from Georgia?

22       A.    We -- Louisiana.  North Carolina and South

23  Carolina.  Tennessee.  Alabama.  Florida.  And

24  Texas.  And I think that's it.  I mean, if I were

25  shown a map, I might be able to...

R. K.                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 234

1      Q.    Seven states, that is, you named, right?

2      A.    (Witness nods head.)

3      Q.    And did you stay at hotels at all these

4  places?

5      A.    Yes.

6      Q.    And is there any other brands we haven't

7  mentioned that you stayed at these -- during your

8  alleged trafficking in these other states?

9      A.    When we went to, I'm not sure if it was

10 North Carolina or South Carolina, we would stay at

11 a DoubleTree.  But Extended Stays were also very

12 popular.  Red Roof Inns while we were out of town

13 were less popular, because I think we only stayed

14 at ones that Bagz had established to be safe from

15 the police and that he was visibly comfortable, you

16 know, parading us around at.

17     Q.    Do you remember any other Red Roofs out of

18 state that you stayed at?

19     A.    I feel like there was maybe one, I think,

20 in Tennessee.

21     Q.    Do you remember what city or where, which

22 area?

23     A.    I'm not sure.

24     Q.    And the DoubleTree hotel you said in the

25 Carolinas, have you sued the DoubleTree hotel?

R. K.                                                May 6, 2022

Page 235

```
 1       A.   No.
 2       Q.   So you get back to Georgia with Bagz,
 3   right?
 4       A.   Eventually, yes.
 5       Q.   And so we are -- October 2010.  When do
 6   you think you got back to Georgia from that trip?
 7       A.    When we went on these trips, they were
 8   really -- they were usually about a week or two,
 9   maybe sometimes three weeks long, so maybe the end
10   of October or so, November, maybe the beginning.
11   And by the time we were back in Atlanta, we had
12   gone from me, ████ , and ██████ to just me and
13   ████████ pretty quickly.
14       Q.   What happened to ████ ?
15       A.   I'm not sure.
16       Q.   Do you think she escaped?
17       A.   I really don't know.
18       Q.   Okay.  So tell me about Bagz.  Once you --
19   You said that you thought Bagz would be a nicer
20   pimp, right?
21       A.   Yes.
22       Q.   And did Bagz turn out to be a nicer pimp
23   than Bless?
24       A.    For the first, like, week or so, yes.  It
25   seemed that way.
```

R. K.                                                                May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 236

1        Q.   Did you have sex with him the first week?

2        A.   Yes.

3        Q.   And was that voluntary?

4        A.   As I said before, it was basically

5    understood that you had to do that.  You didn't

6    really have a say in that matter, because you were

7    basically their property.

8        Q.   But he didn't force or threaten you in any

9    ways, right?

10       A.   Not at this time, no.

11       Q.   And when was the first -- So when you got

12   back, which hotel did you get back to?

13       A.    In Atlanta?  When we first got back,

14   that's when we went to that apartment that was

15   shown because Bagz needed to get some clothes and

16   stuff.  And we -- ███████ and I actually did fall

17   asleep there on a chair, because I believe after

18   Bagz got some of the belongings he needed, he went

19   somewhere and told us to stay put until he got

20   back.  And then I don't think he got back till the

21   morning, and so I think ███████ and I fell asleep on

22   a chair because there was nowhere else to sleep for

23   us in the living room.

24       Q.   And did you guys go to a hotel afterwards

25   to resume the commercial sex?

R. K.                                                                   May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 237

1    A.   Yes.

2    Q.   Was that at -- Which hotel was that?

3    A.   It's hard to remember what order certain

4    hotels were, because we were in and out of hotels

5    constantly from this point till the very end of my

6    stay in Georgia.

7    Q.   Okay.  And I want to ask you a specific

8    question about it.  Do you recall when the first

9    time that you stayed at the Red Roof North Druid

10   Hills was?

11   A.   I believe it was sometime maybe late

12   November, because we --

13   Q.   2010?

14   A.   Yes.  2010.  We had gone on another little

15   quick trip out of town, just ███████ and I, maybe, I

16   would say, at the end of October.  And then at that

17   time, she had come up with this plan to escape, and

18   she had -- she had left.  And then I ended up

19   coming back alone to Georgia.

20   Q.   So ███████ had a plan to escape, and she

21   did escape sometime in November 2010?

22   A.   Yes.

23   Q.   Did she ask you to go with her?

24   A.   Yes.

25   Q.   You said no?

R. K.                                                     May 6, 2022

W.K., et al v. Red Roof Inns, Inc., et al

Page 238

1      A.   I -- I didn't think that it was that bad

2   at the time.

3      Q.   Okay.  So you didn't go with████ not

4   because you were scared; you just thought it was

5   fine doing commercial sex with Bagz, right?

6      A.   Well, not necessarily.  I was still very

7   scared of Bagz.  He's 20 times scarier than Bless

8   ever was, and he didn't even have to try at first.

9   But I had also seen the pattern now of how the

10  pimps operated and how scary that they were.  So

11  that fear was already instilled and just became

12  more and more as time went on.  So yes, I was still

13  afraid.

14     Q.   Had Bagz -- At the time ████ escaped,

15  had Bagz been physically abusive to you?

16     A.   No.  Not yet.

17     Q.   And at the time that ████ escaped, had

18  Bagz threatened you in any ways by that -- up to

19  that time?

20     A.   Briefly, yes.  Part of ████ plan when

21  we were out of town -- We went out of town to North

22  Carolina, and in the middle of the night instead of

23  staying in North Carolina, she said let's go to New

24  York.  And I trusted her because from what it

25  looked like, it looked like Bagz really held her on

R. K.                                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 239

1   a pedestal.  It seemed that way.  So I thought

2   maybe -- I didn't think that it was going to get us

3   in trouble.  I thought -- Just the way she made it

4   sound is that we're not going to tell him yet.

5   We're going to surprise him that we're going here.

6            And then once we were there, I spoke

7   to him.  And when he found out that we were there,

8   he did get very angry and aggressive and scary.

9   But I think he sensed that, because I was so new to

10  him, that if he was too angry and aggressive that I

11  would be more apt to be able to escape with ████.

12  And so he started using very manipulative mind

13  games on me and used that more to get me back than

14  the aggressive approach.

15       Q.   Okay.  So he didn't threaten you.  You're

16  saying he used manipulative ways?

17       A.   At first he did, and then he changed his

18  way of manipulating.

19       Q.   How did he threaten you?

20       A.   He said something along the lines of he's

21  going to -- He would use a lot of degrading words

22  when he talked to -- Like, when he got angry, he

23  would use very degrading words, and he would say

24  I'm going to -- I'm going to -- I can't remember

25  exactly verbatim what he would say, but along the

R. K.                                                            May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 240

1    lines of "I'm going to beat you."

2        Q.    Okay.

3              MS. MYKKELTVEDT:  Were you finished?

4    BY MR. ALLUSHI:

5        Q.    Yeah.  Are you finished?

6        A.    No.  No.

7        Q.    Okay.  Go ahead.  Sorry.

8        A.    That's okay.  He would say things like

9    "I'm going to beat you."  And he would, like,

10   really degrade us like saying things, "I'm going to

11   beat you," like, "dirty whores," and stuff like

12   that, and -- I don't know.  I don't know how to

13   explain it.  But it would make us feel really low,

14   and then he would flip it, and it's -- For my naive

15   mind back then, it was a lot to comprehend.  So

16   when he would flip it and he would start being

17   really, really nice, I almost, like, tried to cling

18   onto that.  And that's what he used specifically to

19   get me back from New York instead of letting me

20   escape with ███████ at the time.

21       Q.    Are you finished?

22       A.    Yes.

23       Q.    Okay.  So let me just understand this a

24   little bit, ████████████.  So you and ███████ were

25   in North Carolina by yourself, the two of you, and

R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                        Page 250

1   confusing, and I didn't realize that.  We lost the
2   car, and all of our luggage and stuff was in it,
3   and so we didn't have any clothes or anything like
4   that.  So that's -- We were -- We didn't have
5   anything.  So I think we maybe bought an outfit
6   each, and I'm sure we bought food at some point.
7   We'd have to eat at some point.  And then anything
8   else I had, I brought it back to him when I did
9   arrive back in Atlanta.
10      Q.   Well, how did Bagz know how much money you
11  made each day and how much money you used for food,
12  for gas, for things like that?  Did you-all keep a
13  log of them, or did you-all keep like receipts for
14  everything and he demanded receipts?  I'm just
15  trying to understand how that worked out.
16      A.   So, besides this trip in particular,
17  because this trip obviously wasn't how things went
18  usually, but we would have a daily quota.  And we
19  would talk to Bagz throughout the day, many times
20  throughout the day to check in and to let him know
21  when we were going to get food and let him know
22  that we were going -- when we were going to pay for
23  the hotel.  These were all things that were
24  required of us.
25               And even after paying for our food and

R. K.                                                May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 251

1   our hotel, our quota was still a certain number.

2   So we'd have to make our quota then plus enough

3   food for ourselves to eat or get a room.

4   Otherwise, we would get beaten up.

5       Q.   But my question was he didn't ask you for

6   receipts on food or receipts for gas or receipts

7   for toiletries or receipts for the dresses you said

8   you bought, right?  Did he ask you for those

9   receipts?

10      A.   I didn't buy dresses.  I don't know what

11  you're referring to.

12      Q.   Okay.  Strike the dresses.  Did he ask you

13  for receipts for food that you bought, for gas that

14  you bought, for toiletries that you bought?

15      A.   In general or on this specific trip?

16      Q.   On this specific trip.

17      A.   On this specific trip his only concern was

18  getting me back to him.

19      Q.   Okay.

20      A.   That was his only concern.

21          MR. ALLUSHI:  Objection,

22  nonresponsiveness.

23      Q.   (By Mr. Allushi)  My question was for the

24  things that you bought on this trip, ███████████,

25  did he ask you for receipts for these specific

R. K.                                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 254

1    here, you stayed at the Red Roof North Druid Hills

2    25 times, right, approximately?

3         A.   That's very possible.  Yes.

4         Q.   Okay.  Do you recall -- That's what you

5    put in the -- You can review your testimony here on

6    these, if you'd like.  If you go to page -- Do you

7    see page 32?

8         A.   Yes.

9         Q.   And it says Red -- And that's -- It says

10   "Plaintiff further provides the following details

11   relating to her --

12                   MR. ALLUSHI:   Sorry.  I'm reading fast

13   again.

14        Q.   (By Mr. Allushi)  "Plaintiff further

15   provides the following details relating to her

16   trafficking at specific hotels relevant to this

17   action about which R.K. has specific recollection."

18   And it says "Red Roof Inn North Druid Hills."  And

19   it says "R.K. believes the first time she was at

20   this hotel is in late September 2009."

21                   Now, that is incorrect, right?  We've

22   established here today that the first time you

23   stayed at the Red Roof Inn North Druid Hills is

24   November 2010, correct?

25        A.   Yes.  That sounds more right.

R. K.                                                                May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 255

1     Q.   Okay.  We've established that today here
2   from testimony in documents, right?
3     A.   Yes.
4     Q.   Okay.  And then it says "Her trafficker at
5   that time" was Bagz, "would have been Bagz,"
6   correct?
7     A.   Yes.
8     Q.   "Over the course of her trafficking, R.K.
9   estimated that she was at this hotel up to 25
10   times," correct?
11     A.   Yes.  That's accurate.
12     Q.   So maximum of 25 times, right, over the
13   two years and a half?
14            MS. MYKKELTVEDT:  Object to the form.
15     Q.   (By Mr. Allushi)  It says up to 25 times.
16   Did I read that correct?
17     A.   Well, it says up to 25 times, but it's
18   more ballpark.
19     Q.   Okay.  Well, that's what that says there,
20   right?
21     A.   That's what it says there, but --
22     Q.   And you wrote that, right?
23     A.   No.  I did not write that.
24     Q.   You told that to your attorneys, right?
25     A.   I think what we -- What I meant was that

R. K.                                                            May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 256

1    it's more of a ballpark around 25 times.

2        Q.    Okay.

3        A.    It's hard to be exact.

4        Q.    And I understand that and appreciate that,

5    ███████████.    But this says -- Under oath you

6    signed this document saying that these are true and

7    correct representations.   You understand that?

8        A.    Well --

9        Q.    Is that a yes?

10       A.    I don't know.

11       Q.    Do you understand that you signed the

12   document saying that this document contains true

13   and accurate representations of these answers?

14   I'm not trying to trick you.   I'm just asking if

15   you understand that.

16       A.    I'm not sure.

17       Q.    Okay.  So you don't know if that

18   Verification we discussed earlier, you didn't

19   understand what that meant when you signed it where

20   it says under penalty of perjury you're signing

21   these to be true and correct?

22       A.    Well, I understood that there might be a

23   couple of typos in there.

24       Q.    Okay.  And do you think this is a typo

25   here?

R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 257

1       A.    I mean, basically, yes.

2       Q.    So you think it was more than 25 times

3    now?

4       A.    I think it's ballpark around 25 times.

5       Q.    Okay.

6       A.    It could be more than 25 times.

7       Q.    And it could be less, right?

8       A.    Yes.  It could be less.  It could be more.

9    That's why around 25.

10      Q.    Understand.  And then it says each stay at

11   the hotel was usually three to five days at a time;

12   is that accurate?

13      A.    Yes.

14      Q.    To the best of your recollection?

15      A.    Yes.

16      Q.    And it says this was one of the most

17   frequented hotels by your trafficker, which is --

18   is that Bagz?

19      A.    Yes.

20      Q.    And what were some of the other hotels

21   that were the most -- Because it says one of the

22   most.  Which one are the others?

23      A.    Really any of the Extended Stays, we

24   rotated through those pretty often.  The Hampton

25   Inn right across the street from this one.

R. K.                                                                May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 263

1      Q.   Okay.  Did you understand -- Do you know

2  what prostitution is?  Do you know what the legal

3  definition in Georgia of prostitution is?

4      A.   I do not.

5      Q.   Okay.  Let me read it to you.  OCGA 16-6-9

6  says "A person 18 years or older of age commits the

7  offense of prostitution when he or she performs or

8  offers or consents to perform a sexual act

9  including but not" -- "but not limited to sexual

10 intercourse or sodomy for money and other items of

11 value."  Were you doing that?

12     A.   I wouldn't consider what I was doing to

13 fit that exactly, because I did not have the

14 ability to say no, and I did not keep any of my

15 money, so I don't think it fits that definition

16 exactly.

17     Q.   Okay.  But did this definition I just read

18 you say anything about ability to keep money or

19 ability to say no?

20     A.   It did say consent.

21     Q.   Let me read it again.  "A person 18 years

22 of age or older commits the offense of prostitution

23 when he or she performs," is first, "or offers," is

24 second, "or consents to perform a sexual act,"

25 right?  There's three different -- "including but

R. K.                                               May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 264

1    not limited to sexual intercourse or sodomy for

2    money or other items of value."  So you did perform

3    sexual intercourse in exchange for items of value,

4    correct?

5        A.   It's just not the term that I would have

6    used for what was happening.

7                 MR. ALLUSHI:  Objection,

8    nonresponsiveness.

9        Q.   (By Mr. Allushi)  I understand that.  And

10   you can certainly answer and describe whichever way

11   you'd like, ████████████.  My question was:  You

12   did perform sexual intercourse in exchange for

13   items of value, money, correct?

14       A.   Yes.  If I chose not to, then I would be

15   beaten up by Bagz.

16       Q.   Did you know at the time that it was

17   illegal to perform acts of sexual intercourse in

18   exchange for items or value like money?

19       A.   Yes, but I was more afraid of Bagz than

20   the police.

21       Q.   The first time you were at the Red Roof

22   Inn -- Any of the 25 times, approximately, you

23   stayed at the Red Roof Inn North Druid Hills, was

24   -- any of that time the room was under your name?

25       A.   No.

R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                              Page 265

1        Q.   Do you know whose name it would have been?

2        A.   Well, it was possible it was under

3    whatever ID Bagz was using.  Also, if ███████ had

4    an ID, it may have been under her name.  But I

5    don't know if you can get a hotel room under 17.  I

6    don't know if that's legal.

7        Q.   Well, ███████ testified yesterday that she

8    never rented a room at the North Druid Hills hotel

9    in her name.  Do you have any reason to dispute

10   that?

11       A.   Not necessarily.  But what I'm going off

12   is Bagz, when we would have multiple girls, he'd

13   have -- sometimes have the room put under the other

14   girls' names.  And I was never one of those because

15   I never had an ID except for the brief time that I

16   had the fake ID.

17       Q.   Okay.  As you sit here today, do you have

18   any evidence that you stayed 25 times at the Red

19   Roof North Druid Hills?  And by evidence, I mean,

20   do you have any documents, any folios, any

21   receipts, any receipts from vending machines, any

22   receipts from buying anything there or doing

23   anything there?  Do you have anything like that?

24            MS. MYKKELTVEDT:  Object to the form.

25   Go ahead.

R. K.                                          May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 266

1            THE WITNESS:  I don't have any

2    physical evidence.  I don't have anything at all

3    from my time in Georgia.  I mean, obviously,

4    besides these documents.  But I never -- I didn't

5    keep anything from Georgia when I got out of

6    prison.

7        Q.  (By Mr. Allushi)  Let me -- Let me

8    rephrase that question, ██████████, because your

9    lawyer objected.

10           Do you have any written documentation

11   in your possession showing that you stayed at the

12   Red Roof North Druid Hills ever?

13       A.   Not that I know of.  Not any physical --

14   Not anything physical.

15           MR. ALLUSHI:  Let's take a quick

16   break.  He needs to change the video.

17           THE VIDEOGRAPHER:  We're going off the

18   record at 4:50 p.m.

19           (Off record 4:50 - 4:59.)

20           THE VIDEOGRAPHER:  We are going back

21   on the record at 4:59 p.m.

22       Q.  (By Mr. Allushi)  ███████████ we're

23   back from a quick break.  We were talking about

24   your stays at the Red Roof North Druid Hills.

25           And during your stays at the Red Roof

R. K.                                                        May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 267

1  North Druid Hills, your alleged stays there, did

2  you ever speak to any employees?

3       A.   Yes.

4       Q.   Who?

5       A.   Often the front desk people.  We would go

6  downstairs and pay for our rooms each day, pay for

7  another stay in the hotel.  And we would have to go

8  -- either go down there or call down, but often we

9  would go down there and ask for towels.  We had to

10 get a lot of, like, towels throughout the day for

11 when we were seeing customers to clean up and

12 everything.

13            And -- And then anytime the -- the

14 ladies would go by with their carts, we'd ask for a

15 bunch of towels and stuff, too.  But they were only

16 doing that a certain time every day, so if it was

17 past that time and we needed towels, we'd go down

18 to the front desk and ask them.

19      Q.   And this was the same type of procedure in

20 all these hotels you stayed, right?  You'd do the

21 same thing, right?

22      A.   Yes.

23      Q.   All of the dozen brands that we talked

24 about, correct?

25      A.   Yes.

R. K.                                                           May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 268

1      Q.   And do you recall any names specifically

2   of employees at the Red Roof North Druid Hills?

3      A.   No.

4      Q.   And do you -- Did you ever tell anyone at

5   the Red Roof North Druid Hills that you were being

6   held against your will?

7      A.   No.  I did not.  They were all, like,

8   connected to Bagz or, you know, other pimps, but

9   Bagz was -- like knew them.  He was friendly with

10  them.  So no, I didn't -- I didn't think they would

11  help us.  I thought if I asked for help from them,

12  they'd surely tell Bagz and then I'd get beaten up.

13     Q.   And how do you know they were connected to

14  Bagz?

15     A.   Because we only went to hotels

16  specifically if the pimps felt comfortable taking

17  us there, meaning they knew they wouldn't get in

18  trouble for taking us to certain hotels.

19            MR. ALLUSHI:  Objection,

20  nonresponsiveness.

21     Q.   (By Mr. Allushi)  My question is how do

22  you know, ████████████, that Bagz was connected to

23  the Red Roof employees?  Did he tell you?  Did

24  somebody else tell you?  That's what I'm trying to

25  understand.

R. K.                                                     May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 269

1      A.   I'm sure he did say -- say something along

2   those lines.  But also just by the way that they

3   would act at these hotels.  For example, in hotels

4   that he wasn't necessarily super comfortable in, he

5   wouldn't even get out of the car.  He wouldn't go

6   inside unless, you know, maybe by himself.

7           But in these hotels, Red Roof Inn and

8   many of the other ones mentioned, he -- he would

9   not only go inside and pay for the room when we'd

10  first get to the hotel, but he would hang out in

11  the parking lots of these hotels with other pimps.

12  And a lot of times he would sit in the parking lot

13  and smoke with some of the girls, especially

14  specifically at this Red Roof Inn sometimes.

15     Q.   And you're saying based on those

16  observations you just described, that's how you

17  concluded that he was connected at the hotels,

18  right?

19     A.   Yes, his comfortability at those hotels.

20     Q.   But you never witnessed him discuss

21  anything with the employees at North Druid Hills,

22  correct?

23     A.   Yes, I did.

24     Q.   What was he discussing?

25     A.   I've seen him go into hotels and just,

Page 270

1   like, chat with them as if he knew them.  And his

2   comfortability with the employees -- it was very

3   obvious that he was comfortable with them.

4        Q.   But again, that was just an observation,

5   right?  You didn't hear what the -- the substance

6   of the conversation, did you?

7        A.   What was the original question?

8        Q.   At the North Druid Hills hotel, did you

9   ever hear what the substance of any conversations

10  between Bagz and employees were?

11       A.   Yeah.  I did hear -- I mean, sometimes

12  like when he'd go in, he would, you know, be very

13  friendly with them when, like, getting the room.

14  And he would just speak like he's speaking to a

15  friend or someone he knew, very familiar with.

16       Q.   Okay.  But did he -- Did you ever hear him

17  specifically say I'm a pimp and these girls are

18  working and appreciate you guys letting us stay

19  here?

20       A.   I've heard him say "appreciate you guys,"

21  almost exactly that verbatim.

22       Q.   Okay.

23       A.   But he didn't need to state the other

24  stuff, because when we would -- It was very obvious

25  that he was a pimp and we were his, the way we were

R. K.                                                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 271

1    to follow behind him and walk with our heads down

2    and bring our money downstairs while he waited

3    downstairs.

4         Q.   It was obvious to you, though, right?  Or

5    it should have been obvious to anybody, according

6    to your testimony?

7         A.   It should have been obvious to the

8    employees that worked there to look out for

9    something like that.

10        Q.   Okay.  To look out for somebody just

11   having girls follow him around and pay cash, right?

12        A.   For girls that looked like they were being

13   trafficked.

14        Q.   And what do girls that were being

15   trafficked look like?

16        A.   Very submissive and -- Very submissive to

17   a man and usually multiple girls with a man, or it

18   could be even just one, but very, very submissive

19   and running money down from upstairs to hand to a

20   man.  And just signs of someone being trafficked is

21   -- besides that would be getting towels multiple

22   times a day, being dressed up to linger around a

23   hotel room, paying cash every day to renew the

24   room.  Those would be signs, I would say, to look

25   for if you're looking for signs for trafficking

Page 272

1  victim.

2      Q.   I understand -- I'm sorry.  Are you

3  finished?

4      A.   I'm done.

5      Q.   Okay.  I understand you understand that

6  now.  You filed a lawsuit alleging these things.

7  But earlier you told me you didn't know what

8  trafficking was at the time, right?

9      A.   No, I did not.

10     Q.   Okay.  But you expected the hotel to know

11  at the time?

12     A.   I expect, yeah, the hotel to know better.

13     Q.   And you think that somebody that has a

14  submissive girl with him, that should have been a

15  sign?

16     A.   It should have been looked into, at least.

17  And if they had any suspicion, then they should

18  turn it away or call the police.

19     Q.   And you don't think that there is plenty

20  of relationships where a woman is submissive to a

21  man that go and stay at a hotel?

22     A.   That's possible.  But it should raise some

23  concern at a hotel specifically.

24     Q.   So every time a hotel employee sees a

25  woman that's submissive and pays cash, runs down

Page 280

1      A.    Probably.

2      Q.    Okay.  Then you went back to Georgia, back

3    to Bagz, right?

4      A.    Well, in this particular instance he

5    picked me up from jail.

6      Q.    So he came to Tennessee to pick you up?

7      A.    Yes.

8      Q.    But when you were in Tennessee alone, you

9    didn't escape or anything?

10     A.    No.  I was too afraid.  I wasn't going to

11   try it.  I knew what would happen if I tried and

12   failed.

13     Q.    Did Bagz ever beat you up?

14     A.    Very often.  Yes, he did.

15     Q.    Okay.  And how often?

16     A.    Monthly.  Weekly sometimes.  It honestly

17   just depended.

18     Q.    And were you placed on probation after

19   this arrest here?

20     A.    I don't remember.

21     Q.    Okay.  I think it says here.  Do you see

22   where it says "appearance details"?  Do you see

23   that paragraph?

24     A.    Yes.

25     Q.    It says you showed up in court on -- This

R. K.                                                          May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 405

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION
 3   W.K., E.H., M.M., R.P., M.B.,)
     D.P., A.F., C.A., R.K., K.P.,)
 4   and T.H.,                    )
              Plaintiffs,         )
 5                                )CIVIL ACTION NO:
     V.                           )1:20-CV-05263-VMC
 6                                )
     RED ROOF INNS, INC., et al., )
 7        Defendants.             )
 8   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 9   JANE DOE 1-4,                )
              Plaintiffs,         )
10                                )CIVIL ACTION NO.
     V.                           )1:21-CV-04278-WMR
11                                )
     RED ROOF INNS, INC., et al., )
12        Defendants.             )
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
13
                    REPORTER'S CERTIFICATION
14       VIDEOTAPED ORAL DEPOSITION OF ███████████
                       May 6, 2022
15
         I, Julie W. Greene, Certified Shorthand
16   Reporter in the State of Texas, do hereby certify
     to the following:
17       That the witness, ██████████████, was duly
     sworn by the officer and that the transcript of the
18   oral deposition is a true record of the testimony
     given by the witness;
19       I further certify that pursuant to FRCP Rule
     30(e)(1) that the signature of the deponent was
20   requested by the deponent or a party before the
     completion of the deposition; that the deposition
21   transcript was submitted on May 25, 2022,to the
     witness or to the attorney for witness for
22   examination, signature, and return to Veritext
     Legal Solutions by 30 days from receipt of transcript;
23       That the amount of time used by each party at
     the deposition is as follows:
24       ADI ALLUSHI:         8 hours, 32 minutes
         TIANA MYKKELTVEDT: 0 hours, 00 minutes
25       ELLIOTT REAM:        0 hours, 00 minutes
```

R. K.                                                    May 6, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 406

1        That pursuant to information given to the
    deposition officer at the time said testimony was
2   taken, the following includes counsel for all
    parties of record:
3   FOR THE PLAINTIFFS:
            Tiana S. Mykkeltvedt, Esq.
4           BONDURANT, MIXSON & ELMORE
            1201 West Peachtree St. NW, Suite 3900
5           Atlanta, Georgia 30309
            404-881-4144
6           mykkeltvedt@bmelaw.com
    FOR DEFENDANT RED ROOF INNS:
7           Adi Allushi, Esq.
            -and-
8           Lillian Henry, Esq.
            LEWIS, BRISBOIS, BISGAARD & SMITH
9           600 Peachtree Street NE, Suite 4700
            Atlanta, Georgia 30308
10          404-348-8585
            Adi.Allushi@lewisbrisbois.com
11          Lillian.Henry@lewisbrisbois.com
    FOR DEFENDANT VARAHI HOTEL, LLC:
12          Elliot Ream, Esq.
            HAWKINS, PARNELL & YOUNG
13          303 Peachtree Street NE, Suite 4000
            Atlanta, Georgia 30308
14          404-614-7400
            eream@hpylaw.com
15       I further certify that I am neither counsel
    for, related to, nor employed by any of the parties
16  in the action in which this proceeding was taken,
    and further, that I am not financially or otherwise
17  interested in the outcome of the action.
         Certified to by me on May 25, 2022.
18
19
20
21
22          Julie W. Greene, CSR #2847
            Expiration Date: 07/31/23
23
24  Job No. 5213695
25