Page 1

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION
3     W.K., E.H., M.M., R.P., M.B.

      D.P., A.F., C.A., R.K., K.P.
4     and T.H.,
5              Plaintiffs,

                                    CIVIL ACTION NO.:
6     vs.                           1:20-CV-05263-MHC
7     RED ROOF INNS, INC.; FMW RRI

      NC, LLC; RED ROOF FRANCHISING,
8     LLC; RRI WEST MANAGEMENT, LLC;

      VAHARI HOTEL, LLC; WESTMONT
9     HOSPITALITY GROUP, INC.;

      and RRI III, LLC,
10
               Defendants.
11
12
13            C O N F I D E N T I A L
14          VIDEO DEPOSITION OF A.F.
15             August 31, 2022
16                 9:11 a.m.
17       1960 Satellite Boulevard, Suite 4000
18                Duluth, Georgia
19     Carolyn M. Carboni, RPR, RMR, CCR-B-878
20           Leo Mileman, Videographer
21
22
23
24
25

**PL Sum. J.**

**Ex.  024**

CONF A.F.                                          August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                    Page 2

1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiffs in W.K., et al. v. Red

3    Roof Inns, et al. case:

4            PATRICK J. McDONOUGH, ESQUIRE

5            Andersen Tate & Carr, PC

6            1960 Satellite Boulevard

7            Suite 4000

8            Duluth, Georgia  30097

9            770.822.0900

10   and

11           MICHAEL R. BAUMRIND, ESQUIRE (Via Zoom)

12           Bondurant Mixson & Elmore, LLP

13           1201 West Peachtree Street, Suite 3900

14           Atlanta, Georgia  30309

15           404.881.4100

16   On behalf of the Defendants Red Roof Inns, Inc.;

17   FMW RRI NC, LLC; Red Roof Franchising, LLC; RRI

18   West Management, LLC; Westmont Hospitality Group,

19   Inc.; and RRI III, LLC:

20           LILLIAN K. HENRY, ESQUIRE

21           PEYTON PATTERSON, ESQUIRE

22           Lewis Brisbois Bisgaard & Smith LLP

23           600 Peachtree Street, Suite 4700

24           Atlanta, Georgia  30308

25           404.348.8585

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                        Page 3

1    APPEARANCES (Continued):

2    Also Present:

3              Beth Richardson (via Zoom)

4

5

6

7

8              (Pursuant to Article 10(B) of the Rules

9    and Regulations of the Georgia Board of Court

10   Reporting, a written disclosure statement was

11   submitted by the court reporter to all counsel

12   present at the proceeding.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:21-cv-04278-WMR  Document 174-24  Filed 03/02/23  Page 4 of 35
CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 39

1    knowledge of this witness, it means that you don't

2    have personal knowledge of other employees?

3        A    No.  I have knowledge of -- okay.  As I

4    said again, I've interacted with employees at the

5    Red Roof Inn, but I wouldn't know them by name.

6        Q    Okay.  What employees did you interact

7    with at the Red Roof -- and sorry.  When we say

8    "Red Roof Inn," are you talking about Red Roof Inn

9    Smyrna?

10       A    Yes.

11       Q    Okay.

12       A    Specifically, Red Roof Inn Smyrna.

13       Q    All right.  Which is located at 2200

14   Corporate Plaza Southeast, Smyrna, Georgia 30080,

15   right?

16            Okay.  So from here on out, when I say Red

17   Roof Inn Smyrna or RRI Smyrna, we know we're

18   talking about that location?

19       A    Yes.

20       Q    Okay.  Thanks.

21            And so what employees did you interact

22   with at Red Roof Smyrna?

23       A    I interacted with front desk staff.  I

24   interacted with housekeepers.

25       Q    Do you remember any of their names?

Page 40

```
 1       A    No.

 2       Q    What were these interactions like?

 3       A    Interactions to ask for extra things like

 4  towels or sheets.  Sometimes there's issues with,

 5  like, internet connection, I would go talk to the

 6  front desk person.

 7       Q    So did you use the internet a lot there?

 8       A    I don't know what we would define as a

 9  lot, but yeah, it was used there.

10       Q    Was it -- on which devices were you using

11  the internet for?

12       A    Mostly, like, a computer, laptop.

13       Q    Was it your own personal laptop?

14       A    No.

15       Q    Whose was it?

16       A    ████████.

17       Q    All right.  We'll discuss more about that

18  later after we get through this list.

19            We'll go to the next person, ████████

20  ████████.  How do you know this person?

21       A    As it says at the bottom, I don't have

22  personal knowledge of the witness.

23       Q    I guess I'm trying to figure out how you

24  knew to list her here if you don't have personal

25  knowledge of her.
```

Case 1:21-cv-04278-WMR   Document 174-24   Filed 03/02/23   Page 6 of 35
CONF A.F.                                          August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 167

1      Q    All right.  So now I want to focus on the

2    years of 2010 and 2011.  Actually, we're going to

3    flip to Exhibit 2, which is the original responses.

4           (Exhibit FA-4 marked.)

5    BY MS. HENRY:

6      Q    I'm handing you what was marked as

7    Exhibit 4.  Have you seen this before?

8      A    Yeah.

9      Q    And that's your signature on the last page

10   verifying that your responses to these

11   interrogatories are true and correct, correct?

12     A    Yes.

13     Q    And that you reviewed them?

14     A    Yes.

15     Q    Okay.  So can you turn to your response to

16   interrogatory 12 which starts on page 18.  All

17   right.  Can you tell me how it all started?  How

18   did you meet ███████████████, and how did you go

19   from hanging out with him to being allegedly

20   trafficked?

21     A    I met ████████ when I was around 15 at a

22   mall.  I think I told you about this earlier.  He

23   was with friends.  We ended up hanging out that

24   same day, and shortly after, started dating.

25           We broke up shortly after that and didn't

Case 1:21-cv-04278-WMR   Document 174-24   Filed 03/02/23   Page 7 of 35
CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 168

1   talk for a while.  And then we became reacquainted

2   my senior year of high school.

3        Q    And how did your relationship evolve into

4   you engaging in commercial sex?

5        A    When we reacquainted when I was in high

6   school, █████████ indicated that he had some modeling

7   jobs that could help me, you know, fund my college

8   and living or whatever while I was in school.

9        Q    And he said it was modeling and nothing

10  else?

11       A    Yeah.  The first time he presented it to

12  me was as modeling only jobs.  I can't say as time

13  progressed that he didn't flip that script, but

14  when we initially talked about it, he told me it

15  was for modeling.

16       Q    So how many times did you talk about it

17  before you actually started working in the

18  industry?

19       A    I can't really recall counting, but I'm

20  sure we talked about it at least a handful of

21  times.

22       Q    Okay.  And so each time was it only

23  modeling or did he ever eventually say -- or what

24  type of modeling did he say you would be doing?

25       A    Modeling, taking, I guess you could say,

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                    Page 169

1    risque photos and pictures, webcam modeling, things

2    of that nature.

3          Q    Okay.  You said that you discussed this a

4    handful of times before you actually started

5    participating.  As a sex worker, did -- before the

6    first time that you ever were with a john or with a

7    client or whatever you want to call it, did you and

8    ██████ ever have a conversation that you would be

9    engaging in sexual activity with other people in

10   exchange for money?

11         A    He told me that it was something that I

12   could offer, but he told me if I didn't want to,

13   then I didn't have to.

14         Q    Okay.  And so you said you first met him

15   when you were 15, right, at a mall?

16         A    Yes.

17         Q    Okay.  Can you tell me about that?  Like,

18   did you leave the mall together?  And tell me about

19   that day exactly what you -- what you did.

20         A    Yes, we did leave the mall together.  We

21   went to 315 Mill Ridge Court.  Hung out for a few

22   hours.  Smoked some weed that he provided.  And

23   then I went back home.

24         Q    Was anyone else there?

25         A    Yes, some of his friends.

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 174

1     Q    But you eventually got back together?

2     A    We did -- right.  We did respark the

3  romance.

4     Q    Okay.  Did you think that you were in love

5  with him?

6     A    When I ran back into him at the mall?

7     Q    No.  I guess over the course of your

8  relationship, were you in love with ████████████?

9     A    Yeah, at the time, I definitely felt like

10  I was in love.  I can look back on it now and can

11  clearly know that that wasn't a real loving

12  relationship.  But at the time, yeah, I definitely

13  felt like I was in love.

14     Q    Okay.  Did you -- and he proposed to you

15  that you would be modeling some, I guess, nude

16  modeling or cam girling, right?

17     A    Yes.

18     Q    Okay.  And then he said that if you wanted

19  to, you could also have sex for money, right?

20     A    I wouldn't put it like that, but yes, he

21  did tell me I could do extra services such as see

22  people in person, escort, maybe do nude dancing,

23  get paid to go on dates, et cetera, yes.

24          But he told me I wouldn't have to if I

25  didn't want to.

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 180

1    commercial sex and voluntarily giving their money

2    to someone else and then someone who is engaging in

3    commercial sex and being forced to give their money

4    to someone else?  There's a difference between

5    those two, right?

6       A    I mean, yes, the sentences you just said

7    are different, yeah.  They have different words, so

8    they're different, but --

9       Q    Well --

10      A    -- they're very heavily related.

11      Q    But one is voluntary and one is

12   unvoluntary; is that fair?

13      A    That's what you said in your definitions,

14   yes.  So that's what you just said.  You said one

15   is voluntary and one is not.  That's what you just

16   said, and yes, I agree it's what you said.

17      Q    Okay.

18           MS. HENRY:  I'm going to object to the

19   responsiveness of the answer, but I'll move on.

20   BY MS. HENRY:

21      Q    So during 2010 to -- during your time with

22   ███████, and we know it's spring of 2010, right,

23   that's when you started?

24      A    Yeah.

25      Q    And it ended sometime in fall or winter of

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 181

1    2011, right?

2         A     Yeah.

3         Q     All right.  Did you ever voluntarily

4    prostitute yourself during that time frame?

5         A     I did work independently on a few

6    occasions when I was able to leave ███████ for some

7    days, yes, I did.

8         Q     How many?

9         A     Like how many times?

10        Q     Uh-huh.

11        A     Probably less than 20.

12        Q     And this was when you were with ███████?

13        A     I was able to -- well, I tried to leave

14   ███████ after our trip to Barbados and did engage

15   in some independent work.  But ultimately, he

16   sucked me back in with his manipulation, and I went

17   back to him.

18        Q     So you mentioned after -- the first

19   time you left him was after Barbados?

20        A     I tried to leave on occasions prior to

21   that, but it was met with physical and emotional

22   violence.

23        Q     Okay.  Tell me about the first time you

24   tried to leave.

25        A     The first time that I can remember that I

Page 182

1    tried to leave and I guess was met with violence

2    was when I was staying at my apartment on Windy

3    Hill with ██████.

4        Q    I'm sorry.  Which Windy Hill address?

5    There was --

6        A    Only my apartment, so 2121 Windy Hill.

7        Q    Okay.

8        A    And I tried to leave and I was in, like,

9    the front area of the apartment complex.  And he

10   was sending me threatening text messages, asking

11   where I was.  And he ultimately got me to go back

12   to the apartment with him.

13       Q    And this was how long after you began

14   working with him?

15       A    I'm not sure, but probably no more than

16   three months.

17       Q    All right.  So sometime in the summer of

18   2010?

19       A    Late summer, yes.

20       Q    And why were you trying to leave at that

21   point?

22       A    Just wasn't -- it wasn't what he told me

23   that it was going to be.  He told me, A, that I was

24   doing this or is going to be able to do it so I

25   could help put myself through college.  He

Page 183

1    ultimately ended up not letting me even enroll into

2    the university of -- or excuse me, into Georgia

3    State.  I never got to enroll.

4            I wasn't being able to keep the money.  I

5    mean, he told me that I was going to have a job,

6    and I would be expecting to get paid, and that

7    wasn't the case.

8            He was also being really mentally and

9    physically abusive.  And it seemed like I could try

10   to get out at this time, but I wasn't able to.

11      Q    All right.  So you were trying to leave,

12   you were in the parking lot, and he texted you

13   threatening messages, and so you came back?

14      A    Yes.  He was also driving around in the

15   area, and yes, he drove past me, and I got back in

16   the car.

17      Q    Okay.  During your time with ████, were

18   you ever in control of choosing who and when to

19   have sex with for money?

20      A    No.  He told me that, you know, I wouldn't

21   have to do those sexual things if I didn't want to.

22   And when I indicated that I didn't want to, he just

23   completely -- just snapped.

24      Q    So was he always there when you were with

25   a customer?

Page 187

```
1   else?  He didn't threaten you if you didn't leave
2   your parents' house?
3        A    No.  At this time, he wasn't being
4   threatening.  He was actually being, you know,
5   pretty nice.  It's crazy how much he changed after
6   he got me out of my parents' house and with all my
7   possessions, it's crazy how much he changed.  But
8   no, he was nice.  While he was getting me to move
9   out of my parents' house, he was really nice.
10       Q    After you left with ████    in spring of
11  2010, did you ever see your parents again in 2010
12  or 2011?
13       A    Yes.
14       Q    When?
15       A    I saw them on a few occasions.  I think I
16  went back to the house to get some more items.  I
17  also saw them -- I saw them at a Thanksgiving as
18  well as when I got out of jail for the first time.
19       Q    So I think you listed three times:  You
20  went back to get a few items, Thanksgiving, and
21  then did you say your dad bailed you out of jail?
22       A    Yes.
23       Q    Or your mom and your dad.  And those were
24  three separate times?
25       A    Yes.
```

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 188

1      Q    The first time, when you went back to get

2   a few items, when was that?

3      A    I don't recall.  Sometime in 2010.

4      Q    Do you know how long you had been with

5   ████████  at that point?

6      A    Not that long.  Maybe a month.

7      Q    All right.  And did you go back to your

8   parents' house by yourself?

9      A    No.  Just keep in mind during this time

10  that I didn't have a driver's license nor a car.

11  So if I got somewhere, that ████████ drove me.

12     Q    Okay.  Did ██████ go inside of your

13  parents' house with you when you were collecting

14  these items?

15     A    No.  He just waited in his car outside.

16     Q    Were your parents there?

17     A    I don't recall.

18     Q    Was it -- do you know if anyone was there?

19     A    I'm sure someone was there because they

20  let me in.  I don't know if it was my mom or my

21  dad.

22     Q    And you didn't tell anyone that you were

23  being trafficked and that they needed to help you?

24     A    No.  Again, ██████ was in the car.  He

25  does have guns, multiple guns.  And that's

Case 1:21-cv-04278-WMR  Document 174-24  Filed 03/02/23  Page 16 of 35
CONF A.F.                                          August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 189

1  something he specifically forbade me, like don't

2  tell your parents, don't tell teachers, don't tell

3  police if you get arrested.

4        So no, he was right outside my parents'

5  house with weapons, so no, I didn't go try to tell

6  them.

7     Q    At that point, did you want to leave him?

8     A    At this point, I definitely think that I

9  had realized that, you know, maybe I had made a

10  mistake leaving -- leaving my parents' house.

11    Q    So you did want to leave him at this point

12  or you were still thinking about it?

13    A    Yes, you could say I was thinking about

14  it, yeah.

15    Q    So at this point, were you -- at this

16  point, you were still choosing to stay with him?

17    A    Yeah, you could say that.

18    Q    All right.  And the next time, at

19  Thanksgiving, was this in 2010?

20    A    I think it might have been in 2011.

21    Q    Okay.

22    A    Yeah, it would have -- it would have had

23  to be in 2011.

24    Q    So you think you were still with ██████

25  at least through Thanksgiving of 2011?

Page 190

1      A    Let's see.  Well, no, I graduate in 2010,

2   in May, that wraps up the year.  Yeah.

3      Q    Okay.  So at Thanksgiving 2011, you're

4   still with ███████ and you go to your family's

5   Thanksgiving?

6      A    Yeah.

7      Q    All right.  And is ███████ there?

8      A    No.

9      Q    No.  Is this at your house at 185

10  Brightmore?

11     A    Yes.

12     Q    All right.  Who all was there?

13     A    It's hard to say definitively, but my mom

14  and dad were definitely there, my brother, possibly

15  my sisters, nieces and nephews.

16     Q    So --

17     A    A pretty big family gathering.

18     Q    All right.  Did you tell anyone there that

19  you were being trafficked?

20     A    No.

21     Q    All right.  Why not?

22     A    The same situation, mentally being

23  controlled, being told not to tell anybody.  Also

24  fearing physical retaliation, ███████ told me, you

25  know, if I tried to leave him or get in trouble,

Case 1:21-cv-04278-WMR  Document 174-24  Filed 03/02/23  Page 18 of 35
CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 191

1   that he would try to hurt me or my family.  He did

2   know where my family stays.  So no, I didn't tell

3   them.

4       Q    So besides the threats, what mental

5   control did he have over you?

6       A    I think verbal threats are pretty

7   significant.  He also did things to wear down my

8   self-esteem.  He did give me, like, a branding

9   tattoo to show that he owned me of an eye.  Told me

10  he could always see what I was doing, see what I

11  was saying, see -- know what I was telling other

12  people.

13          And it sounds kind of stupid now, but he

14  was pretty convincing with making it seem like

15  these things were true and would definitely happen.

16      Q    When you say "branding tattoo," so is it

17  an ink tattoo?

18      A    Yeah, a regular tattoo with a needle.

19      Q    And what is it of?

20      A    I got a coverup, but it was of an eye.

21      Q    Okay.  What is it covered up with?

22      A    Africa, the continent of Africa.

23      Q    Okay.  So you can't see it at all anymore?

24      A    No.

25      Q    Okay.  All right.  Why did you choose to

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 199

1      A    Yeah.

2      Q    Just from 2010 to 2011?

3      A    Yes.

4      Q    And those were all with ███████?

5      A    Yeah.  I mean, some of those hotels, you

6   know, we might have only stayed at once, but others

7   we did stay at more often.

8      Q    And did you say that you stayed at the

9   InTown Suites in Buckhead the most?

10     A    No, I wouldn't say that.  I just said

11  that's where we started.

12     Q    Okay.  Is there one you frequented --

13  sorry.  I can't speak today.  Is there one you went

14  to the most compared to any of the others?

15     A    We did, of course, go to Red Roof a lot.

16  It was one of the ones with weekly rates.  Other

17  than that, we really -- it was just really at

18  random.

19     Q    Okay.  Were you working every day when you

20  were with ███████?  And by working, I mean,

21  engaging in commercial sex.

22     A    I can't say literally every day, but yeah,

23  I worked -- I worked almost every day, multiple --

24  at least five or six -- five, six days a week.

25     Q    And how many clients would you see each

Page 200

1    day that you worked?

2         A    Usually at least three a day.  It usually

3    wouldn't get to be more than 10 a day.  The

4    average, probably four or five.

5         Q    So on average, you were working five to

6    six days a week, and each day you would see at

7    least three, no more than ten, clients a day?

8         A    Yeah.

9         Q    But normally the average --

10        A    About five.

11        Q    -- clients, four to five?

12             All right.  Did you go to any hotels with

13    ████████  outside of Georgia?

14        A    Yes, but I can't recall the name.  We did

15    go to a hotel in South Carolina.

16        Q    Just one hotel?

17        A    Yes.

18        Q    All right.  Any other states?

19        A    One in D.C.  I also don't recall the name.

20        Q    Just one hotel?

21        A    Yes.

22        Q    So for the hotel in South Carolina, how

23    long did you stay at the hotel?

24        A    Less than a week.

25        Q    How many clients did you see?

Case 1:21-cv-04278-WMR  Document 174-24  Filed 03/02/23  Page 21 of 35
CONF A.F.                                     August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 214

1   know, normal boyfriend-type stuff.

2          But, I mean, it didn't take long for him

3   to, like, just flip the script, start making me

4   do -- start wanting me to work more and start

5   imposing quotas and getting angry, you know, if I

6   didn't make enough money for him.

7          So for a majority of the time that I was

8   forced to work for him, we really didn't do -- have

9   much downtime.

10     Q    What was your quota?

11     A    They really just changed based on his

12  moods.  Like if he, for whatever reason, thought

13  that it was a good time to make a lot of money,

14  like, I don't know if a lot of people were calling

15  your phone or he saw a lot of traffic where you're

16  at, then he might be expecting you to just make

17  thousands and thousands of dollars.

18         Other days, if he was in a better mood,

19  then he might not want you to make as much money.

20  At, like, hotels like the Red Roof that were, like,

21  really busy with action and prostitution, the

22  quotas would be higher.

23     Q    How much money do you think you made for

24  ██████  while you were with him total?

25     A    I don't know.  I'd have to think about

CONF A.F.                                        August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 215

1    that for a second.

2         Q    We can take a second.  You can give me a

3    minimum/maximum if you can come up with that.

4              On the next break, if you could just take

5    a second and maybe come up with -- if you've got to

6    think about how much, we can figure it out later,

7    but we'll move on.

8              Did you ever get to keep any of the money?

9         A    No.

10        Q    Not once ever?

11        A    The only times I kept any money was when I

12   got back from Barbados and tried to leave him for

13   those few weeks.  Other than that, no, I never got

14   to keep any of the money.

15        Q    So only time was when you were back from

16   Barbados by yourself doing independent work?

17        A    Yeah, for two or three weeks while I tried

18   to leave him for good but was unsuccessful.

19        Q    The money that you made, was it ever used

20   to pay for things for you?

21        A    Yes, ███████ bought me food before.

22        Q    Anything else?

23        A    Nails so I'd look good for my clients.

24   Clothes so I could wear on dates.  That's really

25   the extent to it.  Things needed to look good for

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                    Page 221

1   police officer in my face who forced me to do

2   sexual services.  So I could have possibly been a

3   little mistrusting of the police having just been

4   raped by somebody coming to me under the guise of

5   being a police officer.

6            I mean, ███████ had also been coaching me,

7   telling me if the police come, then -- if the

8   police come for any reason, then you can't tell

9   them what's going on.  If you tell them what's

10  going on, then, you know, me and you are going to

11  have problems.  I could hurt you.  I could hurt

12  your family.

13           I'm sure if I told -- gave the police any

14  inkling of what was going on, that after they left,

15  that I probably would have gotten severely beat.

16  So no, that didn't seem advisable.

17       Q    The man who raped you, so you don't think

18  he was actually a police officer, you think he was

19  pretending to be a police officer?

20       A    I really don't know.  But I do know he

21  presented a genuine-looking police badge.

22       Q    Okay.  So that's a pretty traumatizing

23  event, right?

24       A    Yeah.

25       Q    And you think this was at the La Quinta?

Page 226

1    least since April?

2         A    Or May, yeah, of 2010.

3         Q    Was this the first time you had been

4    arrested?

5         A    We're talking about this rape incident,

6    right?

7         Q    Oh, I'm sorry.  Was this the first time

8    you called the police?

9         A    I'm not sure.

10         Q    Okay.  All right.  So this was one

11    instance where you called the police.  Can you

12    recall any others during 2010 or 2011?

13         A    No, not off the top of my head.

14         Q    Okay.  And so we've established that your

15    alleged trafficking with ██████ ended sometime in

16    2011, most likely after Thanksgiving?

17         A    Yes.

18         Q    And I know you have mentioned a few times

19    that you called a hotline, they connected you to

20    support services, and that's what helped you leave

21    ██████ right?

22         A    Yes.

23         Q    Can you just walk me through in a little

24    bit more detail exactly how that happened, why you

25    decided to call the hotline, you know, what brought

CONF A.F.                                           August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 231

1    to leave but were ultimately unsuccessful because

2    he, I think you said, he sucked you back in.  What

3    made this time different?

4         A    I guess having a place to really get away

5    and unplug from him.  You know, I didn't have

6    access to my computer or phone for such a long

7    time, he didn't have a way to reach out to me.

8    And, yeah, it was definitely, definitely helpful in

9    leaving and being able to stay away.

10        Q    So what prevented you from being able to

11   stay away from him if you had just gone back to

12   your parents' house?

13        A    I don't think we can just invite myself

14   back to my parents' house and say that they'll

15   welcome me because I don't think that would have

16   been the case.

17             I was also kind of scared to go back to my

18   parents' house.  Again, ██████ carries guns.  He

19   threatens me.  He knows where my parents live.  So

20   I could go back there, and it would be a great

21   place for him to come find me.  He would definitely

22   know where I was.  Whereas, at the safe house, he

23   didn't have the location and he couldn't contact

24   me.

25        Q    Did you ever see ██████ get physical with

Case 1:21-cv-04278-WMR   Document 174-24   Filed 03/02/23   Page 26 of 35
CONF A.F.                                           August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 232

1    anyone else?

2         A    Yes.

3         Q    Who?

4         A    Let's see.  He was violent with ████████

5    who's listed in the thing.  Other than that, I'm

6    not sure that I really did witness other violence,

7    really just heard about it and heard threats of it.

8    But I did see him physically assault ████████.

9         Q    But never any -- you never saw him

10   physically assault anyone besides her?

11        A    The girl who stayed at InTown Suites,

12   ████████  he also assaulted her.

13        Q    Who?  I'm sorry.

14        A    ████████████████

15        Q    Who is that?

16        A    Someone who was at InTown Suites.

17        Q    I don't think we went over her.  How do

18   you know her?

19        A    She was around when we -- when I first

20   started hanging out with ████████  while he was

21   introducing the modeling to me, but I hadn't done

22   any jobs yet.

23        Q    Was she a prostitute?

24        A    No.

25        Q    She was just hanging out?  Like what was

Case 1:21-cv-04278-WMR   Document 174-24   Filed 03/02/23   Page 27 of 35
CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 236

1      A    No, that can't be right.  I need a

2   calculator.

3      Q    Would you like a calculator?

4      A    Yeah.  Thanks.

5      Q    You're welcome.

6      A    I'd estimate about 120,000.

7      Q    $120,000?

8      A    Yeah.

9      Q    All right.  And what did you -- what did

10  you write down on the paper?

11     A    Math that I can't do, but my

12  justification --

13     Q    I'm with you.

14     A    My justification for doing this math was

15  thinking I made about $500 a day, at least five

16  days a week, for about 12 months.

17     Q    All right.  Okay.  So estimate $120,000 a

18  year, I mean, total while you were with ████████.

19          Okay.  Now I think we're still on your

20  supplementary -- or your original response to

21  interrogatory number 12 where you kind of give your

22  timeline of being with ████████ and being at Red

23  Roof Inn Smyrna.  And you state on page 19 that

24  ████████ trafficked you at Smyrna Red Roof Inn for

25  several months starting in November 2010.  So was

Case 1:21-cv-04278-WMR  Document 174-24  Filed 03/02/23  Page 28 of 35
CONF A.F.                                              August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 237

1   the first time you were ever at Red Roof Inn

2   Smyrna, was that November 2010?

3           It's second to last paragraph, first

4   sentence.

5       A    Yeah.

6       Q    Okay.  It goes on to say that you were

7   trafficked at this hotel about five times.  So in

8   2010, since you were there first time November, in

9   those two months of 2010, how many stays were you

10  there?  How many -- how many stays did you have at

11  Red Roof Smyrna?

12      A    So between 2010 and 2012, after November,

13  how many times did I stay at Red Roof?

14      Q    No.  I just mean in 2010, just November

15  and December, like before 2011, just in 2010, how

16  many of those five stays took place?

17      A    I'm not positive, but probably one.

18      Q    One, okay.  And do you know how long?

19      A    No, I don't know specifically.  But when

20  we stayed there, it was usually for a couple of

21  days to a week.

22      Q    Okay.  Do you have any memory of your

23  first time at Red Roof Smyrna?

24      A    I mean, I remember going to a new style of

25  hotel and remembering what it looked like.  I'm not

Case 1:21-cv-04278-WMR   Document 174-24   Filed 03/02/23   Page 29 of 35
CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 242

1      A     Yes.

2      Q     Was that the number posted on online

3  advertisements?

4      A     Yes.

5      Q     All right.  And can you walk me through

6  how the process worked of, you know, getting a john

7  to the Red Roof?

8      A     Sure.  ▮▮▮▮▮▮▮ would post an ad for me on

9  usually Backpage.  Meantime, we'd wait for people

10 to call the ad.  He'd also have me walk around the

11 area of the Red Roof and the street the Red Roof

12 was located on, Corporate Plaza, he'd have me walk

13 that area looking for johns while waiting for phone

14 calls.

15          If I found a john, like, on the street,

16 I'd usually get in his car and we'd drive back to

17 my room.  I'd call ▮▮▮▮▮▮ so he could get out of

18 the room because he'd usually hang out -- hang out

19 in the room while I was out walking around looking

20 for clients.  And he would leave, and we'd go in

21 the room, or if somebody called me, then I'd have

22 ▮▮▮▮▮▮ leave.  And the client would come up to the

23 room while ▮▮▮▮▮▮ was nearby to kind of survey

24 things.

25     Q     Did you ever post any of the online ads

Page 246

1      A     Yeah.

2      Q     When you were at Red Roof Smyrna, did you

3   ever call housekeeping?

4      A     I mean, from my memory, they just came

5   around voluntarily.  I would ask the housekeeping

6   ladies for stuff if I saw them around.  But it's

7   not like you had to call -- like with COVID now,

8   you have to call and ask them to come clean your

9   room for you.  It's just something they

10  automatically do on a schedule.

11     Q     And what did you ask them for?

12     A     Sometimes towels, sheets.  We go through

13  sheets a lot, just ask for extra sheets.  It's

14  usually what I would ask them for.

15     Q     Did you speak to any other employees

16  besides housekeeping?

17     A     I did speak to people at the front desk

18  sometimes usually to ask about internet-related

19  issues.

20           I also may go down there to put, like,

21  cash on the room.  Like if we originally were just

22  going to stay for one night, then I could go down

23  there and add more money.

24           Occasionally, go out there if your key got

25  messed up, they'll get messed up if they touch a

CONF A.F.                                                 August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 247

1    cellphone, it will stop working and letting you in

2    the room.

3              These are reasons I would go down there.

4         Q    And you never told any of those employees

5    that you were being held against your will?

6         A    No.

7         Q    Do you think that they should have known

8    that you were being allegedly trafficked?

9         A    Yeah, I think they should have known.

10        Q    How would they have known?

11        A    Of course, ██████████ came and rented the

12   room for me because I wasn't old enough.  We always

13   asked about things like the internet working, but,

14   you know, weren't really dressed like in business

15   attire, like we were business people, so I think

16   that might raise alarm.

17             He did have me walking around in the area

18   with, like, clothes so I could catch dates.  So

19   I'd, like, wear high heels, really short shorts,

20   crop tops, try to walk around and find dates on the

21   hotel premises.

22             And when I tried to do things like that at

23   other hotels, typically, they would call the police

24   for loitering or ask you to leave or tell you to

25   go, to go hang out in your room.  And at this

CONF A.F.                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

                                                        Page 248

1    hotel, it just seemed like it was fine.  I feel

2    like -- I kind of feel like they knew; like, they

3    just didn't care.

4        Q    Why is a guest asking for internet -- why

5    would that cause alarm?  Isn't that a pretty

6    typical request?

7        A    It is.  But I feel like any normal person,

8    like -- I don't know.  I can't speak prior to when

9    I met ████████  I didn't stay in that many hotels.

10   But I would imagine most, like, if you went to a

11   hotel, you would just expect the internet to work.

12   You wouldn't have to ask if it was going to work.

13   And then you wouldn't -- you wouldn't, like, freak

14   out when it wasn't working because, I don't know,

15   you couldn't post an ad.  I just feel like we're

16   kind of in there about the internet acting -- just

17   acting odd and suspicious.

18       Q    Okay.

19       A    But I wouldn't say that's the biggest

20   reason they should have known.  I mean, they should

21   have known because we were out walking around,

22   walking up to cars, getting dates, having multiple

23   guests go in and out of the room.  I think those

24   things seem like real obvious.

25       Q    The entrances to each individual room at

Page 249

1    the Red Roof Smyrna, they're outside, right?

2         A     Yes.

3         Q     Like you don't have to walk in -- you

4    don't have to walk by the front desk to get to the

5    room?

6         A     No.

7         Q     So how would they know that multiple

8    guests are going in and out of the room?

9         A     It's a pretty rough area.  I would hope

10   that they would have cameras to protect their

11   guests.  Maybe they didn't, but if they had

12   cameras, I would assume they would have security

13   and someone watching the cameras.

14        But there was -- I mean, if someone was

15   watching, then it seems like they didn't care.  Or,

16   I mean, maybe they allowed it to happen because, of

17   course, we would go and we would rent the rooms and

18   we would bring money to the rooms.  Seemed like,

19   like, almost everyone that stayed there was always

20   loitering or walking around trying to find a date

21   or was a guy with a bunch of girls.

22        I guess they took our money because nobody

23   else would want to stay there.  Like it wasn't a

24   place to bring your family.  So if we weren't going

25   to pay to rent the room, then who was going to pay

CONF A.F.                                      August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 256

1      Q    Did you do it this morning?

2      A    No.

3      Q    When was the last time you did coke?

4      A    Before I went to the New Beginnings.

5      Q    Okay.  So how often would you do coke with

6    █████████?

7      A    It was more frequent towards, I guess, the

8    middle and end of our time being together.  It

9    could be daily then, but it didn't -- it didn't

10   start like that.

11     Q    And how often did you take X?

12     A    No more than three times.

13     Q    Okay.  Did y'all ever go out to, like,

14   clubs or do any, like, fun activities when you

15   weren't working?

16     A    Not really.  He snuck me into a club one

17   time, but you have to remember, I was under 21 and

18   he didn't have any type of fake ID for me, so...

19     Q    So just one time or --

20     A    One time we went to a club, yes.

21     Q    Did you -- I think you mentioned earlier

22   that I know he would pay to get your nails done,

23   right?

24     A    Yes, for work, so I'd look good for the

25   clients.

CONF A.F.                                                    August 31, 2022
W.K., et al v. Red Roof Inns, Inc., et al

Page 341

1                          CERTIFICATE
2      STATE OF GEORGIA:
       COUNTY OF FULTON:
3
4             I hereby certify that the foregoing
       transcript was taken down, as stated in the
5      caption, and the colloquies, questions and answers
       were reduced to typewriting under my direction;
6      that the transcript is a true and correct record of
       the evidence given upon said proceeding.
7
8             I further certify that I am not a relative
       or employee or attorney of any party, nor am I
9      financially interested in the outcome of this
       action.
10
11            I have no relationship of interest in this
       matter which would disqualify me from maintaining
12     my obligation of impartiality in compliance with
       the Code of Professional Ethics.
13
14            I have no direct contract with any party
       in this action and my compensation is based solely
15     on the terms of my subcontractor agreement.
16
17            Nothing in the arrangements made for this
       proceeding impacts my absolute commitment to serve
18     all parties as an impartial officer of the court.
19
20            This the 12th day of September, 2022.
21
22            _Carolyn M. Carboni_
23     _____
24     CAROLYN M. CARBONI, RPR, RMR, CCR-B-878
25