PL Sum. J.

Ex. __036__



Transcript of **Marina MacDonald**

Tuesday, June 14, 2022

*W.K. v. Red Roof Inns, Inc*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 117470

1            IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3                       - - -
   W.K., et al.,                 :
4            PLAINTIFFS,         :
                                 : Civil Action
5        vs.                     : File No.
                                 : 1:20-cv-05263-VMC
6   RED ROOF INNS, INC.;         :
   et al,                        :
7            DEFENDANTS.         :

8                       - - -
   JANE DOE 1, et al.,           :
9            PLAINTIFFS,         :
                                 : Civil Action
10       vs.                     : File No.
                                 : 1:21-cv-04278-WMR
11  WESTMONT HOSPITALITY         :
   GROUP, et al.,                :
12           DEFENDANTS.         :

13                      - - -
   J.A.,                         :
14           PLAINTIFF,          :
                                 :
15       vs.                     : Civil Action
                                 : File No.
16  RED ROOF INNS, INC.,         : 1L21-cv-03655-TWT
   et al.,                       :
17           DEFENDANTS.         :
                        - - -
18

19                   Deposition of

20                 MARINA MacDONALD

21           Taken at the office of
             Bailey Cavalieri, LLC
             10 West Broad Street
22        20th Floor Conference Room
             Columbus, Ohio  43215
23

          on June 14, 2022 at 8:54 a.m.
24

25      Reported by:  Jennifer L. Parish, RPR

```
1      APPEARANCES:

2      AMANDA KAY SEALS, ESQUIRE
       TIANA S. MYKKELTVEDT, ESQUIRE
3      BONDURANT MIXSON & ELMORE, LLP
       1201 West Peachtree Street NW
4      Suite 3900
       Atlanta, Georgia  30309
5      seals@bmelaw.com
       mykkeltvedt@bmelaw.com
6
           and
7
       PATRICK J. McDONOUGH, ESQUIRE (via Zoom)
8      ANDERSEN, TATE & CARR, PC
       1960 Sugarloaf Centre
9      Suite 4000
       Duluth, Georgia  30097
10     pmcdonough@atclawfirm.com

11         on behalf of Plaintiffs.

12
       ADI ALLUSHI, ESQUIRE
13     CHRISTIAN NOVAY, ESQUIRE
       LEWIS BRISBOIS BISGAARD & SMITH, LLP
14     600 Peachtree Street NE
       Suite 4700
15     Atlanta, Georgia  30308
       adi.allushi@lewisbrisbois.com
16     christian.novay@lewisbrisbois.com

17         on behalf of Defendants Red Roof Inns,
           Inc.; FMW RRI NC, LLC; Red Roof
18         Franchising, LLC; RRI West Management,
           LLC; Westmont Hospitality Group, Inc.; and
19         RRI III, LLC.

20
       DENISE D. HOYING, ESQUIRE
21     LAW & MORAN
       563 Spring Street NW
22     Atlanta, Georgia  30308
       denise@lawmoran.com
23
           on behalf of Plaintiff J.A.
24

25
```

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    APPEARANCES (cont'd.):

2    C. SHANE KEITH, ESQUIRE
     HAWKINS PARNELL & YOUNG, LLP
3    303 Peachtree Street NE
     Suite 4000
4    Atlanta, Georgia  30308
     skeith@hpylaw.com
5
          on behalf of Defendant Varahi Hotel, LLC.
6

7

8    ALSO PRESENT:

9         Bruce Sandy, Videographer

10        Nick Kolitsos, Red Roof Inn

11        Beth Richardson, Paralegal (via Zoom)

12

13                      – – –

14

15

16

17

18

19

20

21

22

23

24

25

1           This email refers to, quote,

2   corporate managed locations.  If we talk about

3   corporate managed locations or corporately

4   managed locations, what does that mean to you?

5           A.  Well, I was not involved -- I was

6   -- I worked for Red Roof Franchising, so I

7   worked for the entire brand.  And corporate

8   managed were a small group of hotels that had

9   an operations team that managed them.

10          Q.  Okay.  An operations team.  Well,

11  let me say this:

12          You say that that's a -- there's a

13  small group of hotels as opposed to what else

14  is sort of out there?  How are you

15  distinguishing between corporate managed and

16  what else?

17          A.  Independent franchisee.

18          Q.  Independent franchisee.  Okay.

19          So if -- if we're talking about

20  over the course of today corporately managed

21  locations versus independent franchisee

22  locations, when we're talking about

23  independent franchisee locations, we're

24  talking about locations that have what might

25  be called a third-party franchisee.

1          A.   Yes.

2          Q.   And, again, I'm not looking for

3   mechanical precision around this.  I'm just

4   trying to have a ballpark of what the -- what

5   the management structure looked like.

6               You said the number 20 earlier.

7   Is that the number today?  Where did the 20

8   number come from?

9          A.   At one point we had 20.

10         Q.   Okay.  Was that point between the

11  2010 and 2018?

12         A.   No.

13         Q.   Okay.  So by 2018 you think that

14  the max it would have been would be somewhere

15  north of 8 but less than 20?

16         A.   Yes.

17         Q.   Okay.  How big was your budget?

18              MR. ALLUSHI:  Objection.

19         Q.   Again, I'm talking about --

20         A.   What time frame?

21         Q.   Okay.  So around 2010 about how

22  big was it?

23         A.   Oh, I cannot remember.

24         Q.   How big was it in 2018, roughly?

25         A.   Roughly 10 to 13 million.

1          Q.   Okay.   Do you think it would have

2    been seven figures in 2010?

3          A.   No.

4          Q.   So less than a million in 2010?

5          A.   It was --

6               MR. ALLUSHI:   Objection.

7          A.   I cannot remember.

8          Q.   Okay.   What about 2012?

9          A.   I -- I cannot remember.

10         Q.   Okay.   So you mentioned that you

11   were -- you worked for -- I think if I heard

12   you correctly, you worked for Red Roof

13   Franchising; is that correct?

14         A.   I work for -- I work for Red Roof

15   Franchising.

16         Q.   You work for the Red Roof

17   Franchising today.   Is that --

18         A.   Always have.

19         Q.   Always have.   So for the entire

20   time frame that you have worked for the Red

21   Roof brand, you have worked for Red Roof

22   Franchising?

23         A.   Red Roof Franchising, LLC.

24         Q.   And so when I say "Red Roof

25   Franchising," we'll know that we're talking

1          Q.  And that brand includes properties

2     that were operated by third-party franchisees.

3     Correct?

4               MR. ALLUSHI:  Objection.

5          A.  Yes.

6          Q.  Okay.  And that brand includes

7     locations, a small fraction of locations, as

8     you said, that were operated or that were

9     so-called corporate managed locations.

10              MR. ALLUSHI:  Objection.

11         Q.  Is that correct?  Again, we're

12    talking about the 2010-to-2018 time frame.

13         A.  Yes, yes.

14         Q.  In other words, when you were

15    spending your marketing dollars or when you

16    were performing your job functions, were you

17    distinguishing in your work between locations

18    that were operated by third-party franchisees

19    and locations that were operated by

20    corporately -- by corporate managed?

21         A.  No.

22         Q.  Okay.  So you had responsibility,

23    marketing responsibility, as it pertained to

24    advertising, press strategy, crisis

25    management, social media platforms, the

1          Q.  -- or -- or at reservation, then

2     when that guest checked out, they were sent a

3     survey to complete by some vendor.

4          A.  Yes.

5          Q.  And if the guest completed that

6     survey, then the vendor collected that data

7     and sent it back to the brand; is that

8     correct?

9          A.  Yes.

10         Q.  Okay.  Are you familiar with

11    Reputology?

12         A.  Yes.

13         Q.  And what do you know Reputology to

14    be?

15         A.  They would aggregate social --

16    they would aggregate review sites, TripAdvisor

17    review sites specifically, Expedia, their

18    reviews, booking.com, their reviews.

19         Q.  Hotels.com, do you know whether

20    they ever --

21         A.  Hotels.com is part of Expedia, so

22    yes.

23         Q.  Okay.  So Reputology was a vendor

24    that aggregated reviews from these third-party

25    reservation sites like Expedia and

1   booking.com.

2           A.   They did that, yes.

3           MR. ALLUSHI:   Objection.

4           Go ahead.

5           Q.   And then they also aggregated

6   reviews from TripAdvisor.   Correct?

7           A.   Correct.

8           Q.   Is TripAdvisor a third-party

9   booking site?

10          MR. ALLUSHI:   Objection.

11          A.   It's a review platform.

12          Q.   Okay.

13          A.   They may have a booking engine.

14  I'm not familiar.

15          Q.   Okay.   But all of these sites,

16  whether they have a booking engine or not,

17  have customer reviews.   And the function of

18  Reputology for Red Roof was to aggregate

19  reviews from these sites; is that correct?

20          A.   Correct.

21          Q.   And what role did you have in --

22  in that work done by Reputology?

23          MR. ALLUSHI:   Objection.

24          A.   What -- I don't understand the

25  question.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1   exactly when.

2          Q.  Did you receive the reports from

3   Reputology?

4          A.  I did.

5          Q.  Did you receive the -- and when I

6   say "the reports from Reputology," I mean

7   Reputology would aggregate this review

8   information.  Correct?

9          A.  Correct.

10          Q.  And at regular intervals, be it

11   monthly or weekly, they would send you reviews

12   for the locations that they were -- for which

13   they were monitoring reviews.  Correct?

14          A.  They monitored all properties.

15          Q.  Okay.  So they would --

16          A.  And if there was a review that a

17   guest left, some hotels received them, some

18   didn't.

19          Q.  And positive, negative, whatever

20   review, Reputology would aggregate it and send

21   it at -- at regular intervals.

22          A.  Yes.

23          Q.  And you received those reports.

24          A.  I did.

25          Q.  Okay.  Did anyone else?

1          A.   Yes.

2          Q.   Who else received those reports,

3    to your knowledge?

4          A.   Everyone in operations.  All

5    operations received it.  I don't know who

6    senior management received it.

7          Q.   Okay.  So -- and, again, I'm

8    focused on the sort of 2010 to September 2015

9    time period.  We talked about a few sources of

10   information that are being -- a few sources of

11   customer -- let's call it customer review

12   information that are being collected,

13   aggregated, and distributed within the

14   company.

15         A.   Yes.

16         Q.   The -- the customer surveys would

17   be one source; is that correct?

18         A.   Correct.

19         Q.   The we'll call it Reputology

20   information it's aggregating from the review

21   sites would be another source.

22         A.   Correct.

23         Q.   The NR reports would be a third

24   source.  Is that --

25         A.   Yes.

1        Q.   -- via some other more automated

2   process.

3        A.   Correct.

4        Q.   And the goal of this report was to

5   aggregate guest chatter, you said, around

6   certain topics.  Correct?

7        A.   Correct.

8        Q.   And those topics, would it be fair

9   to say, were related to possible criminal

10  activity at locations?

11       A.   Crisis activity that could turn

12  into a crisis.

13       Q.   Okay.  You said "crisis activity."

14       A.   Well --

15       Q.   What do you -- what do you mean by

16  that?

17       A.   Drugs, weapons, police, human

18  trafficking, those -- prostitution, those

19  types of things.  Those types of words.

20       Q.   Okay.  So the focus was on

21  collecting chatter on these -- these topics

22  that could -- most of these appear to be

23  related to potential criminal activity; is

24  that correct?

25       A.   I don't know.

1    the witness.

2              MR. ALLUSHI:  Okay.

3    BY MS. SEALS:

4         Q.  Presumably, Red Roof was

5    generating these reports, collecting this

6    information for some reason.  Correct?  There

7    was a reason, whatever it was.

8              A.  George -- for the reason George

9    wanted.

10             Q.  For the reason George wanted.  And

11   so it was -- so Red Roof could do something,

12   whatever it was George wanted to do, in

13   response to this information.

14             MR. ALLUSHI:  Objection.

15             Q.  Again, I'm not asking what he

16   wanted to do.  I'm just saying that,

17   presumably, there was some action that the

18   company wanted to take --

19             A.  It was --

20             MR. ALLUSHI:  Wait.

21             Q.  -- in response to these reports.

22             MR. ALLUSHI:  Objection.

23             Go ahead, if you know.

24             A.  The only thing I know was to

25   monitor chatter.  That's all I know.

1    you know what I'm talking about --

2            A.  I do.

3            Q.  -- those are the reports that H+K

4    generated that aggregated press mentions for

5    Red Roof, Inc.?

6            A.  Yes.

7                MR. ALLUSHI:  Objection.

8            Q.  And they included positive --

9                MR. ALLUSHI:  Did you say Red

10   Roof, Inc.?

11           Q.  Sorry.  Red Roof the brand is what

12   I really mean.  So I'll clarify that.

13               Those were the reports that

14   aggregated press mentions for Red Roof.

15           A.  Yes.

16           Q.  The brand.

17           A.  Yes.

18           Q.  And they aggregated mentions

19   whether they were, we'll call it, positive

20   press or negative press.

21           A.  Correct.

22           Q.  Correct?

23           A.  Yes.

24           Q.  And I think your testimony was

25   that you're not sure precisely when you

1  started -- or when H+K started receiving those

2  reports.  Correct?  Or H+K started sending

3  those reports.

4          A.  That is correct.

5          Q.  Okay.  But that you believe it was

6  by -- again, I don't want to put words in your

7  mouth.

8          My understanding of your testimony

9  is you believe these reports were being sent

10 out by the 2010 time frame.

11         A.  On and off starting in 2010.

12         Q.  Okay.  When you say "on and off,"

13 what do you mean?

14         A.  Sometimes we would get them

15 monthly and sometimes we would get them

16 quarterly and sometimes we would get them

17 daily.

18         Q.  Okay.  Understood.  The interval

19 might have changed, but you were receiving

20 these reports at least by 2010.

21         A.  Yes.

22         Q.  Okay.  You got the reports, I

23 think we talked about, directly from H+K.

24 Correct?

25         A.  Correct.

1          Q.   Did you get the reports every time
2     they got sent out?   In other words, did you
3     get -- when the reports were being sent out
4     daily, were you receiving them daily?
5               MR. ALLUSHI:   Objection.
6          A.   Yes.
7          Q.   And when the reports were being
8     sent out weekly, you were receiving them
9     weekly?
10         A.   Yes.
11              MR. ALLUSHI:   Objection.
12              You're fine.
13         Q.   Who -- do you know whether
14    anyone -- or whether anyone else in the
15    marketing department or otherwise was
16    receiving these press roundups?
17              MR. ALLUSHI:   Objection.
18         A.   I would receive them, and maybe
19    some people on my staff would receive them.   I
20    cannot recall every person that would receive
21    them all the time, because the staff changed.
22         Q.   Sure.
23         A.   Other people would receive them
24    within marketing.
25         Q.   Okay.   So between 2010 and 2018

you were receiving them and other people in marketing were receiving them.
A. Yes.
Q. And people who reported to you were receiving them, at least some of them. Correct?
A. Correct.
Q. And potentially people who reported to the people who were reporting to you, you're sort of -- people for whom you were the skip boss as we called it --
A. Yes.
Q. -- they were receiving them.
A. Yes.
Q. Correct?
Was anyone else on the -- other than you, was anyone else on the senior management team receiving them?
A. No.
Q. Did you -- strike that.
When you got these, did you read them?
A. Sometimes.
Q. Okay. Was it someone's job to read them?

1          A.   Was it someone -- no.   It wasn't

2     someone's job just solely to read all of them,

3     no.

4          Q.   Of course, and that's not my

5     question.   It wouldn't be someone's job only

6     to read those things.   My question is whether,

7     among the responsibilities of some employee,

8     was it some employee's responsibility to read

9     the reports H+K was generating?

10               MR. ALLUSHI:   Objection.

11          A.   I never directed anyone to

12     specifically read everything on the report,

13     no.

14          Q.   Okay.   Did you expect that someone

15     on your team would be reading the reports?

16          A.   It didn't occur to me, no.

17          Q.   And so it also didn't occur to you

18     to have someone on your team, like, click

19     through the links on the news reports to read

20     those?

21          A.   Correct.

22          Q.   Sometimes, and I think we've seen

23     at least one example, you passed these reports

24     along to senior management.

25               Is that fair to say?

1             CROSS-EXAMINATION (cont'd.)

2     BY MS. SEALS:

3             Q.  Ms. MacDonald, when we were

4     talking very early in the day about the people

5     with whom you interacted, you mentioned

6     Dorraine Lallani and Mohamed Thowfeek.

7             Do I remember that correctly?

8             A.  Do I have some interaction with

9     them?

10            Q.  Well, yes.

11            A.  I have some interaction with them.

12            Q.  Okay.  What -- what interaction

13    did you have with them in the 2010-to-2018

14    time period?

15            A.  With Mr. Thowfeek, very little.

16    Maybe once a year.  A marketing review.

17            Q.  Okay.  And what would that

18    marketing review cover?

19            A.  It would cover the marketing

20    results from the previous year and then the

21    plan for the following year.

22            Q.  What about Ms. Lallani?

23            A.  She would be in meetings with me.

24    I would have interaction with her when we did

25    a marketing review, and we would do a

1   marketing review with her in attendance at a

2   brand health meeting maybe two to three times

3   a year.

4           Q.  You said -- and would that be true

5   for the 2010-2018 time period, generally

6   speaking?

7           A.  I don't know when she started,

8   so...

9           Q.  What's your understanding of her

10  job?

11          A.  Asset manager.

12          Q.  For whom?

13          A.  She was asset manager for Red

14  Roof.

15          Q.  To your understanding, is she a

16  Red Roof employee?

17          A.  Not to my knowledge.

18          Q.  Okay.  So, to your knowledge, who

19  employs her?

20          A.  I don't know.

21          Q.  Okay.  No idea?

22          A.  No.

23          Q.  If she had an @whg.com email

24  address, does that tell you anything about who

25  employed her?

301

```
 1              C E R T I F I C A T E

 2   STATE OF OHIO        :
                          SS:
 3   COUNTY OF FRANKLIN   :

 4          I, Jennifer L. Parish, a Registered
     Professional Reporter and Notary Public in and
 5   for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the within
 6   named MARINA MacDONALD was by me first duly
     sworn to testify to the truth, the whole
 7   truth, and nothing but the truth in the cause
     aforesaid; that the deposition then given by
 8   her was by me reduced to stenotype in the
     presence of said witness; that the foregoing
 9   is a true and correct transcript of the
     deposition so given by her; that the
10   deposition was taken at the time and place in
     the caption specified and was completed
11   without adjournment; and that I am in no way
     related to or employed by any attorney or
12   party hereto, or financially interested in the
     action, and I am not, nor is the court
13   reporting firm with which I am affiliated,
     under a contract as defined in Civil Rule
14   28(D).

15          IN WITNESS WHEREOF, I have hereunto
     set my hand and affixed my seal of office at
16   Columbus, Ohio, on this 20th day of June,
     2022.

17

18

19

20

21

22

23          _____
            JENNIFER L. PARISH, RPR
24          NOTARY PUBLIC-STATE OF OHIO

25   My Commission Expires:  November 23, 2024.
```