Case 1:21-cv-04278-WMR   Document 175-13   Filed 03/02/23   Page 1 of 9
CONF K.P.                                          September 14, 2022
C.A., K.P., R.K., and T.H. v. Extended Stay America

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF GEORGIA
3                       ATLanta DIVISION

**PL Sum. J. Ex. 038**

5    C.A., K.P., R.K., and T.H.,
6         Plaintiff,
7    vs                                CIVIL ACTION FILE NO.
8    EXTENDED STAY AMERICA, INC.;      1:21-cv-00957-SDG
     ESA MANAGEMENT, LLC; and
9    HVM, LLC,
10        Defendants.

13                    VIDEOTAPED DEPOSITION OF
14                             K.P.

17                    September 14, 2022
18                         9:53 a.m.

21       1201 West Peachtree Street, Northwest, Suite 3900
22                    Atlanta, Georgia 30309

25              Ashley N. Ellis, CVR-7199, CCR

Case 1:21-cv-04278-WMR   Document 175-13   Filed 03/02/23   Page 2 of 9
CONF K.P.                                September 14, 2022
C.A., K.P., R.K., and T.H. v. Extended Stay America

Page 2

1                APPEARANCES OF COUNSEL
2
3    On behalf of the Plaintiff(s):
4        TIANA S. MYKKELTVEDT, ESQUIRE
         Bondurant, Mixson & Elmore, LLP
5        1201 West Peachtree Street, Northwest, Suite 3900
         Atlanta, Georgia 30309
6        Office: 404.881.4100
         E-mail: mykkeltvedt@bmelaw.com
7
     On behalf of the Defendant(s):
8
         SHUBHRA R. MASHELKAR, ESQUIRE
9        Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
         3344 Peachtree Road, Northeast, Suite 2400
10       Atlanta, Georgia 30326
         Office: 404.876.2700
11       Fax: 404.875.9433
         E-mail: smashelkar@wwhgd.com
12
         SHANNDOR A. McCLAIN, ESQUIRE
13       Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
         3344 Peachtree Road, Northeast, Suite 2400
14       Atlanta, Georgia 30326
         Office: 404.876.2700
15       Fax: 404.875.9433
         E-mail: smcclain@wwhgd.com
16
     Also present:
17
         PAIGE BRANTLEY, VIDEIGRAPHER
18
19   (Pursuant to Article 10(b) of the Rules of Regulations of the
20       Georgia Board of Court Reporting, a written disclosure
21    statement was submitted by the court reporter to all counsel
22                   present at the proceeding.)
23
24
25

1    A    Yes, yes.  She knew that I was in an abusive
2    relationship.
3    Q    She was also one of the people that encouraged you to
4    get out of it; is that right?
5    A    Yes.
6    Q    Did you ever tell ▮▮▮▮ that ▮▮▮▮ was forcing
7    you to have sex with other people?
8    A    Well, she knew that it -- that he was my pimp.
9    Q    But she also knew that he was your boyfriend, right?
10   A    But that's not how -- so a part of the
11   manipulation -- a part of how ▮▮▮▮ manipulated me was by
12   making me feel like he was my boyfriend.
13   Q    I read in your last deposition that you have not
14   spoken to ▮▮▮▮ in eight months.  What happened there?
15   A    I don't know.
16   Q    What was your last communication with her?
17   A    I think I talked to her at the beginning of January,
18   like the first or second day of January, maybe not even --
19   maybe it was December, the end of December, but I don't know.
20   She ghosted me.
21   Q    Did she know about this lawsuit?
22   A    Yes, I asked if she would be a witness.
23   Q    And she's still going to be your witness; is that
24   right?
25   A    I don't know.

```
1     Q    And life was overwhelming at that time?
2     A    Yes.
3     Q    And when you met ████████, ████████ was showing you a
4  good life, right?
5          MS. MYKKELTVEDT:  Object to the form.
6          THE WITNESS:  He was very affectionate, and he was
7     just nicer to me than other people.
8  BY MS. MASHELKAR:
9     Q    Okay.  Did ████████ threaten you in any way to engage
10 in commercial sex?
11    A    After -- after I started, yes.
12    Q    Okay.  At what point?
13    A    So many points.  I can't even go through every -- I
14 can't even recall every single instance of him threatening me.
15 There were so many.
16    Q    Okay.  How would he threaten you?
17    A    Very creatively.  There were lots of different
18 threats that he told me, like about telling my family or outing
19 me in some way or, you know, that he would hurt me or that
20 somewhere else would be worse or that I'm not shit or whatever.
21 Like, it could be anything from coercive to belittling.
22    Q    And when you say hurt you, you mean physically?
23    A    Yes.
24    Q    Okay.  Did he physically hurt you?
25    A    Yes.
```

```
 1        Q    How many times?
 2        A    Again, just like the threats, it was not something
 3   that I counted.  It happened so many times that I can't
 4   remember every instance.
 5        Q    In your last deposition, you said probably around ten
 6   times.  Is that -- is that fair?
 7        A    When -- I think in the deposition, they said when --
 8   like how many times did I get beat up.  And when I say beat up,
 9   I mean, like, he beat the brakes off of me.  So ten times is
10   probably correct with, like, beating the brakes off of me, but
11   not about how many times did he physically hurt me, because
12   there were so many times that he physically hurt me that didn't
13   involve making absolutely like pummeled.  It was a hit or a
14   hair pull or, you know, some other form of physical violence
15   that did not necessarily include a full before body beating,
16   but like a partial one.  So that is more than ten times.  But
17   actually getting like beat up, beat up, that is probably -- ten
18   times is probably accurate.
19        Q    Okay.  When you were beat up, beat up the ten times,
20   did you go to the hospital?
21        A    There was one instance when I went to the emergency
22   room.  Like, it wasn't an emergency room.  It was like a quick
23   care place, like, by the Intercontinental in Buckhead.  And
24   it's because I -- I was having severe pain in my -- like, my
25   chest and my ribs because he kneed me in my ribs.  So I think,
```

1   Q   And this is the same man that beat you?
2   A   Yes.
3   Q   So as you sit here today, you think you told ▆▆▆▆
4   that he beat you?
5   A   Yeah, yes.
6   Q   And you told ▆▆▆▆ that he beat you?
7   A   I'm sure that ▆▆▆▆ witnessed or heard me being
8   beat up just like I witnessed or heard her get beat up and
9   ▆▆▆▆ as well.
10  Q   So earlier you said that ▆▆▆▆ -- you never told
11  ▆▆▆▆ that ▆▆▆▆ was forcing you to have sex.  So what --
12  why did she think he was beating you up?
13  A   Because he was an asshole.
14  Q   And so, as you sit here today, you're contending that
15  you engaged in commercial sex because you were scared of
16  ▆▆▆▆ and in love with him?
17  A   Yeah, I was scared.  I was coerced.  I was -- I was
18  not -- I was in a vulnerable position.
19  Q   When you use the word coerced, what does that mean to
20  you?
21  A   It means that I was, like, tricked and also there are
22  methods of coercion that aren't necessarily just physical, even
23  though part of the coercion is physical.  There are other
24  things that ▆▆▆▆ did that were coerced over exploiting
25  me -- like, exploiting me in a way that he knew how to

```
1    purposes.
2        Q    So here you're talking about he wants to be with you
3    long term, but he's not ready to commit to a marriage; is that
4    right?
5        A    Yes.
6        Q    Okay.  And then on the first page at the bottom, it
7    says, he's told me he wants key is with me; is that right?
8        A    Yes.
9        Q    Okay.  And your friend says, where do you want to be
10   in five years, and it continues and she actually goes on to ask
11   you 10, 20 years.  And at the top, you say I'm scared to leave
12   him behind.  So your friend here is telling you that you should
13   leave him, right?
14       A    She didn't say that.
15       Q    Okay.  Did you, in any way, out here say that you
16   were scared of ▇▇▇▇ or that he was beating you up?
17       A    No, but there was, again, a duality in our
18   relationship where there was part of the time where it felt
19   like normal boyfriend and girlfriend stuff, and then there was
20   the trafficking side of our relationship so -- and -- so
21   over -- overall, this was a part of me being manipulated by
22   ▇▇▇▇ because he wanted to make me feel secure and like I
23   was loved, and a part of his manipulation tactics to string me
24   along.
25            Of course, he didn't want -- like, looking back now,
```

1  of course, he didn't want to get married.  He didn't give a
2  shit if he had kids with me.  He wanted to keep me there so
3  that he could continue to traffic me or manipulate me or take
4  advantage of me.
5       Q    Okay.  Okay.
6       A    So, yeah.
7       Q    Mark this as Exhibit 15.  And, again, you have to
8  start from the back.  In the middle of the page goes haha,
9  little quirk starting to aggravate you.  I mean it's just
10 stupid shit.  And then on the top you say I just want to be
11 normal.  I'm about to write a new resume get a fucking regular
12 job.  ▮▮▮▮▮ says good.  Not good is what you say, annoying.
13 ▮▮▮▮▮ says, but you need to.  And you say, I know.  So at this
14 point, this is August of 2011, you recognize what you're doing
15 is not normal, right?  You say that you want to be normal?
16      A    Right.
17      Q    Okay.  Okay.
18           MS. MASHELKAR:  I'm going to use up all your
19      stickers.  This is Exhibit 16.
20      (Defendant's Exhibit No. 16 marked for identification.)
21 BY MS. MASHELKAR:
22      Q    Again, these are your conversations with ▮▮▮▮▮
23 ▮▮▮▮▮.  At the bottom it says, I love T, but -- and when you
24 say T, you mean ▮▮▮▮▮; is that right?
25      A    (Nonverbal response.)

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial of:

This the 2nd day of October, 2022.