## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOES 1-4 | * | |
| | * | |
| Plaintiffs, | * | Civil Action No. |
| | * | 1:21-CV-04278-WMR |
| v. | * | |
| | * | |
| RED ROOF INNS, INC., et al. | * | |
| | * | |
| Defendants. | * | |

### DEFENDANTS RED ROOF INNS, INC., FMW RRI NC, LLC, RED ROOF FRANCHISING, LLC, RRI WEST MANAGEMENT, LLC, AND RRI III, LLC'S REPLY IN SUPPORT OF SUMMARY JUDGMENT AS TO ALL PLAINTIFFS

COME NOW Defendants Red Roof Inns, Inc., FMW RRI NC, LLC, Red Roof Franchising, LLC, RRI West Management, LLC, and RRI III, LLC ("Defendants" or "Red Roof Defendants") and file this Reply in Support of Summary Judgment as to All Plaintiffs.[1]

### INTRODUCTION

---

[1] Defendants formerly filed their briefs in support of summary judgment as to each Plaintiff individually. Given Plaintiffs Response to Defendants' Motions for Summary Judgment ("Plaintiffs' Response"), which relates to all four of Defendants' Summary Judgment Motions, Defendants reply here in one brief. Defendants are filing a nearly identical reply in *W.K. v. Red Roof Inns, Inc.*, 20-CV-5263-VMC.

The Red Roof Defendants filed their Motions for Summary Judgment on January 20, 2023, demonstrating Plaintiffs lack sufficient evidence to support their claims for negligence, Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Trafficking Victims Protection and Reauthorization Act ("TVPRA"). Plaintiffs, in a haphazard attempt to create a question of material fact as to their claims, cite to their own testimony, in an incorrect assertion that the facts applicable to one Plaintiff are applicable to all. Indeed, each Plaintiff must prove that the Red Roof Defendants violated these statutes as to her individually. Plaintiffs instead cite to testimony of one Plaintiff as evidence of the trafficking of another. Additionally, in regard to each of Plaintiffs' claim, Plaintiffs fail to identify a scintilla of evidence that would show that the Red Roof Defendants had knowledge of sex trafficking occurring on their properties, a requirement which overarches all of Plaintiffs' claims. Red Roof Defendants reply to Plaintiffs' individual arguments below.

## STATEMENT OF ADDITIONAL FACTS

The Red Roof Defendants incorporate by reference the facts set forth in their Motions and Briefs in Support of Summary Judgement. In reply to Plaintiffs, Defendants highlight the additional material facts below.

As anticipated, Plaintiffs rely heavily on the testimony of Smyrna RRI employee Forrest Castille to support their contention that the Red Roof Defendants were engaged in sex trafficking via this employee. Plaintiffs completely fail to identify, or even address the argument, that Mr. Castille's actions fell outside the scope of his employment with any Red Roof Defendant. Importantly, Mr. Castille testified that his duties at the subject property involved operating the front desk, greeting guests, making sure guests paid for their rooms, "checking people in and out, [and] answering the phones."[2] Castille admitted he did not report his knowledge of prostitution at the property to Smyrna Red Roof management.[3] Moreover, Castille testified that he associated only with Plaintiff M.M.'s alleged trafficker by smoking marijuana while on the job.[4]  Further, once the Smyrna hotel manager and Varahi employee, Bharat Patel, heard Mr. Castille may have been "involved" in these activities, he was immediately fired.[5] Plaintiffs have failed to show that any alleged conduct of Mr. Castille could be imputed to any Red Roof Defendant.

---

[2] Castille Dep. (Exh. 1) 19:19-21, 131:24-25.

[3] Castille Dep. (Exh 1) 129:1-13, 154:7-22 (testifying that, during the period of corporate ownership of the Smyrna Red Roof, he did not tell the general manager of the property, Jay Moyer, or anyone at Red Roof corporate that prostitution was occurring at the property).

[4] Castille Dep. (Exh. 1) 142:4-11.

[5] Bharat Patel Dep. (Exh. 2) 111:18–112:3.

Next, some Plaintiffs admit they only stayed at one of the subject properties "once"[6] throughout their years of trafficking, which occurred at countless hotels across many states.[7] Plaintiffs disregard of this contention disproves their allegation

---

[6] Pls.' Resp. in Opp'n at 55.

[7] R.P. Dep. (Exh. 3) 168:19–173:10 (testifying that she was trafficked at the following locations: Microtel, Extended Stay, Hyatt Place, Ramada Limited, Courtyard Marriott, Masters Inn, Masters Inn, Intown Suites, Horizon Inn & Suites, Super 8, Quality Inn & Suites, Crossland Studio Apartments, Holiday Inn, Motel 6, Holiday Inn Express, Stay Inn & Suites); R.K. Dep. (Exh. 4) 190:23-25 (testifying she was trafficked in at least a dozen hotels); C.A. Dep. Vol. 1 (Exh. 5) 89:1-10, 97:25–98:4, 107:12-25 (testifying that she was trafficked at over twenty different hotels in multiple states); D.P. Dep. (Exh. 6) 46:6-21, 59:21–63:16 (stating she was trafficking at multiple Motel 6 properties, the Hospitality Inn, the Country Hearth, the Masters Inn, the Days Inn, the Regency Inn, the Rodeway motel, and the Marietta (now Economy) Motel); M.B. Dep. (Exh. 7) 81:3-21 (testifying she was trafficked at an Econo Lodge, a Super 8 motel, a Microtel, and multiple Extended Stay America hotels); W.K. Dep. (Exh. 8) 107:10–110:23, 117:3–118:25 (testifying that she was held against her will at gunpoint and forced to participate in commercial sex at a Super 8 and stating that she was trafficked at a number of other hotels including multiple Super 8s, Hospitality Inn, Motel 6, Marietta Hotel, Masters Inn); A.F. Dep. (Exh. 9) 198:20–199:1 (stating her trafficking occurred at 15 to 20 hotels); T.H. Dep. 152:15–153:25 (Exh 10); M.M. Dep. (Exh. 11) 228:20–231:8 (claiming her pimp trafficked her out of "numerous hotels" including a Magnuson Inn, Masters Inn, Country Hearth Inn, Days Inn, Drury Inn, Econo Lodge, Travelers Lodge, and two hotels in Alabama that she did not recall); K.P. Dep. (Exh. 12) 204:1–213:9 (testifying she was trafficked in Maryland, North Carolina, and Florida at various hotels including hotels such as Extended Stay America, Suburban Extended Stay, Microtel, DoubleTree, Marriott, Motel 6, La Quinta, Crowne Plaza, Hampton Inn, Quality Inn, Intercontinental Buckhead, the W Hotel, and Aloft in addition to smaller "mom and pop" type hotels); JD1 Dep. Vol. 1 (Exh. 13) 64:4-7, 188:8-17, 210:11-212:14, 231:9-25 (stating she was trafficked in at least 18 hotels other than the subject properties across several states including Georgia, Alabama, Florida, and Mississippi, this included a La Quinta where one of her traffickers mutilated her

that the Red Roof Defendants caused their injuries. Indeed, Jane Doe 4, per her own testimony, admits that any injury she suffered at the hands of her alleged traffickers would have happened regardless of where it occurred.[8] E.H. was allegedly trafficked at up to 40 hotels in 46 states.[9] Similarly, Jane Doe 2 was allegedly trafficked in several states at approximately 50 hotels.[10] Plaintiffs fail to show that their rare stay at a Red Roof hotel caused their alleged trafficking, and is the proximate cause of their alleged injuries.

Additionally, Plaintiffs rely on the incorrect assertion that the Red Roof Defendants "ignored" complaints of prostitution. However, when presented with complaints of prostitution taking place on the properties, the Red Roof Defendants responded by speaking directly with managers, supervisors, staff, and the Safety and Security department; inspecting and staying at the properties; and talking to

---

genitalia); JD3 Dep. (Exh. 14) 80:3–81:16; JD4 Dep. (Exh. 15) 57:23–58:18 (allegedly trafficked at approximately 10 hotels).

[8] JD4 Dep. (Exh. 15) 261:11-17.

[9] E.H. Dep. (Exh. 16)14:23–15:12, 23:24–24:15, 30:19-21, 31:10-20, 32:4-25, 33:9-21(E.H. could recall the following hotel chains where she was allegedly sex trafficked by McCoy: Comfort Inn, Travel Lodge, Economy Inn, La Quinta, Hilton, Days Inn, Microtels, Extended Stay America, Motel 6, Masters Inn, Ramada Inn, Marriot, Holiday Inn, Hyatt, Windham, Drury Inn, Sleep Inn, Super 8, and the Smyrna Red Roof).

[10] JD2 Dep. Vol. 1 (Exh. 17) 204:6-21

clientele.[11] Further, the Red Roof Defendants never received reports of *sex trafficking* at the properties—reports were limited to prostitution, which is critically and fundamentally different.[12] Finally, the Red Roof Defendants maintained policies requiring employees to report instances of prostitution or sex trafficking or other criminal activity to the police and did report prostitution when suspected.[13]

## ARGUMENT AND CITATION TO AUTHORITY

I. **Plaintiffs have failed to identify evidence on record that is sufficient of their claims for Georgia RICO.**

Plaintiffs' Response fails to identify evidence that (1) the Red Roof Defendants participated in the alleged sex trafficking to the extent that they could be considered participants of the crime; (2) that, but for the Red Roof Defendants' actions, Plaintiffs would not have suffered their alleged injuries; and (3) that the Red

---

[11] Moyer Dep. (Exh. 18) 214:1-12, 215:4-8.

[12] Moyer Dep. (Exh. 18) 214:13-16; *see infra* sec. III.B.i.

[13] Moyer Dep. (Exh. 18) 162:5–164:2; Cole Dep. (Exh. 19) 73:18–74:17 (testifying that it was Red Roof policy to report prostitution and illegal activity to the police and that she always called the police when she suspected illegal activity); *see also* Thomas Dep. (Exh. 20) 95:7–96:6 (at the time of Mr. Thomas' employment with Red Roof, staff received the following direction: "if you observe anyone whose actions put you, our employees and/or guests at risk, contact your supervisor immediately . . . and the police should be contacted if necessary").

Roof Defendants had a "tacit understanding" with Plaintiffs' traffickers such that Plaintiffs can demonstrate an "overall objective to be charged."[14]

## A. Plaintiffs misconstrue the level of involvement that is required under Georgia law to show participation in a crime.

Georgia's RICO statute requires a higher level of involvement in the commission of a crime than Plaintiffs assert—as demonstrated by the case law cited to by Plaintiffs. Specifically, Plaintiffs cite to *Clemmons v. State*, 361 Ga. App. 666 (2021), for the proposition that the Red Roof Defendants were a party to the alleged crime of sex trafficking.[15] However, Plaintiffs entirely disregard the facts in *Clemmons* in making this assertion. In *Clemmons*, a pimp was convicted of child molestation after aiding and abetting the prostitution of a minor. In affirming this conviction, the Court noted that "the evidence … reflected that [the defendant] was present at the locations where the sexual encounters between [the minor] and the men occurred, had knowledge that the encounters were to take place and approved of them, and encouraged and facilitated the encounters by … posting the Backpage.com advertisements, arranging the encounters with the men, and driving [the minor] to the locations." *Clemmons*, 361 Ga. App. at 670-71. Further, the

---

[14] Pls.' Resp. in Opp'n at 57-58.

[15] Pls.' Resp. in Opp'n at 40.

defendant provided photographs of the minor for online posting, paid for the online advertisements, set the prices for the sexual acts, coached the minor on what to do, and waited outside the hotel rooms while the minor was inside with the buyers. *Id.* at 667-68. The totality of these acts led the Court to its holding that there was enough evidence of the defendant being a participant in the crime, even though he did not engage in the sex acts directly.

Indeed, the Court of Appeals of Georgia consistently requires this heightened level of participation in order to find that a defendant aided and abetted a sex crime by encouraging and facilitating sexual encounters between a victim and a third party. *See Dockery v. State*, 309 Ga. App. 584, 586-587 (2011) (defendant was party to the crime of child molestation where the defendant was present for the acts of child molestation committed by her husband, and the defendant gave the underage victim alcohol, thong panties, and pornographic material to read shortly before the molestation occurred); *Newman v. State*, 286 Ga. App. 353, 354 (2007) (affirming defendant was party to the crime of child molestation where the defendant instructed the underage victim to put cream on her ex-husband's penis); *Hixon v. State*, 251 Ga. App. 27, 28-29 (2001) (defendant was party to the crime of child molestation where the defendant, among other things, instructed the underage victim to have sexual intercourse with an adult man).

Here, there is no evidence that any Red Roof Defendant took any such action. Specifically, there is no evidence that any Red Roof Defendant ever (1) was present during prostitution or sex trafficking activity; (2) instructed Plaintiffs—or anyone— to engage in sexual activity; (3) set up "dates" with any men; or (4) facilitated such activity in any way (i.e., posting illicit online advertisements, driving Plaintiffs to their "dates," guarding hotel room doors, or otherwise). Indeed, Plaintiffs, in support of their attempt to hold a hotel chain liable under RICO, point to cases where *pimps* were found to be the facilitator of the crime – despite the fact that the plaintiffs have not named their respective pimps as defendants. The authority cited by Plaintiffs only affirms the culprit of their alleged trafficking are their alleged traffickers, not the hotels or other places where the alleged criminal activity occurred. Plaintiffs cannot show the Red Roof Defendants facilitated any sex crime akin to the trafficker defendants in the cases relied upon by Plaintiffs.

Plaintiffs also make unsubstantiated claims that Defendants shared a "common criminal intent with the direct perpetrators" (*i.e.*, Plaintiffs' pimps).[16] Plaintiffs rely on *Platt v. State*, 335 Ga. App. 49 (2015), in this assertion. Again, Plaintiffs fail to analyze the facts in *Platt*. Specifically, *Platt* asserts that much more

---

[16] Pls.' Resp. in Opp'n at 41.

evidence is required than Plaintiffs have or could have presented to show common criminal intent. In *Platt*, the Court found that the defendant aided and abetted a gang-related shooting. This finding was based on evidence that the defendant (1) supplied a car stocked with ammunition; (2) accompanied others to the apartment in another car; (3) remained parked outside while maintaining phone contact with the others after they went inside; and (4) served as the getaway driver for a wounded individual. *Id.* at 54. Here, once again, there is no evidence of any such involvement from any Red Roof Defendant. The facts required to prove that the Red Roof Defendants' shared criminal intent with Plaintiffs' alleged traffickers simply do not exist. Indeed, there is no evidence that any Red Roof Defendant even *knew* any of Plaintiffs' alleged traffickers, much less engaged in a common criminal enterprise with them.

Instead, Plaintiffs point to speculative testimony from witnesses who allege that "hookers" were frequently engaged in "prostitution" at the subject properties.[17] Importantly, this speculation fails to identify any instance where a Red Roof Defendant aided and abetted sex trafficking. The mere presence of prostitution activity at a hotel simply cannot meet the standard of showing that the hotel chain participated in the crime or shared a common criminal intent with sex traffickers. As

---

[17] Pls.' Resp. in Opp'n at 43-44.

demonstrated in the case law above, there must be a great deal more involvement in the actual commission of the crime than the mere existence of a hotel providing a private space where sex acts may occur behind closed doors.

### i. Unidentified employees acting outside the scope of their employment are not enough to show that the Red Roof Defendants were engaged in a criminal enterprise.

Plaintiffs' argument that some unidentified employees acting as lookouts constitutes the Red Roof Defendants' participation in a crime fails for two reasons: (1) Plaintiffs wholly ignore the fact that, even if true, these employees' alleged misconduct falls outside the scope of their employment with any Red Roof Defendant; and (2) there is no evidence that any officer of any Red Roof Defendant ratified these actions.

Plaintiffs argue that "a corporation is liable under civil RICO for the acts of its agents just as any other person would be."[18] Even accepting Plaintiffs' argument as true, for an employer to be liable for the actions of its employees, the test is whether the tort was done within the scope of the actual transaction of the employer's business for accomplishing the ends of the employee's employment. *Rent to Own, Inc. v. Bragg*, 248 Ga. App. 130, 131 (2001) (in a malicious prosecution case, a store

---

[18] Pls.' Resp. in Opp'n at 59.

manager was acting within the scope of his employment where he was directed by a company vice-president to swear out a warrant for the arrest of an incorrectly named individual who failed to pay for rental appliances; the Court held that, in the absence of evidence that the manager acted for personal reasons, it was undisputed that he was acting within the scope of the actual transaction of the rental business for accomplishing the ends of his employment); compare with *Jefferson v. Hous. Hosps., Inc.*, 336 Ga. App. 478, 481-82 (2016) (where, in contrast, the evidence shows that a hospital technologist was not acting within the scope of her employment when she improperly accessed the mammography computer files and forged reports, testifying that it was not part of her duties to do so, but instead that she did so because she was lazy).

Plaintiffs fail to identify any facts that indicate that any Red Roof employee acted at the direction of any Red Roof Defendant.[19] It is likewise unproven by the record that any Red Roof Defendant ratified these actions. Further, as to the only

---

[19] Plaintiffs contend that the Michael Thomas speculative testimony that Mr. Moyer was aware of prostitution on the property because "there's no way that he couldn't have" is insufficient to show that the Red Roof Defendants knew that prostitution activity was occurring on the property. *See* Pls.' Resp. in Opp'n 23; Thomas Dep. (Exh. 20) 45:14-48:10. Further, there is no evidence that the "young girls" Mr. Thomas testifies to were in fact prostitutes.

identified employee that allegedly engaged as a lookout,[20] Mr. Castille testified that

his duties at the subject property involved operating the front desk, "checking people

in and out, [and] answering the phones."[21] Thus, even if Plaintiffs' allegations

towards Mr. Castille were true, it is clear that assisting a pimp would not be included

in Mr. Castille's duties as a front desk manager. Indeed, once the Smyrna hotel

manager and Varahi employee, Bharat Patel, was informed Mr. Castille may have

been "involved" in these activities, he immediately fired Castille.[22] As such,

Plaintiffs have failed to show that the Red Roof Defendants have taken any action

that would indicate that they could be vicariously liable for the alleged criminal

misconduct of any hotel employee.

## B. Plaintiffs would have suffered their alleged injuries without any involvement of the Red Roof Defendants.

Plaintiffs next contend that because "each Plaintiff alleges that she was sold

for sex multiple times and stayed *at least one night* at each Red Roof hotel for which

she asserts a claim," the "evidence is more than sufficient to show each Plaintiff was

---

[20] Forrest Castille has testified that he did not act as a lookout for the pimps, nor did he ever take money from the pimps in exchange for acting as a lookout. Castille Dep. (Exh. 1) 139:13–141:6; *see also* Cole Dep. (Exh. 19) 139:16-18 (testifying that Forrest Castille was a good employee), 144:14-19 ("[Forrest] *did not* serve as a lookout [for pimps].") (emphasis added).

[21] Castille Dep. (Exh. 1) 19:19-21.

[22] Bharat Patel Dep. (Exh. 2) 111:18–112:3.

injured by *at least one* predicate act, and to establish proximate cause under Georgia RICO."[23] Under Georgia law, "[i]n order to establish such a civil RICO claim, [Plaintiff] is required to show by a preponderance of the evidence that [Defendant] violated the RICO statute, that she has suffered injury, ***and that [Defendant's] violation of the RICO statute was the proximate cause of the injury.*** *Cox v. Mayan Lagoon Estates, Ltd*, 319 Ga. App. 101, 108-09 (2012). To satisfy the proximate cause element of a Georgia RICO claim, a plaintiff must show that her injury "flowed directly" from a predicate act. *Najarian Capital, LLC v. Clark*, 357 Ga. App. 685 (2020).

Not only have Plaintiffs not established proximate cause, but the record reflects Plaintiffs cannot even establish cause-in-fact or that the alleged injuries flowed directly from a predicate act by the Red Roof Defendants. Plaintiffs, per their own testimony, admit that any injury suffered at the hands of their alleged traffickers would have happened without the Red Roof Defendants, given that Plaintiffs were allegedly trafficked over several years, at numerous hotels, in multiple states:

> A: It's a -- I know it rooted from [my pimp], but it wasn't executed without these hotels.
>
> Q: You don't think you could have been trafficked somewhere else other than Red Roof with [your pimp]?

---

[23] Pls.' Resp. in Opp'n at 55 (emphasis added).

A: I was trafficked somewhere else. Like you've specified in the other entities, in the lawsuit, like you've pointed that out yourself, so obviously, I was, and I could have been.

Q: So it could have happened without the Red Roof, correct?

A: Yes.[24]

Indeed, all Plaintiffs have testified that they engaged in prostitution at many other hotels.[25] For example, JD2 testified to the following:

Q: Did this occur in approximately how many hotels in Atlanta? Including ones that you have sued and ones that you haven't sued, how many?

A: A lot. I mean, we've stayed at Hiltons, we've stayed at Doubletrees, we've stayed at Crowne Plazas. **We've stayed at, you know, I mean, basically every hotel you could ever think of** except for ones that were like maybe three, $400 a night.

Q: More than 20 hotels?

A: **Way more than 20 hotels.**

Q: **More than 50 hotels?**

---

[24] JD4 Dep. (Exh. 15) 261:11-17.

[25] R.P. Dep. (Exh. 3) 168:19–173:10; R.K. Dep. (Exh. 4) 190:23-25; C.A. Dep. Vol. 1 (Exh. 5) 89:1-10, 97:25–98:4, 107:12-25; D.P. Dep. (Exh. 6) 46:6-21, 59:21–63:16; M.B. Dep. (Exh. 7) 81:3-21; W.K. Dep. (Exh. 8) 107:10 – 110:23, 117:3–118:25; A.F. Dep. (Exh. 9) 198:20–199:1; T.H. Dep. 152:15–153:25 (Exh 10); M.M. Dep. (Exh. 11) 228:20–231:8; K.P. Dep. (Exh. 12) 204:1–213:9; JD1 Dep. Vol. 1 (Exh. 13) 64:4-7, 188:8-17, 210:11-212:14, 231:9-25; JD3 Dep. (Exh. 14) 80:3–81:16; JD4 Dep. (Exh. 15) 57:23–58:18; JD2 Dep. Vol. 1 (Exh. 17) 204:6-21; E.H. Dep. (Exh. 16) 14:23–15:12.

A: **Probably about that**, even including not in Atlanta, because I was trafficked with Kwan's associate, Black, in Greenville, South Carolina, so...[26]

Additionally, Plaintiff E.H. testified that she was subjected to sex trafficking in numerous hotels and that her alleged sex trafficking took place in over 90% of the states in the United States of America:

Q: [D]o you know how many different hotels you, as you've alleged, have been subjected to sex trafficking at?

A: No, sir.

Q: What's your best estimate?

A: **Probably like 30 or 40 hotels**.

Q: And at this time, **the only one that you've sued is the Smyrna Red Roof Inn, true**?

A: **Yes, sir**.

Q: **Do you know how many different states you have been in where, as you've alleged, you were subjected to sex trafficking**?

A: Yes, I do.

Q: How many is that?

A: **46**.[27]

---

[26] JD2 Dep. Vol. 1 204:6-21 (emphasis added).

[27] E.H. Dep. (Exh. 16) 14:23–15:12 (emphasis added).

Plaintiffs have testified they were trafficked at various hotels in up to 46 different states. Thus, not only have Plaintiffs failed to prove that the Red Roof Defendants were participating in a criminal enterprise, but they have failed to establish that any act on behalf of the Red Roof Defendants caused their trafficking or proximately caused their alleged injuries. In other words, Plaintiffs have failed to show that but for the Red Roof Defendants, their trafficking and alleged resulting injuries would not have occurred. To the contrary, Plaintiffs have consistently and repeatedly testified the alleged trafficking would have occurred without the Red Roof Defendants. Thus, Plaintiffs have failed to prove causation as required under the Georgia RICO statute.

### C. Plaintiffs have yet to identify any evidence that could constitute conspiracy to commit RICO.

Lastly, Plaintiffs allege that there was some "tacit understanding" between Red Roof Defendants and the Plaintiffs' traffickers.[28] In support of this allegation, Plaintiffs assert that Red Roof Defendants "took no effort to investigate or stop" the prostitution / sex trafficking activity. Plaintiffs rely on *United States v. Browne*, 505 F.3d 1229 (11th Cir. 2007), which affirmed a finding of conspiracy between a union

---

[28] Pls.' Resp. in Opp'n at 57-58.

president and his assistant/sister, who together committed mail fraud, bank fraud,

embezzlement, union violations and fraud against the government, among others:

> Browne hired Devaney to be his administrative assistant, in which
> capacity she came to wield extraordinary control over the books,
> records, and finances of the union. With that authority, Devaney was
> able to enrich herself through her payroll scheme and by charging
> personal expenses to the union. For his part, Browne was able to use
> his influence to obtain payments from employers. In addition,
> Devaney's activities both facilitated Browne's fraudulent expenses and
> shielded them from view. In filling out Browne's expense vouchers,
> Devaney admitted to fabricating the names of persons attending dinners
> and ascribing a union-related purpose to personal meals. Devaney
> herself attended several expensive dinners that were not related to union
> business. She also failed to maintain adequate documentation for
> claimed expenses. Her role thus brought her "squarely within [the
> alleged] enterprise." ... In turn, Browne warded off the complaints of
> union officials and accountants who expressed concerns over
> Devaney's performance and criticized the absence of checks and
> balances over the union's financial affairs.

*Browne*, 505 F.3d at 1275.

The *Browne* Court found that the sum of this evidence showed that there was

an "overall objective to be charged." *Id.* at 1276. The extensive misconduct of the

union president's assistant, who was also the president's sister and was responsible

for all bookkeeping on his behalf, was enough for a jury to infer that the president

himself was a part of a conspiracy to commit fraud. *Id.* at 1264. Plaintiffs

misconstrue this case to say that the underlying conspiracy was rooted in Browne's

warding off complaints. To the contrary, the Court found that a conspiracy existed

due to the nature of their close relationship and subject matter of the assistant's fraud, *i.e.*, her brother's bookkeeping and expenses.

Here, Plaintiffs' allegations that the Red Roof Defendants did nothing to stop the prostitution activity fail to prove conspiracy as both a matter of fact and law. First, the record shows that the Red Roof Defendants took steps to investigate complaints of prostitution activity on the properties and address any confirmed activity by calling the police and/or placing involved individuals on the do-not-rent list.[29] When presented with complaints of prostitution taking place on the properties—the Red Roof Defendants and their employees would speak with managers directly, talk to staff, talk to supervisors, talk to the Safety and Security department, stay at the properties, walk the properties, and talk to clientele.[30] Further, the Red Roof Defendants never received a report of *sex trafficking* taking place at the properties—only suspected prostitution.[31]

Second, even if the Red Roof Defendants failed to take these remedial measures, any such omission still would not constitute a conspiracy with Plaintiffs' traffickers to commit sex crimes. Unlike the ample evidence of fraud in *Browne*,

---

[29] *See e.g.*, Cole Dep. (Exh. 19) 107:1-24; Alexander Dep. (Exh. 21) 101:16–105:11.

[30] Moyer Dep. (Exh. 18) 214:1-12, 215:4-8.

[31] Moyer Dep. (Exh. 18) 214:13-16.

here there is no evidence that the Red Roof Defendants employed or engaged any individual for the purpose of facilitating prostitution or sex trafficking. There simply has not been a showing that there was an "overall objective to be charged" by the mere (and incorrect) allegation that the Red Roof Defendants did nothing to respond to prostitution complaints on the premises. As such, Plaintiffs have likewise failed to prove conspiracy to commit RICO.

## II.     Plaintiffs have failed to meet their burden of establishing liability against the Red Roof Defendants under the TVPRA.

In their effort to demonstrate liability against the Red Roof Defendants under the TVPRA, Plaintiffs continuously attribute plaintiff-specific facts to other Plaintiffs. However, it is Plaintiffs' burden to demonstrate that the Red Roof Defendants are liable to each Plaintiff individually. Therefore, generalized assertions of fact, which occur throughout Plaintiffs' argument, about what should have alerted the Red Roof Defendants to instances of TVPRA violations cannot stand as a basis to deny summary judgment. In order to be held liable under the TVPRA, the Red Roof Defendants must have had actual or constructive knowledge of the Plaintiff's specific trafficking. As such, this Court must look only to specifically asserted claims concerning the Red Roof Defendants' alleged constructive knowledge of TVPRA violations in determining whether each individual Plaintiff has set forth

sufficient evidence to survive summary judgment. The Red Roof Defendants further address Plaintiffs' contentions by property below.

### A. Plaintiffs have failed to demonstrate that the Red Roof Defendants had actual or constructive knowledge of TVPRA violations at the Buckhead RRI.

In their attempts to establish that the Red Roof Defendants had constructive knowledge of their trafficking, Plaintiffs JD1, JD2, JD3, JD4, R.K., T.H., K.P., C.A., R.P., and W.K. (collectively "Buckhead Plaintiffs") claim that the Red Roof Defendants should have been aware of TVPRA violations at the Buckhead Red Roof based on the sheer volume of commercial sex taking place.[32] As an initial matter, commercial sex is not tantamount to human trafficking. ***The mere fact that a person is involved in a high-risk industry, such as an adult engaging in commercial sex acts, does not mean human trafficking has occurred***.[33] Moreover, there is no evidence that any Red Roof employees ever witnessed the Buckhead Plaintiffs providing commercial sex acts to buyers. With this being the case, Plaintiffs' arguments necessarily require the Red Roof Defendants to have gleaned from other circumstances that commercial sex was taking place at the Buckhead Red Roof. Yet,

---

[32] Pls.' Resp. in Opp'n at 72.

[33] *See* U.S. Department of Justice, *National Strategy to Combat Human Trafficking*, Jan. 2022, 8 (emphasis added).

the factors Plaintiffs claim to have been present at the Buckhead Red Roof are simply insufficient to have put any of the Red Roof Defendants on notice of TVPRA violations.

The Buckhead Red Roof is an exterior access hotel.[34] As such, individuals did not have to enter the lobby to access rooms, making it impossible for Defendants to know, much less police, the number of visitors any one guest may have on a given day or over the course of time.[35] These individuals would not have checked in at the front desk as they were not renting rooms and could have easily avoided any interaction with Red Roof staff during their alleged visits to the Buckhead Red Roof property.

In order for the Red Roof Defendants to have had constructive knowledge of alleged TVPRA violations based on the "sheer volume of commercial sex," it would have had to monitor each of the Plaintiffs, and their hotel rooms, individually, to keep track of the number of daily visitors.  Of course, doing so would go far beyond any definition of the term "reasonable diligence," and likely constitute an illegal infringement on Plaintiffs' privacy rights. The Red Roof Defendants would have to

---

[34] Cole Dep. (Exh. 19) 104:3-6 (testifying that both the Buckhead and Smyrna Red Roof properties were exterior access hotels).

[35] *See* Cole Dep. (Exh. 19) 104:7-21.

severely invade the privacy of each and every one of its guests before it could have any idea how often each guest had visitors. Even then, the Red Roof Defendants would have to assume that each of these visitors was on the property for the purpose of purchasing commercial sex acts from the unwilling Plaintiffs and act on that assumption. Indeed, there are countless legitimate reasons why a guest might invite individuals to their room. There is no evidence in the record demonstrating that Plaintiffs' alleged visitors made any effort to make their intentions to purchase commercial sex acts known to the public, much less to Red Roof employees. As indicated in Dr. Kimberly Mehlman-Orozco's ("Dr. Mehlman-Orozco") rebuttal expert report, there is no reliable empirical evidence to support the contention that repeated visitors at a hotel are indicative of sex trafficking.[36] Similarly, even if Red Roof Defendants' employees were to identify Plaintiffs' visitors, their presence itself is not illegal and would have been unactionable had the Red Roof Defendants' reported their presence to law enforcement.[37]

Were this Court to accept Plaintiffs' argument, it would require every single hotel property in the United States to profile all property visitors to determine each visitor's intent, *i.e.*, whether each visitor was present to purchase commercial sex

---

[36] Rebuttal Report of Dr. Kimberly Mehlman-Orozco (Exh. 22) at 19.

[37] Rebuttal Report of Dr. Kimberly Mehlman-Orozco (Exh. 22) at 19.

acts or perform commercial sex acts.  This is an impossible task that would likely result in a litany of lawsuits based on incorrect assumptions of visitors' intentions and highly offensive accusations.[38] It would also undoubtedly result in false prosecution claims in the event that hotel staff called law enforcement to remove suspected purchasers of commercial sex from the property.  In this regard, there is no evidence that requiring hotel staff to make such judgment calls about visitors on the property would do anything to quell the sale of commercial sex acts at a given property. As previously stated, there is no reasonable way for the Red Roof Defendants' employees—or employees of any other hotel—to determine whether an individual intends to purchase commercial sex acts. The simple act of a guest having visitors at the hotel, in and of itself, is not illegal or suspicious. Therefore, to establish that the Red Roof Defendants had constructive knowledge of TVPRA violations based on the number of visitors each Plaintiff had while staying at the Property,

---

[38] *See e.g., Marcia Festen and E.L. v. Eastside Med. Center, LLC, et al.*, Case No. 1:22-cv-02646 (N.D. Ga. Jul. 3, 2022) (filing suit after E.L. was reported to the police as a suspected victim of trafficking when she was not); *see also Peter Delvecchia, et al. v. Frontier Airlines, Inc., et al.*, Case No. 2:19-cv-01322 (N.D. Nev. Jul. 31, 2019) (and his minor African American son, contracted with Frontier Airlines to fly from North Carolina to Las Vegas. A Frontier employee falsely accused Plaintiff of engaging in illegal human trafficking and sexual assault. These accusations were allegedly based on the employee's belief that an older white man should not be traveling with a younger black child).

Defendants would have: (1) had to know that the Plaintiffs' visitors were on the Property; and (2) that the visitors were there for the purpose of purchasing commercial sex acts. There is no evidence to demonstrate that any Red Roof Defendant had any such knowledge.

The allegation that requesting an "extraordinary number of extra sheets and towel[s]"[39] should have alerted Red Roof Defendants to TVPRA violations similarly fails to establish constructive knowledge. First, there is no evidence of record to establish what an "extraordinary" number of sheets or towels is. This self-serving characterization of the Plaintiffs' alleged requests of Red Roof's employees is inadmissible opinion evidence and cannot stand as a basis to oppose summary judgment. None of the Plaintiffs testified that they had any experience working as housekeepers for Red Roof or other similarly situated hotels; therefore, they cannot set forth a foundation for knowledge of how many sets of sheets or towels are normally requested by guests. In this regard, none of the Plaintiffs could testify to an actual number of towels or sheets requested. With this being the case, this Court lacks any evidence to make a determination as to whether Plaintiffs' alleged requests

---

[39] Pls.' Resp. in Opp'n at 72.

for sheets and towels could have put Red Roof Defendants on notice of TVPRA violations.

There are many legitimate reasons for sheet and towel requests, and Plaintiffs even admitted that asking for additional linens was not a particularly strange request.[40] This is precisely why Red Roof employees would have complied with requests for additional sheets and towels. Furthermore, there is no evidence that any of the Plaintiffs expressed to Red Roof staff their reasons for requesting sheets and towels. Complying with these requests absent knowledge of the Plaintiffs' intentions is nothing more than an effort to provide Red Roof's guests with a positive guest experience. Moreover, there is no evidence that any Red Roof employee believed Plaintiffs' requests for sheets and towels to be excessive.  Dr. Mehlman-Orozco also opined there is no reliable empirical data to suggest that "excessive" towel or sheet requests can or should put a hotel on notice of sex trafficking.[41] Again, requests for sheets and towels is not illegal, and had the Red Roof Defendants' employees reported this behavior to law enforcement, it would have been unactionable.[42]

---

[40] *See e.g.,* C.A. Dep. Vol. 1 (Exh. 5) 117:6-8.

[41] Rebuttal Report of Dr. Kimberly Mehlman-Orozco (Exh. 22) at 18.

[42] Rebuttal Report of Dr. Kimberly Mehlman-Orozco (Exh. 22) at 18.

Plaintiffs also claim that the number of condoms in their hotel room trashcans should have alerted Red Roof employees to TVPRA violations.[43] This allegation cannot stand as a basis to deny summary judgment. First, there is no evidence of record that Red Roof employees examined the contents of the trashcans in each of its guest rooms.  Therefore, there is no evidence that Red Roof employees were ever aware of condoms in Plaintiffs' trashcans.  As a result, Plaintiffs' testimony, at best, can only establish there were used condoms in their trashcans. However, they have not, and cannot, demonstrate that any of Red Roof Defendants' employees actually knew that there were condoms in their trashcans at any point. Moreover, condoms are not illegal or indicative of illegal activity. In this instance, Plaintiffs would have this Court treat condoms as though they were illegal drug paraphernalia; the mere presence of which would indicate illegal activity were Red Roof employees to discover their existence.  Condoms themselves are not indicative of illegal activity. Therefore, even assuming that Red Roof employees were aware of condoms in Plaintiffs' trash cans (despite there being no evidence to this effect), this still would not have placed Red Roof Defendants on notice of TVPRA violations. There is no reliable empirical evidence to support the contention that condoms in trashcans are

---

[43] Pls.' Resp. in Opp'n at 72.

indicative of sex trafficking.[44] For these reasons, Plaintiffs' testimony that there were excessive amounts of condoms in their trashcans during the relevant time period cannot demonstrate that Red Roof Defendants had constructive knowledge of their alleged trafficking.

Plaintiffs also claim that their appearance should have put Red Roof Defendants on notice of TVPRA violations.[45] They claim they were, at times, dressed scantily in provocative clothing.[46] This is yet another vague and ambiguous characterization that cannot stand as a basis to deny summary judgment. What one might consider provocative dress another may not. Cultural norms dictate what clothing is "appropriate" versus "inappropriate," therefore, what one might consider appropriate dress in the United States might be considered inappropriate in Saudi Arabia. In a brief walk around the City of Atlanta, an individual is likely to encounter men and women wearing revealing clothes that could be considered provocative. Plaintiffs would have this Court rule that everyone should assume that people

---

[44] Rebuttal Report of Dr. Kimberly Mehlman-Orozco (Exh. 22) at 18.

[45] Pls.' Resp. in Opp'n at 72.

[46] *Cf.* D.P. Dep. (Exh. 6) 263:22–264:8 (admitting that she only wore revealing clothing inside her hotel room and would not wear revealing outfits out in public places at the hotel); JD2 Dep. Vol. 1 (Exh. 17) 202:13–203:8 (testifying that when she was outside of her room she would just wear "regular clothes").

dressed in such a fashion are sex trafficking victims and everyone who failed to make efforts to rescue them should be held liable. In the context of a hotel, one would reasonably assume that guests would dress much differently in and around their room—where comfort is the primary motivator for choice of dress—than they would if they were going to work.

Were this Court to accept Plaintiffs' arguments concerning their clothing, it would place an affirmative duty on all hotels in the United States to profile their guests based on their clothing to determine whether they were working as a prostitute. This is an impossible burden to carry that goes far beyond reasonable diligence. In the United States, citizens are free to dress as they please. Hotel employees cannot accurately determine whether an individual is a prostitute or sex trafficking victim based on their manner of dress. They are not fashion police.

Aside from clothing, Plaintiffs' specifically reference K.P.'s testimony in which she claims that she looked "incredibly pale and sleep deprived" while a guest at the Property.[47] Plaintiffs fail to provide any explanation as to how an employee could appreciate that K.P. looked pale and sleep deprived, much less make the illogical leap to assume that this is evidence of sex trafficking. People come in a

---

[47] Pls.' Resp. in Opp'n at 73.

wide variety of complexions; without being specifically familiar with an individual, there is no way to know whether they look "pale" on a given day. Similarly, there is no way to know whether a stranger looks sleep deprived or exactly how they look on any other day. Moreover, K.P. testified that these were the only "signs" of her alleged poor physical state and admitted that during her alleged period of trafficking she never appeared to be underweight or malnourished.[48]

Plaintiffs also allege that, at times, some of them exhibited bruising and other injuries.[49] Many Plaintiffs deny exhibiting any physical injuries, however, during their alleged trafficking.[50] Again, there is no evidence that any Red Roof employee ever saw Plaintiffs' alleged injuries. Even if they had, there is simply no reason why an employee would associate such injuries with TVPRA violations absent specific knowledge that Plaintiffs were being trafficked for sex.  In sum, Plaintiffs assert that Red Roof employees should know, as a matter of law, what prostitutes and/or sex trafficking victims look like. In reality, there is no uniform appearance that sex trafficking victims share. Further, without evidence that Red Roof employees

---

[48] K.P. Dep. (Exh. 12) 184:20-23.

[49] Pls.' Resp. in Opp'n at 73.

[50] *E.g.,* T.H. Dep. (Exh. 10) 279:22–280:1; M.B. Dep. (Exh. 7) 198:19-25, 301:13–302:4.

observed Plaintiffs' conditions, Plaintiffs cannot establish that the Red Roof Defendants had constructive knowledge of their alleged trafficking.

Plaintiffs further allege that their traffickers required them to "keep their heads down and avoid eye contact."[51] Again, these self-serving characterizations of Plaintiffs' behavior are woefully ambiguous and cannot demonstrate that the Red Roof Defendants knew or should have known of alleged TVPRA violations. All individuals have varying natural dispositions that may cause them to be comfortable with more or less eye contact. It is impossible to make a determination as to why an individual might be less engaging during an encounter or avoid eye contact. Furthermore, there is no evidence that any employees actually witnessed Plaintiffs avoiding eye contact, much less appreciated their social disposition as evidence of TVPRA violations. Moreover, as R.K. testified, the alleged "rule" cited by Plaintiffs was that girls were not supposed to look at other pimps, not just anyone.[52] Therefore, there would be no reason why this rule could or should alert the Red Roof Defendants or their employees to Plaintiffs' alleged trafficking as it applied to girls looking at pimps.

---

[51] Pls.' Resp. in Opp'n at 73.

[52] R.K. Dep. 37:20-23, 219:4-23, 221:12-25.

Plaintiffs' assertion that their alleged traffickers "flaunte[ed] their conduct, dressing in loud clothes and lots of bling"[53] similarly cannot demonstrate that Red Roof Defendants knew or should have known of alleged TVPRA violations. As is the recurring theme in this case, Plaintiffs would have Defendants, and all other hotels across the country, profile guests on their property based on their appearance and make assumptions about possible criminal activity without evidence. In this regard, it is unclear what the phrase "flaunted their conduct" is intended to mean as there is no evidence that any of Plaintiffs' alleged traffickers openly committed TVPRA violations in public view. Associating with other guests of the hotel in common areas is not a crime nor indicative of criminal activity. This does not change simply because a guest is wearing what Plaintiffs would consider "loud clothes" or "bling." The Red Roof Defendants and their employees cannot assume, nor should they assume, that guests are engaged in criminal activity because of their fashion choices especially when, as Plaintiff JD1 testified, "[t]hey all had different looks."[54]

---

[53] Pls.' Resp. in Opp'n at 73 (internal quotations omitted); *but see* JD1 Dep. Vol. 1 (Exh. 13) 161:4-10 (describing pimps and their various appearances: "They'd wear Polos. They're just more clean-cut, not just like wearing - - I mean, of course, some of them had baggy pants, but it wasn't - - not all of them looked like thugs.").

[54] JD1 Dep. Vol. 1 (Exh. 13) 161:22.

Simply put, Plaintiffs have not set forth any evidence that, through the exercise of reasonable diligence, Red Roof Defendants could have discovered alleged TVPRA violations against them. Instead, they argue that had the Red Roof Defendants individually surveilled Buckhead RRI's guests and made numerous sweeping generalizations about their appearances, they would have discovered TVPRA violations. These arguments require this Court to place a burden on hotels that exceeds the reasonable diligence standard provided by the TVPRA. As such, the Red Roof Defendants cannot be deemed to have had constructive knowledge of Plaintiffs' alleged trafficking at the Buckhead RRI.

**B. Plaintiffs have failed to demonstrate that Red Roof Defendants had actual or constructive knowledge of TVPRA violations at the Smyrna Red Roof.**

Plaintiffs JD1, JD2, JD3, JD4, R.P., W.K., M.M., E.H., M.B., D.P., and A.F. also contend that Red Roof Defendants had constructive knowledge of their alleged trafficking at the Smyrna Red Roof.[55] Plaintiffs' again rely on the alleged number of visitors to each room, number of towels requested, and Plaintiffs' appearance to provide notice under the TVPRA that Plaintiffs were victims of sex trafficking.[56]

---

[55] Pls.' Resp. in Opp'n at 74.

[56] Pls.' Resp. in Opp'n at 75.

For the reasons stated above, this is insufficient evidence that Red Roof Defendants were on notice of a TVPRA violation.

Regarding the Smyrna RRI specifically, Plaintiffs rely heavily on Forrest Castille's deposition testimony to support the contention that the Red Roof Defendants were aware of TVPRA violations at the Smyrna Red Roof. As an initial matter, Castille only testified to being familiar with Plaintiff M.M.[57] As such, any alleged knowledge he may have had about M.M.'s alleged trafficking is not attributable to other Plaintiffs.

Further, Castille admitted that he did not report his knowledge of prostitution at the property to Smyrna Red Roof management.[58] Specifically, Castille testified as follows:

> Q: So you didn't report it to the police and you didn't report it to your supervisors. So how would you improve the safety of the property that you were working at if you weren't reporting it to anyone?
>
> A: Why is that my problem?
>
> [. . .]

---

[57] *See generally* Castille Dep. (Exh. 1).

[58] Castille Dep. (Exh. 1) 129:1-13; 154:7-22 (testifying that during the period of corporate ownership of the Smyrna Red Roof he did not tell the general manager of the property, Jay Moyer, or anyone at Red Roof corporate that prostitution was occurring at the property).

A: Why was that my problem?  Why would I play security guard or play policeman?  Why?  That was not my job.  Like I said, this was going on when I got there and when I left.  So I—there's—I'm not going to say, oh I should have, could have did better, should have, could have, would have.  No, I'm not going to say that.  That was not my job.[59]

Although Plaintiffs claim that Castille was working alongside their alleged traffickers as a lookout for police, Castille denied doing any such thing.[60] This was further confirmed by Vanessa Cole who testified that Castille was a good employee and "**did not** serve as a lookout [for pimps]."[61] Further, as addressed above, even if Castille had been acting as a lookout for M.M.'s alleged trafficker, this act cannot be attributed to the Red Roof Defendants because it would have been done outside the scope of his employment. Tortious acts committed by an employee cannot be attributed to an employer unless the tortious act is committed in furtherance of the employer's business. *Piedmont Hospital, Inc. v. Palladino, et al.*, 276 Ga. 612 (2003). "The test of liability is, not whether the act was done during the existence of the employment, but whether it was done within the scope of the actual transactions of the master's business for accomplishing the ends of his employment." *Waters v.*

---

[59] Castille Dep. (Exh. 1) 129:1-13; *see also* Castille Dep. (Exh. 1) 125:9-14 ("I was not there to police the Red Roof Inn. I was there to get a paycheck every other Friday. That was my main concern. . . . I was not the prostitute police or the pimp police.").

[60] Castille Dep. (Exh. 1) 139:8–142:11.

[61] Cole Dep. (Exh. 19) 139:16-18, 144:14-19 (emphasis added).

*Steak and Ale*, 241 Ga. App. 709, 710-11 (2000); *see also Brownlee v. Winn-Dixie*, 240 Ga. App. 368 (1999) (employer not responsible for sudden assault committed by employees). Moreover, Castille testified that he associated with M.M.'s alleged trafficker by smoking marijuana while on the job in violation of Red Roof policy.[62]

Furthermore, Red Roof Defendants maintained policies requiring employees to report instances of prostitution to the police during the relevant time period.[63] Castille unequivocally and repeatedly testified that he refused to comply and report prostitution to the police, in clear disregard of his employment duties.[64] Therefore, by failing to report information concerning alleged prostitution at the property and associating with M.M.'s alleged trafficker, Castille was intentionally acting outside the scope of his employment. Even if Castille had in fact been acting as a lookout for M.M.'s trafficker, he would have clearly been acting outside the scope of his employment by perpetuating criminal activity at the Smyrna Red Roof. As such,

---

[62] Castille Dep. (Exh. 1) 142:4-11.

[63] Moyer Dep. (Exh. 18) 162:5–164:2; Cole Dep. (Exh. 19) 73:18–74:17 (testifying that it was Red Roof policy to report prostitution and illegal activity to the police and that she always called the police when she suspected illegal activity); *see also* Thomas Dep. (Exh. 20) 95:7–96:6 (at the time of Mr. Thomas' employment with Red Roof, staff received the following direction: "if you observe anyone whose actions put you, our employees and/or guests at risk, contact your supervisor immediately . . . and the police should be contacted if necessary").

[64] *E.g.,* Castille Dep. (Exh. 1) 129:1-13.

information Castille gained through his illicit interactions with M.M.'s alleged trafficker while doing drugs on the job and/or facilitating their criminal acts is not attributable to the Red Roof Defendants. Castille specifically testified that he actively concealed his knowledge of prostitution and related issues at the Smyrna Red Roof from his superiors.[65] As such, Defendants cannot be deemed to have had constructive knowledge of Plaintiffs' alleged trafficking based on Forrest Castille alone.

Further, even if this Court were to conclude that Castille's knowledge of criminal activity at the Smyrna Red Roof were attributable to the Red Roof Defendants, it would only apply to Plaintiff M.M., not Plaintiffs as a whole. For these reasons, Plaintiffs have failed to demonstrate that Defendants had constructive knowledge of their trafficking, and Defendants are entitled to judgment in its favor as a matter of law.

## III.   Plaintiffs' Negligence Claims Fail as a Matter of Law.

To recover under their negligence claims, each Plaintiff must prove that Defendants: (1) owed her a duty to guard her against injury from the abuse of her

---

[65] Castille Dep. (Exh. 1) 129:1-13; 154:7-22 (testifying that during the period of corporate ownership of the Smyrna Red Roof, he did not tell the general manager of the property, Jay Moyer, or anyone at Red Roof corporate that prostitution was occurring at the property).

alleged traffickers because it was reasonably foreseeable; and (2) should have taken ordinary precautions to protect Plaintiffs from the risk posed by the purported abuse based on Defendants' superior knowledge of the specific danger.

### A. Plaintiffs' negligence claims fail because they were not invitees.

Under Georgia law, "[i]t is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation and damages." *Ware v. Jackson*, 357 Ga. App. 470, 476, 848 S.E.2d 725, 731 (2020). In Georgia, the duty of an owner/occupier or proprietor to invitees on its premises is established by O.C.G.A. § 51-3-1, which provides:

> <u>Duty of owner or occupier of land to invitee</u>. Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

O.C.G.A. § 51-3-1. The duty an owner or occupier of land owes to a licensee or trespasser, however, is lessened. *Compare* O.C.G.A. § 51-3-1 *with* O.C.G.A. § 51-3-2(b) (a landowner is "liable to a licensee only for a willful or wanton injury"); O.C.G.A. § 51-3-3 ("A lawful possessor of land owes no duty of care to a trespasser except to refrain from causing a willful or wanton injury.").

In order to be an invitee entitled to a duty of care, a person must be on the subject premises "for any lawful purpose." O.C.G.A. § 51-3-1. Moreover, "[t]he

'accepted test' for invitee status in Georgia is whether the purported invitee's presence is of 'mutual benefit' to the purported invitee and the landowner." *Tobar v. United States*, 696 F. Supp. 2d 1373, 1378 (S.D. Ga. 2009).

Here, Plaintiffs were not on the subject premises "for any lawful purpose." Instead, Plaintiffs were present on the Buckhead and Smyrna Red Roof premises to commit the crime of prostitution. Even if this Court accepts the Plaintiffs' contention that they were on the Buckhead and Smyrna Red Roof premises because they were being trafficked there, Plaintiffs do not qualify as invitees. Prostitution and sex trafficking are crimes, *see* O.C.G.A. §§ 16-6-9 and 16-5-46, and thus Plaintiffs cannot say that they were on the premises "for any lawful purpose" when the sole reason asserted for Plaintiffs being on the premises is for commercial sex in violation of Georgia law.[66] That Plaintiffs were allegedly victims, and not perpetrators, of the sex trafficking does not change the calculus as to whether Defendants owed any duty under the statute.

Furthermore, Plaintiffs' presence at the Buckhead Red Roof and Smyrna Red Roof properties was not a "mutual benefit" to Defendants. Complaints regarding

---

[66] C.A. Dep. Vol. 1 (Exh. 5) 167:20–168:18 (admitting she was aware that she was having sex for money and that such conduct was illegal); R.P. Dep. (Exh. 3) 86:5-10, 208:22–209:2; JD1 Dep. Vol. 1 (Exh. 13) 157:12-22 (testifying that she was aware that she was engaged in prostitution and that her conduct was illegal).

prostitution at Red Roof branded hotels are inherently bad for Defendants' business because they harm their reputations and negatively impact revenue.[67] Thus, Defendants are also victims of such alleged illegal activity.[68] Plaintiffs have failed to produce any evidence that any Red Roof Defendant was *directly* benefitting from this illegal activity.

Plaintiffs were not at the Buckhead Red Roof or Smyrna Red Roof "for any lawful purpose" and therefore they are not entitled to the duty of care owed to invitees per O.C.G.A. § 51-3-1. Plaintiffs thus were either licensees or trespassers, and "no duty arises of keeping the usual condition of the premises up to any given standard of safety, except that they must not contain pitfalls, man-traps, and things of that character." *Moore-Sapp Investors v. Richards*, 240 Ga. App. 798, 799 (1999). As such, Plaintiffs' allegations of negligence fail as a matter of law, and Defendants are entitled to summary judgment on Plaintiffs' negligence claims.

**B. Plaintiffs' negligence claims fail because the third-party criminal acts of sex-trafficking were not foreseeable.**

To establish foreseeability, Plaintiffs must show that: (1) previous substantially similar incident have occurred at the subject premises; (2) Defendants

---

[67] Lam Dep. (Exh. 23) 68:19–69:13.

[68] Lam Dep. (Exh. 23) 68:19–69:13.

had superior knowledge of a dangerous condition giving rise to the criminal act by Plaintiffs' traffickers; and (3) Defendants' negligence proximately caused Plaintiffs' damages.

### i. Prostitution and sex trafficking are not substantially similar crimes sufficient to satisfy Plaintiffs' burden to establish the foreseeability of Plaintiffs' alleged sex trafficking.

The mere occurrence of prior criminal events is not sufficient to establish foreseeability; instead, the incident causing injury to the plaintiff "must be substantially similar in type to the previous criminal activities occurring on or near the premises so that reasonable person would take ordinary precautions to protect his or her customers or tenants against the risk posed by the type of activity." *Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 786 (1997). It is the burden of the plaintiff to establish that the landowner had knowledge of previous substantially similar crimes sufficient to establish foreseeability. *Medical Center Hosp. Authority v. Cavender*, 331 Ga. App. 469, 477 (2015). If a plaintiff is unable to show substantial similarity, the evidence is irrelevant as a matter of law. *Id.* at 474.

To determine whether previous criminal acts are substantially similar, Courts look to factors including the location, nature and extent of the prior criminal activities, and their likeness, and temporal proximity or other relationship to the crime in question. *Rice v. Six Flags Over Georgia*, 257 Ga. App. 864, 868 (2002).

The key question in this analysis is not whether the prior crime was sufficient to attract the landowner's attention to any danger, but is instead whether the prior crime was "sufficient to attract the owner's attention to the dangerous condition which resulted in the litigated" incident. *Tolbert v. Captain Joe's Seafood, Inc.*, 170 Ga. App. 26, 28 (1984).

Although Plaintiffs cite to crime reports to support their foreseeability arguments, the undisputed evidence shows that there were no reported incidents of sex trafficking at the Buckhead Red Roof or the Smyrna Red Roof prior to Plaintiffs' alleged sex trafficking.[69] With no evidence of prior incidents of sex trafficking, Plaintiffs argue that prostitution is a substantially similar crime to sex trafficking sufficient to overcome the foreseeability issue.[70] Prostitution and sex trafficking, however, are not the same, nor are they sufficiently substantially similar to support Plaintiffs' premises liability claims.

Prostitution is defined as the "practice or an instance of engaging in sexual activity for money or its equivalent; commercialized sex."[71] On the other hand, sex trafficking is defined as the "practice or an instance of recruiting, harboring,

---

[69] Moyer Dep. (Exh. 18) 214:13-16.

[70] Pls.' Resp. in Opp'n at 94.

[71] *Prostitution*, Black's Law Dictionary (11th ed. 2019).

transporting, providing, or procuring a person, or inducing a person by fraud, force, or coercion, to perform a sex act for pay."[72] Any reasonable definition of "sex trafficking" necessarily includes a level of involuntariness while prostitution may be entirely voluntary. Pursuant to the U.S. Department of Justice, human trafficking is also distinct from other forms of exploitation and abuse … *The mere fact that a person is involved in a high-risk industry, such as an adult engaging in commercial sex acts, does not mean human trafficking has occurred.*[73] Moreover, applying the factors discussed in *Rice*, the analysis shows that there are significant differences between prostitution and sex trafficking.[74] Sex trafficking requires the involvement of a third party (*i.e.*, the trafficker) while prostitution does not. In instances of prostitution, the prostitute is the perpetrator of the crime while in sex trafficking, the sex worker is a victim. The crime of prostitution is a misdemeanor while sex trafficking is a felony offense.

Therefore, even if this Court finds that Defendants were somehow on notice of the potential for prostitution to occur at its property, such notice is not sufficient to put Defendants on notice of the potential for sex trafficking at the Buckhead Red

---

[72] *Sex Trafficking*, Black's Law Dictionary (11th ed. 2019).

[73] *See* U.S. Department of Justice, *National Strategy to Combat Human Trafficking*, January 2022, 8 (emphasis added).

[74] *Compare* O.C.G.A. § 16-5-46 *with* O.C.G.A. § 16-6-9.

Roof or Smyrna Red Roof, and specifically the sex trafficking of Plaintiffs at these locations.

### ii.   Plaintiffs' knowledge of the risk of sex trafficking at the Red Roof hotels was equal to or superior to that of Defendants.

The fundamental basis for an owner or occupier's liability is that party's superior knowledge of the hazard encountered by the plaintiff. *Travis v. QuikTrip Corp.*, 339 Ga. App. 551, 553 (2016). Although the issue of a plaintiff's exercise of ordinary care for her own safety is typically a question for the jury, a defendant may prevail on summary judgment where the plaintiff's knowledge of the risk is clear. *Rice*, 257 Ga. App. at 868 (2002); *Rappenecker v. L.S.E., Inc.*, 236 Ga. App. 86, 87-88 (1999). Where a plaintiff has equal or superior knowledge of a hazard or dangerous condition on an owner or occupier's premises, a plaintiff is not entitled to recovery if she fails to exercise reasonable care to avoid the hazard or dangerous condition. *Id.*

In *Rice v. Six Flags Over Georgia*, the Georgia Court of Appeals held that a sexual assault victim had superior knowledge of the hazard and dangerous condition posed by another Six Flags patron. *Rice*, 257 Ga. App. at 868. While Rice, a minor, was in line to ride a roller coaster, an adult man in line behind her pulled her by the arm and told her that they were going to ride together *Id.* at 865. Rice declined an offer from another park guest in front of her to let her out of the line, despite

admitting that she was fearful at the time. *Id.* While on the roller coaster, Rice was sexually assaulted and subsequently sued Six Flags under a theory of premises liability. *Id.* In affirming the trial court's summary judgment ruling, the Georgia Court of Appeals held that "[her] knowledge of the potential for violence on board the roller coaster ***was equal to or superior to that of the appellees in that [plaintiff], though fearful, chose not to alert Park authorities of the concern she felt***." *Id.* at 868 (emphasis added).

Here, each of Plaintiffs' negligence claims must look to who had superior knowledge of the risk of their traffickers and sex trafficking at the subject hotel. The evidence in this case squarely demonstrates that the answer to this inquiry is Plaintiffs. Plaintiffs do not allege that the Buckhead Red Roof or the Smyrna Red Roof were the first establishments where they were allegedly sex trafficked or that they did not know they would be performing sexual acts in exchange for money, and thus Plaintiffs cannot contend they encountered the dangerous or hazardous condition on Defendants' property.[75] Plaintiffs accordingly knew of their traffickers'

---

[75] M.M. Dep. (Exh. 11) 221:8-17 (first trafficking experience at Magnuson Inn); E.H. Dep. (Exh. 16) 248:13-15 (E.H.'s trafficking began in the Hoover/Birmingham, Alabama area); R.K. Dep. (Exh. 4) 192:11-25 (R.K. was first trafficked by Bless at an Extended Stay America hotel); D.P. Dep. (Exh. 6) 109:5-14 (stating her trafficking began at an Econo Lodge); K.P. Dep. (Exh. 12) 227:6-15 (testifying that her first trafficking experience occurred at a Crowne Plaza); A.F. Dep. (Exh. 9) 197:23–198:3 (stating that when her trafficking began her trafficker mostly made

propensities and intent to require Plaintiffs to engage in sex for money prior to any

of Plaintiffs alleged trafficking at the Red Roof properties.

Like the plaintiff in *Rice*, Plaintiffs here chose not to alert employees at the

Red Roof properties they were allegedly being trafficked for sex.[76] Moreover, during

their alleged periods of trafficking, most of these Plaintiffs spoke to a variety of law

enforcement officers, medical professionals, judicial officials, family members,

friends, and employers and maintained personal cell phones or acknowledged that

they had access to landlines inside of their motel rooms. Notwithstanding, they still

failed to tell these individuals that they were allegedly being forced to have sex for

money or otherwise contact anyone who might have been able to provide them

---

her work at InTown Suites in Buckhead and only after this was she allegedly trafficked at Red Roof); C.A. Dep. Vol. 1 (Exh. 5) 110:8-16; R.P. Dep. (Exh. 3) 40:7-15 (first trafficking experience at a Masters Inn); T.H. Dep. (Exh. 10) 245:22–246:7 (testifying that Bagz first forced her to perform sexual acts for money at an unspecified "ritzy" hotel); JD1 Dep. Vol. 1 (Exh. 13) 109:16–111:18; JD2 Dep. Vol. 1 (Exh. 17) 65:24–66:17 (first trafficking experience occurred at a Suburban Extended Stay); JD3 Dep. (Exh. 14) 126:14-19 (testifying that her trafficking by Bagz began at an apartment complex); JD4 Dep. (Exh. 15) 99:13–102:9 (claiming she was first trafficked at a Suburban Extended Stay).

[76] K.P. Dep. (Exh. 12) 243:22–244:2; T.H. Dep. (Exh. 10) 276:19–277:15; M.M. Dep. (Exh. 11) 239:13-22; E.H. Dep. (Exh. 16) 127:16–128:3, 130:8-16, 258:12-16; R.K. Dep. (Exh. 4) 274:2-6; D.P. Dep. (Exh. 6) 275:14-22, 295:8-12; M.B. Dep. (Exh. 7) 272:11-17; A.F. Dep. (Exh. 9) 247:4-6; C.A. Dep. Vol. 1 (Exh. 5) 116:5–117:5; R.P. Dep. (Exh. 3) 277:16-18; W.K. Dep. (Exh. 8) 242:11–243:1; JD1 Dep. Vol. 2 (Exh. 24) 313:15-18; JD2 Dep. Vol. 1 (Exh. 17) 192:16-22, 196:2-21; JD3 Dep. (Exh. 14) 158:1-6; JD4 Dep. (Exh. 15) 105:13-23, 111:14–112:2.

assistance.[77] Plaintiffs clearly had superior knowledge of the risk of sex trafficking at the Buckhead and Smyrna Red Roofs to that of Defendants and failed to take any action given this superior knowledge of their trafficker's intent. *See Rice*, 257 Ga. App., at 868. Therefore, summary judgment as to Plaintiffs' negligence claims should be entered in favor of Defendants.

---

[77] *See e.g.,* K.P. Dep. (Exh. 12) 182:21-23 (admitting that she never told her employer, a criminal lawyer, a that she was being forced into sex trafficking); E.H. Dep. (Exh. 16) 257:21–258:11; R.K. Dep. (Exh. 4) 274:8-10, 276:5-15, 281:15–282:3; D.P. Dep. (Exh. 6) 81:11-20 (testifying that she told her mother that she "was having sex for money for [Trap] to provide drugs to the community," but never told her that Trap was forcing her to sell herself), 82:8-14; M.B. Dep. (Exh. 7) 168:22–169:6, 173:9–174:7; A.F. Dep. (Exh. 9) 204:19–205:22, 220:17-19; R.P. Dep. (Exh. 3) 136:16–137:25 (admitting that she had ample opportunities to seek help from law enforcement officials, judges, lawyers, etc.); JD1 Dep. Vol. 1 (Exh. 13) 106:1-12, 127:16-19 (agreeing that she had the opportunity to ask the police for help).

### C. Plaintiffs E.H.[78], M.B.[79], D.P.[80], W.K.[81], JD1[82], and JD2's[83] negligence claims related to the Smyrna Red Roof fail as a matter of law because Defendants did not own, operate, or exercise control over the Smyrna Red Roof during their alleged period of trafficking.[84]

Defendants owed no duty to Plaintiffs E.H., M.B., D.P., W.K., JD1, and JD2 supporting their claims for negligence related to their alleged trafficking at the Smyrna Red Roof under a theory of direct liability.[85] "Under O.C.G.A. § 51-3-1, a

---

[78] E.H.'s allegations pertain only to the Smyrna Red Roof, and her alleged trafficking occurred from 2014 through 2018 while the Smyrna Red Roof was owned and operated by independent franchisee Varahi. (*W.K., et al.* SAC ¶¶ 4, 11, 14, 38).

[79] M.B.'s allegations pertain only to the Smyrna Red Roof, and her alleged trafficking occurred from 2015 through 2016 while the Smyrna Red Roof was owned and operated by independent franchisee Varahi. (*W.K., et al.* SAC ¶¶ 4, 11, 17, 38).

[80] D.P.'s allegations pertain only to the Smyrna Red Roof, and her alleged trafficking occurred during 2017 while the Smyrna Red Roof was owned and operated by independent franchisee Varahi. (*W.K., et al.* SAC ¶¶ 4, 11, 18, 38).

[81] W.K.'s alleged trafficking at the Smyrna Red Roof occurred in 2014 while the property was owned and operated by independent franchisee Varahi. (*W.K., et al.* SAC ¶¶ 13, 38; W.K. Dep. (Exh. 8) 131:20–133:5).

[82] JD1's alleged trafficking at the Smyrna Red Roof occurred between New Years Eve 2012 through January 2017 while the property was owned and operated by independent franchisee Varahi. (JD1 SAC. ¶ 90; JD1 Dep. Vol 1 (Exh. 13) 14:19–15:11)

[83] JD2's alleged trafficking at the Smyrna Red Roof occurred in 2014 while the property was owned and operated by independent franchisee Varahi. (JD2 SAC ¶ 91; JD2 Dep. Vol 1 (Exh. 17) 14:10-14)

[84] *See* Plaintiffs' Trafficking Chart by Location and Years (Exh. 25).

[85] In their Response, Plaintiffs forego the argument set forth in their Complaints that, as franchisor, Defendants were vicariously liable for acts of Varahi, apparently acknowledging that no reasonable jury could find that Defendants controlled the

*premises owner* has a duty to exercise ordinary care to keep the premises safe for invitees." *Ferguson v. Premier Homes, Inc.*, 303 Ga. App. 614, 615 (2010) (emphasis added); *see also* O.C.G.A. § 51-3-1 (imposing certain duties on "*an owner or occupier of land*") (emphasis added).

Defendants are not and cannot be liable to Plaintiffs E.H., M.B., D.P., W.K., JD1, and JD2 for any injuries they sustained related to the Smyrna Red Roof as a matter of law because they did not own or occupy the Smyrna Red Roof during the relevant time period and were in no way in control or possession of the property.[86] Here, it is undisputed that Varahi was the owner and operator of the Smyrna Red Roof during the entirety of E.H., M.B., D.P., W.K., JD1, and JD2's alleged period of trafficking. Moreover, as discussed in Defendants' summary judgment motions, the Franchise Agreement and brand standards did not give any of the Defendants control of Varahi's operations, but rather were necessary to maintain the reputation and quality of the Red Roof brand. These Plaintiffs cannot, and do not even attempt

---

time, manner, or method in which Varahi managed and operated the Smyrna Red Roof sufficient to impose vicarious liability under Georgia law. *See* Pls.' Resp. in Opp'n at 98.

[86] Plaintiffs explicitly acknowledge throughout their Response that the duty to keep a premises in a reasonably safe condition is limited to the *owner* of that land. *See e.g.*, Pls.' Resp. in Opp'n at 89 (Georgia law "'imposes a nondelegable duty upon a *landowner* . . .'") (quoting *TGM Ashley Lakes, Inc. v. Jennings*, 264 Ga. App. 456, 462 (2003) (*en banc*) (emphasis added).

to, point to any evidence showing that Defendants owed a legal duty to E.H., M.B.,

D.P., W.K., JD1, or JD2 related to the Smyrna Red Roof. Plaintiffs E.H., M.B., D.P.,

W.K., JD1, and JD2's direct negligence claims pertaining to their alleged injuries

and damages sustained at the Smyrna Red Roof fail as a matter of law.

## CONCLUSION

For the foregoing reasons, this Court should render summary judgment for the

Red Roof Defendants.

Respectfully submitted this 14th day of April, 2023.


LEWIS BRISBOIS BISGAARD
& SMITH LLP
Bank of America Plaza
600 Peachtree Street, NE, Suite 4700
Atlanta, Georgia 30308
(404) 348-8585
(404) 467-8845 Facsimile
Chuck.Reed@lewisbrisbois.com
Adi.Allushi@lewisbrisbois.com
Emma.Fennelly@lewisbrisbois.com

*/s/ Adi Allushi*
CHARLES K. REED
Georgia Bar No. 597597
ADI ALLUSHI
Georgia Bar No. 852810
EMMA J. FENNELLY
Georgia Bar No. 610587

*Attorneys for Defendants*
*Red Roof Inns, Inc., FMW RRI NC,*
*LLC, Red Roof Franchising, LLC,*
*RRI West Management, LLC, Westmont*
*Hospitality Group, Inc. and RRI III,*
*LLC*

## <u>RULE 7.1D CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court was computer-processed, double-spaced between lines, and used Times New Roman font of 14 point size.

Dated: April 14, 2023.

<u>/s/ Adi Allushi</u>
ADI ALLUSHI

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of April, 2023 a true and correct copy of the foregoing was served upon the following parties and/or counsel of record via CM/ECF and/or U.S. First Class Mail, as follows:

John E. Floyd
floyd@bmelaw.com
Manoj S. Varghese
varghese@bmelaw.com
Tiana S. Mykkeltvedt
mykketlvedt@bmelaw.com
Amanda Kay Seals
seals@bmelaw.com
Michael R. Baumrind
baumrind@bmelaw.com
Amanda D. Bradley
bradley@bmelaw.com
Juliana Mesa
mesa@bmelaw.com
BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, Georgia 30309
*Attorneys for Plaintiffs*

Jonathan S. Tonge
jtonge@atclawfirm.com
Patrick J. McDonough
pmcdonough@atclawfirm.com
ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
*Attorneys for Plaintiffs*

C. Shane Keith
skeith@hpylaw.com
Warner S. Fox
wfox@hpy.com
Elliot C. Ream, Esq.
eream@hpylaw.com
HAWKINS, PARNELL, YOUNG, LLP
303 Peachtree Street N.E., Suite 4000
Atlanta, Georgia 30308

John William Hammond, Esq.
PO Box 548
Marietta, GA 30061
jwhammondv@msn.com
*Counsel for Michael Tyrone Rutledge*

Rick Jason Christian, Esq.
166 Anderson Street Suite 100
Marietta, GA 30064
rjclawyer@yahoo.com
*Counsel for Martez Marquel Fuqua*

/s/ Adi Allushi

LEWIS BRISBOIS BISGAARD
& SMITH LLP
Bank of America Plaza
600 Peachtree Street, NE, Suite 4700
Atlanta, Georgia 30308
(404) 348-8585
(404) 467-8845 Facsimile
Chuck.Reed@lewisbrisbois.com
Adi.Allushi@lewisbrisbois.com
Emma.Fennelly@lewisbrisbois.com

CHARLES K. REED
Georgia Bar No. 597597
ADI ALLUSHI
Georgia Bar No. 852810
EMMA J. FENNELLY
Georgia Bar No. 610587

*Attorneys for Defendants*
*Red Roof Inns, Inc., FMW RRI NC,*
*LLC, Red Roof Franchising, LLC,*
*RRI West Management, LLC, Westmont*
*Hospitality Group, Inc. and RRI III,*
*LLC*