EXHIBIT

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JANE DOE 1-4                          *
                                      *
            Plaintiffs,               *         Civil Action No.
v.                                    *         1:21-cv-04278-WMR
                                      *
RED ROOF INNS, INC.;                  *
FMW RRI NC, LLC;                      *
RED ROOF FRANCHISING,                 *
LLC;                                  *
RRI WEST MANAGEMENT,                  *
LLC; VAHARI HOTEL, LLC;               *
WESTMONT HOSPITALITY                  *
GROUP, INC.; and RRI III, LLC         *
                                      *
            Defendants.               *


**Expert Report of Dr. Kimberly Mehlman-Orozco**
**CEO of Break the Chain LLC**
**15920 Fairway Drive**
**Dumfries, Virginia 22025**
**(703) 362-9405**


_____

**SUBMITTED BY DR. KIMBERLY MEHLMAN-OROZCO under penalty of
perjury. September 6, 2022[1].**

---

[1] I may prepare graphic or illustrative exhibits based on the information reviewed and/or my analyses for use at trial. I reserve the right to amend my analysis, opinions, and this report should additional information be made available.

## II.   DEFINITIONS

**Human trafficking**: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.[4]

**Sex Trafficking**: the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion or in which the person induced to perform such act has not attained 18 years of age[5]

**Sex Trafficker:** a person who induces an adult to perform a commercial sex act through the use of force, fraud, coercion, abduction, threat, or deception; or induces anyone who has not attained 18 years of age to perform a commercial sex act.

**Sex Trafficking Victim:** a person who is induced into a commercial sex act through force, fraud, coercion, abduction, threat, or deception; or any person induced into a commercial sex act, who has not attained 18 years of age.

**Consenting Sex Worker:** an adult who chooses to engage in sexual activities in exchange for payment, without being forced, defrauded, coerced, abducted, threatened, or deceived. Also referred to as a prostitute or whore[6].

**Survival Sex:** trading for money, drugs, *or other needs*[7].

**Trick:** committing an act of prostitution (verb), or the person buying it (noun)[8]. A victim is said to be "turning a trick" or "with a trick."[9]

**John:** a man who patronizes sex workers. Also referred to as a monger, hobbyist, or trick.[10]

**Bottom:** a female victim of a sex trafficker who has been indoctrinated enough to facilitate the recruitment, control, and exploitation of other sex workers despite being exploited herself.

**Family/Folks**: the term used to describe the other individuals under the control of the same pimp. He plays the role of father (or "Daddy") while the group fulfills the need for a "family."[11]

---

[4] 22 U.S. Code § 7102.Definitions: https://www.law.cornell.edu/uscode/text/22/7102
[5] TVPRA under 22 U.S.C. § 7102
[6] Gira Grant, Melissa. (2014). Playing the Whore: The Work of Sex Work. Verso.
[7] Clingan, S. E., Fisher, D. G., Reynolds, G. L., Janson, M. A., Rannalli, D. A., Huckabay, L., & Nguyen, H. D. (2020). Survival Sex Trading in Los Angeles County, California, USA. Journal of sex research, 57(7), 943–952. https://doi.org/10.1080/00224499.2019.1703885
[8] A "commercial sex consumer" can be referred to as a "John" or a "Trick" by sex traffickers, victims of sex trafficking, or consenting sex workers; however, these men generally refer to themselves as "mongers" or "hobbyists."
[9] Shared Hope International. N.d. Human Trafficking Terms. Retrieved from: https://sharedhope.org/the-problem/trafficking-terms/
[10] Mehlman-Orozco, Kimberly. (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger.
[11] Mehlman-Orozco, Kimberly. (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger.

**The Game/The Life:** the subculture of prostitution, complete with rules, a hierarchy of authority, and language. Referring to the act of pimping as 'the game' gives the illusion that it can be a fun and easy way to make money, when the reality is much harsher. Women and girls will say they've been "in the life" if they've been involved in prostitution for a while.[12]

**Two-Call System:** a commercial sex exchange tactic to evade third party detection. The commercial sex consumer will call twice for in-call commercial sex providers: first, to set up an appointment time and obtain general directions to the in-call location, and second, to obtain specific information on which hotel room or apartment the sexual services will be provided.[13]

**In-call:** any location where the commercial sex consumer travels to the commercial provider for services, such as the sex worker's place of residence or hotel room.

**Outcall:** any location where the commercial sex worker travels to the consumer for services, such as the hobbyist or monger's place of residence or hotel room. Also known as TOS or "take-out service."

**Trap phone:** A prepaid cellular telephone utilized for illicit exchanges, including but not limited to the sale of drugs or commercial sex.

**Track:** An area where commercial sex is advertised outside.

**Venture:** defined in Section 1591(e) as "any group of two or more individuals associated in fact, whether or not a legal entity[14]."

**Ecological Fallacy:** an error of attributing the characteristics of a population to an individual.

**Secondary Exploitation:** the act of making use of or benefiting from a human trafficking survivor's victimization or the human trafficking phenomenon[15].

**Abuse:** The willful infliction of physical pain, physical injury, sexual abuse, mental anguish, unreasonable confinement, or willful deprivation of essential services[16].

---

[12] *Ibid*.
[13] *Ibid*.
[14] " 18 U.S.C. § 1591(e)(5)" *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018)
[15] Mehlman-Orozco, Kimberly. (2017). *Hidden in Plain Sight: America's Slaves of the New Millennium*. Praeger.
[16] Official Code of Georgia Annotated (O.C.G.A.).

# III.   SUMMARY OF OPINIONS

a.  Sex trafficking is a clandestine crime.

b.  Sex trafficking victims are difficult to identify and are frequently misidentified.

c.  As a consequence of misidentification, sex trafficking victims are often erroneously criminalized by the judicial system.

d.  Indicia of prostitution are often erroneously conflated with indicia sex trafficking.

e.  Indicia of "sex trafficking" in the hospitality industry have not been adequately evaluated for sensitivity or specificity.

f. I am not aware of any reliable empirical research to estimate the prevalence of sex trafficking at hotels or motels in the United States.

g. I am not aware of any reliable empirical research that adequately evaluates the efficacy of the Blue Campaign signs and indicators of sex trafficking.

h. Based on the evidence in this case and my expertise on the identification of sex trafficking victims, it is more likely than not that Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4's alleged sex trafficking victimization was not "open" or "obvious" to the RED ROOF INNS, INC.; FMW RRI NC, LLC; RED ROOF FRANCHISING, LLC; RRI WEST MANAGEMENT, LLC; VAHARI HOTEL, LLC; WESTMONT HOSPITALITY GROUP, INC.; and RRI III, LLC Defendants.

i. Based on the evidence in this case and my expertise on the identification of sex trafficking victims, it is not reasonable to conclude that the RED ROOF INNS, INC.; FMW RRI NC, LLC; RED ROOF FRANCHISING, LLC; RRI WEST MANAGEMENT, LLC; VAHARI HOTEL, LLC; WESTMONT HOSPITALITY GROUP, INC.; and RRI III, LLC Defendants knew or should have known that Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4 were victims of sex trafficking.

Human Trafficking "Indicators" in Aviation

For example, the FAA Extension, Safety, and Security Act of 2016, requires air carriers to provide initial and annual flight attendant training regarding recognizing and responding to potential human trafficking victims. The Blue Lightning Initiative (BLI), led by the Department of Transportation, the Department of Homeland Security, and U.S. Customs and Border Protection, is an element of the DHS Blue Campaign. The BLI trains aviation industry personnel to identify potential traffickers and human trafficking victims, and to report their suspicions to federal law enforcement.

The BLI training was developed based on feedback from aviation industry "experts" and human trafficking survivors.  The training is 25 minutes in length, and is comprised of four lessons that include:

1. What is Human Trafficking?
2. Indicators of Human Trafficking Activity
3. Reporting Suspected Human Trafficking
4. Indicator Challenge[35]

One of the supposed "indicators" or "red flags" that airlines were trained on was "a non-genuine relationship; particularly parent/guardian-child" (see Figure 1)[36]. However, there was absolutely no empirical evidence to support this "indicator" or "red flag" as being a valid indica of trafficking and anecdotal evidence suggests that it may have remarkably low rates of specificity.

According to multiple airline patrons, employees began falsely accusing and/or initiating investigations for trafficking against predominately mixed-race passengers, even though they were law abiding (for examples, see Table 2).

**INDICATORS OF HUMAN TRAFFICKING**

If you notice a person or group of people that have:



No control of travel identification/documents



No freedom of movement/ social interaction



Difficulty articulating reasonable/logical travel plans



A non-genuine relationship; particularly parent/guardian-child

**Figure 1. Blue Lightning Initiative for Aviation Personnel "Indicators"**

**Table 2. Examples of Human Trafficking "Red Flag" Indicia Resulting in False Allegations and Claims of Racial Profiling**

| Case Name/Number | Year | Allegations |
|---|---|---|
| PETER DELVECCHIA, et al., Plaintiffs, v. FRONTIER AIRLINES, Inc., et al., Defendants. Case No. 2:19-cv-01322-KJD-NJK | 2019 | Plaintiff Peter DelVecchia ("Peter") and his twelve-year old son, Plaintiff A.D., contracted with Defendant Frontier Airlines to fly from North Carolina to Las Vegas. Plaintiff Peter is Caucasian and his son, A.D. is African-American. Defendant Warren then falsely accused Peter of engaging in illegal human trafficking and sexual assault. Based upon the allegations of the complaint, the assault and the accusations were based on Warren's belief that an older white man should not be traveling with a younger black child. Warren had discussed these beliefs with the rest of the flight crew, the other |

---

[35] U.S. Department of Transportation. N.d. Blue Lightning Initiative. Retrieved from: https://www.transportation.gov/administrations/office-policy/blue-lightning-initiative
[36] Blue Lightning Initiative. N.d. A Guide for Aviation Personnel to Recognize and Report Suspected Human Trafficking. Retrieved from: http://hiddeninplanesight.org/wp-content/uploads/afa-cobranded-blue-lightning-pocket-guide-5.pdf

| | | |
|---|---|---|
| | | defendants. They concurred in his belief that the situation was "improper" and that Peter showed inappropriate affection to A.D. Warren then forced A.D. to leave his seat and father. He was forced to sit in the rear of the plane where an adult male sat between A.D. and the aisle. The father and the son were not allowed to reunite for the duration of the flight.[37] |
| N/A | 2021 | Mary MacCarthy of Los Angeles and her 10-year-old daughter, Moira, were flying to Denver. When they arrived in Denver, MacCarthy said, she and her daughter were met on the jetway by two Denver police officers. The mother and daughter were cleared, but police report noted that officers were responding to a "possible Human Trafficking reported by South West flight attendant," which Ms. MacCarthy believed was racial profiling[38]. |
| N/A | 2021 | Lakeyjanay Bailey, a 21-year-old Black woman, was traveling from Denver to Dallas with her 4-year-old adoptive sister, Olivia, who is white. When the pair landed at Dallas Fort Worth International Airport, authorities were waiting for them inside the gate. The incident report said that Frontier Airlines requested police to investigate the matter after a passenger on the plane was concerned about a possible human trafficking incident involving a female born in 2001 who was traveling with a female born in 2017[39]. |
| N/A | 2015 | Kathleen Chan and Jay Serrano, are residents of Astoria, Queens, who were returning from a holiday trip to the Dominican Republic. When their American Airlines flight landed at JFK Airport, the flight captain asked everyone to stay seated. After about 20 minutes, three-armed Port Authority police officers entered the plane and asked Chan to escort them outside. Chan, an Asian woman, and Serrano, a Puerto Rican man, were told that the flight crew had alerted the police that it was a possible case of sex trafficking[40], even though the couple were in a consenting adult relationship and actually lived together. |
| N/A | 2017 | Brian Smith, from Arizona, was travelling back from a trip to Florida with his wife Renee and their three children, including Georgianna, 16, who the couple adopted from China. Mr. Smith said as the family got off their Southwest Airlines flight in Phoenix, he was approached by police who said a flight attendant had "some concerns about the person you're with." Southwest Airlines later released a statement: "Our flight attendants do receive training in recognizing expert-identified, common behavioral indicators of human trafficking. Following conversations with authorities on the ground after the flight, we're continuing our conversation with the family and with our employees whose valuable vigilance is aimed at aiding law enforcement in successfully stopping a growing number of trafficking situations.[41]" |
| N/A | 2017 | Osvaldo Maciel had been flying back to New York from a trip to Cancun to visit family with his fairer skinned young daughter on March 1, when another passenger accused him of child trafficking. When the plane touched down at Newark Airport, Mr. Maciel and his daughter were allegedly approached by a number of officers from the Port Authority and Customs and Border Patrol, |

[37] Case information retrieved from: https://casetext.com/case/delvecchia-v-frontier-airlines-1

[38] Selva Jenn and Gregory Lemos. November 8, 2021. Mom says Southwest Airlines thought she was trafficking her biracial daughter. CNN. Retrieved from: https://www.cnn.com/2021/11/07/us/southwest-airlines-human-trafficking-accusation/index.html

[39] Wang, Bayan. July 21, 2021. Black Aurora woman questioned for trafficking white sister at Dallas airport. Retrieved from: https://www.thedenverchannel.com/news/local-news/black-aurora-woman-questioned-for-trafficking-white-sister-at-dallas-airport

[40] Nolan Brown, Elizabeth. January 14, 2016. Another Asian Air Traveler Detained Over Suspicions She's Being Sex Trafficked. Reason. Retrieved from: https://reason.com/2016/01/14/another-asian-woman-detained-at-airport/

[41] News.com.au. December 22, 2017. Man wrongly accused of human trafficking teenage daughter. Retrieved from: https://www.news.com.au/travel/travel-updates/incidents/man-wrongly-accused-of-human-trafficking-teenage-daughter/news-story/0b541932de32ad24c66894fd86bc7ce4

| | | escorted off the plane and interrogated. Mr. Maciel's wife stated the incident was based on nothing more than a racially charged observation[42]. |
|---|---|---|

Additionally, persons erroneously accused of trafficking and/or reported to the police as victims have started to file lawsuits alleging defamation. For example, Marcia Festen and E.L. recently filed a lawsuit against Eastside Medical Center LLC, Robin Lowman White, Elizabeth Davlantes, and Jane Marilyn Pineda on July 3, 2022 (Case Number 1:22-cv-02646-MHC) in the United States District Court Northern District of Georgia Atlanta Division alleging Defamation: Slander and Libel *per se* and Slander and Libel because E.L. was reported to the police as a suspected victim of trafficking, when she was not (see Exhibit II).

Ultimately, although anti-trafficking training and interventions may be well-intentioned, they are largely untested or unsupported by rigorous empirical research. Extant information suggests that many "indicia" have low rates of specificity and misidentification persists.

Human Trafficking "Indicators" in Hospitality

Similar to the aviation industry, the Department of Homeland Security Blue Campaign also released a toolkit for identifying human trafficking in the hospitality industry in or about August 2016[43].

The toolkit shared four sets of "indicators," which were not empirically tested or validated[44], for different types of staff:

1. Hotel and Motel Staff;
2. Housekeeping, Maintenance, and Room Service Staff;
3. Concierge, Bellman, Front Desk, Security, and Valet Staff;
4. Food and Beverage Staff.

The toolkit includes a number of "general indicators," which lack any empirical support, for examples, see Table 3.

Table 3. Sample of Blue Campaign "Indicia" and Countervailing Information

| Applicable Staff | Blue Campaign "General Indicator" | Countervailing Information |
|---|---|---|
| All hotel and motel staff | Individuals have few or no personal items—such as no luggage or other bags. | There is no empirical evidence to support this purported "indicium." Publicly criticized for potentially ensnaring female travelers traveling alone, particularly for business[45]. |

---

[42] News.com.au. April 21, 2017. Father interrogated for child trafficking because his daughter did not look like him. Retrieved from: https://www.news.com.au/travel/travel-updates/incidents/father-interrogated-for-child-trafficking-because-his-daughter-did-not-look-like-him/news-story/dad68db2c0d0a3425a80b04c545fa245

[43] Released on August 10, 2016 per https://www.dhs.gov/blog/2016/08/10/human-trafficking-and-hospitality-industry

[44] Dr. Mehlman-Orozco personally interviewed Mick McKeown, who was Executive Director of the Homeland Security Advisory Council and Campaign Office during the time this toolkit was created and he confirmed absolutely no research was used in the development of these indicators or to test their sensitivity or specificity for identifying potential trafficking on premises.

[45] See, for example: Nolan Brown, Elizabeth. (2019). Are You a Woman Traveling Alone? Marriott Might Be Watching You. Reason. Retrieved from https://reason.com/2019/02/05/hotel-surveillance-state-sex-trafficking/ and Song, Sandra. (2019). When Anti-Sex Trafficking Policies like the Marriott's Do More Harm Than Good. Paper

For example, take the case of Jennifer Lowery-Keith. She was sex trafficked on and off since she was fourteen years old, first by her mother's drug dealer, whom she thought was her "boyfriend." At one point, one of her sex traffickers shot her at point blank range in her right leg, requiring a vascular transfusion. When Jennifer finally called the police to ask for help, she was arrested, not her sex trafficker (see Figure 2). In 2013, police responded to Jennifer's call for help at a Super 8 Motel in West Haven, Connecticut; yet, the police arrested her, not her trafficker.[55] However, like many victims of trafficking, Jennifer's status vacillated for over a decade between being trafficked and engaging in survival sex or consenting prostitution, making accurate identification from a superficial encounter nearly impossible.



**Figure 2. Example of Human Trafficking Victim Erroneously Criminalized**

Many experts agree that "the anti-trafficking field is a strikingly 'rigor-free zone' when it comes to defining the concept's legal parameters[56]. It is believed that key aspects of the legal definition were intentionally left vague in order to achieve legislative consensus, but this has resulted in the indiscriminate conflation of legal concepts and misidentification of victims[57].

### Juveniles

According to Section 103, 8A of the Trafficking Victims Protection Act (TVPA) of 2000, children do not need to be forced, defrauded, or coerced to be considered victims of sex trafficking. The definition of child sex trafficking implies that juveniles do not have the legal capacity to consent to exploitation and that illicit means are implicit when a juvenile is induced to commit a commercial sex act.

As victims of a severe form of human trafficking, commercial sexually exploited children are afforded numerous protections under Section 107, c1 of the TVPA (2000), namely sex trafficked juveniles shall:

(1)   Not be detained in facilities inappropriate to their status as crime victims;
(2)   Receive necessary medical care and other assistance;
(3)   Be provided protection if a victim's safety is at risk or if there is danger of additional harm by recapture of the victim by a trafficker (p. 1477).

The letter and spirit of these provisions are to generally safeguard juvenile sex trafficking survivors. However, these protective directives can be difficult to effectuate in practice. Given the

---

[55] The Associated Press. (2013) Connecticut woman charged with prostitution after calling police on pimp. Oregon Live. https://www.oregonlive.com/today/2013/05/connecticut_woman_charged_with.html
[56] Chuang, Janie A. (2014). Exploitation Creep and the Unmaking of Human Trafficking Law. *The American Journal of International Law*. (108) 4: 609-649.
[57] *Ibid.*

# IX.   "KNEW OR SHOULD HAVE KNOWN"

The "knew or should have known" standard implies that there is an owed duty of care from one individual or entity to another. Generally, this standard can be met if a person:

1. Has actual knowledge;
2. Acts in deliberate ignorance; or
3. Acts in reckless disregard.

Establishing whether someone "knew or should have known" shall be based on all facts and circumstances. This standard can also be met if a person:

1. Had knowledge of sufficient facts that would lead a reasonable person to make the conclusion in question; or
2. If a reasonable person in the actor's same circumstances would make the conclusion in question, based on all the facts reasonably available to the person at the time, which include, but are not limited to:
   a. Presence of indica;
   b. Presence of disclosures; and
   c. Whether appropriate inquiries were made.

In general, TVPA/TVPRA claims involving third-parties[86] typically allege there were subtle "red flags" that employees should have noticed. For example, in the hotel industry, Plaintiffs and their purported experts have claimed that asking for extra towels, turning down room service, or having multiple cell phones, "excessive" condoms, lingerie, and gift cards in the room are "red flags" of trafficking. I am not aware of any empirical evidence to support the reliability of these "red flags" and anecdotal data suggests these that these purported "red flags" have low rates of sensitivity and specificity[87] in a business setting. Moreover, even if these purported "red flags" were reported by employees to law enforcement, most of them are not illegal and are therefore unactionable. In many if not most TVPA/TVPRA third-party liability claims, Plaintiff is asking private businesses to do more than law enforcement, based on nothing more than demonstrably unreliable "red flags." As such, even if accepted as true, these types of purported "red flags" do not rise to the level of establishing a Defendant "knew or should have known" that a Plaintiff was being sex trafficked.

---

[86] TVPA/TVPRA third-party liability claims are filed against a person who is not the alleged trafficker or a business/entity who is not directly profiting from the trafficking enterprise.

[87] Low sensitivity herein means that victims of human trafficking are often misidentified as non-victims, criminals, or co-conspirators. Low specificity herein means that persons who are not victims of human trafficking are often misidentified as being victims.

For instance, as mentioned previously, one of the supposed "indicators" or "red flags" that private businesses in the aviation industry were trained on was "a non-genuine relationship; particularly parent/guardian-child" (see Figure 5)[88]. However, there was absolutely no empirical evidence to support this "indicator" or "red flag" as being a valid indica of trafficking and anecdotal evidence suggests that it may have remarkably low rates of specificity. According to multiple airline patrons, employees began falsely accusing and/or initiating investigations for trafficking against predominately mixed-race passengers, even though they were law abiding (for example, see PETER DELVECCHIA, et al., Plaintiffs, v. FRONTIER AIRLINES, Inc., et al., Defendants. Case No. 2:19-cv-01322-KJD-NJK).



Figure 5. Blue Lightning Initiative for Aviation Personnel "Indicators"

Moreover, although most sex workers are not victims of trafficking[89], many TVPA/TVPRA claims involving third parties allege that businesses should treat purported indicia of sex work as indicia of sex trafficking; thus, asking private citizen employees to assume all suspected sex workers are potentially trafficked victims. In a private business setting, relying on the stereotype of what an average citizen thinks a sex worker might look like is not supported by empirical research and is arguably inappropriate, subjective, unreliable, and may result in violations of the right to privacy or profiling.

In addition to treating suspected consenting sex workers as possible victims of trafficking, Plaintiffs (and their purported experts) in extant civil TVPA/TVPRA cases involving third parties often claim that private businesses should have their security or employees virtually patrol websites, looking for mentions sex work. Again, according to empirical research, the majority of sex workers are not victims of trafficking. Moreover, the content of an online posting rarely, if ever, includes any reliable indicia of trafficking that could be used by a business, much less law enforcement.

---

[88] Blue Lightning Initiative. N.d. A Guide for Aviation Personnel to Recognize and Report Suspected Human Trafficking. Retrieved from: http://hiddeninplanesight.org/wp-content/uploads/afa-cobranded-blue-lightning-pocket-guide-5.pdf

[89] Due to the clandestine nature of the crimes, reliable prevalence estimates are difficult to come by for both sex trafficking and consenting adult sex workers. However, available estimates suggest there are between one million to two million sex workers in the United States, while there are only estimated to be 15,000 to 300,000 victims of sex trafficking. Even if the highest estimates are assumed to be true, this suggests that less than 30% of sex workers are victims of trafficking, but potentially less than 1%. Small sample studies of sex worker populations support the reality that most sex workers are not trafficked. For example, according to Conflict and Agency Among Sex Workers and Pimps: A Closer Look at Minor Domestic Sex Trafficking (2016), pimps were responsible for initiating into sex work 16 percent of the females, 1 percent of the males, and none of those who were transgendered. At 8.1 percent overall, pimp initiation was far less common than peer initiation by a friend (47 percent) or customer initiation (23 percent). In Atlantic City where the researchers interviewed sex workers who were 16 to 24 years old, they found that those who first entered when over 18 years of age reported being approached by a pimp at nearly twice the rate of those whose entry occurred when they were minors, and "self- initiation" was roughly twice as common among minors as those who entered after 18 years of age.

# X.   SECONDARY EXPLOITATION

*Overview*

Given the increased international attention on human trafficking, more service providers, practitioners, and politicians are becoming involved in the movement for modern-day abolitionism. However, the incentive for assisting victims of human trafficking is not always altruistic. Qualitative data suggest that there are an increasing number of third parties who are secondarily exploiting human trafficking survivors, as well as persons erroneously identified as victims, and the topic of human trafficking in general.

Secondary exploitation can take many forms. Generally, it can be defined as the act of making use of or benefiting from a human trafficking survivor's victimization or the human trafficking phenomenon[90]. For example, a human trafficking survivor could be exploited by a third party who wants to tell the victim's story in order to draw attention to themselves or their organization[91]. Politicians also use human trafficking and/or the stories of victimizations to help themselves get elected[92].

As a human trafficking expert witness, I've found that an increasing number of tort attorneys are beginning to file lawsuits against innocent third party businesses for "facilitating human trafficking" when the facts do not support these accusations. Both Plaintiff and Defense attorneys have attempted to recruit my expert witness services in these cases. Some situations do not involve human trafficking and in cases where human trafficking is found to have occurred, I find that many Defendants are truly unwitting to the human trafficking situation and certainly did nothing to facilitate it, suggesting that the lawsuits may be motivated by money, as opposed to culpability. Moreover, the experiences of survivors post-rescue, during litigation, often provides countervailing evidence to the purported "altruistic" effort by Plaintiff attorneys to assist their clients.

Human traffickers should undoubtedly be held criminally and civilly accountable for their crimes and human trafficking survivors should be provided with services and protected from revictimization and erroneous criminalization. However, third parties, who had no substantive and direct involvement with the crime, should not be held liable for the actions of traffickers or the secondarily exploitation of the topic by opportunists.

---

[90] Mehlman-Orozco, Kimberly. (2017). *Hidden in Plain Sight: America's Slaves of the New Millennium*. Praeger.
[91] Cojocaru, Claudia. (2016). 'My Experience is Mine to Tell: Challenging the abolitionist victimhood framework', *Anti-Trafficking Review*, 7, pp. 12—38
[92] Mehlman-Orozco, Kimberly. (2017). In Virginia race, human trafficking must be more than a talking point. *The Hill*. Retrieved from: http://thehill.com/opinion/campaign/358814-in-virginia-race-human-trafficking-must-be-more-than-a-talking-point

### Background

I was first acquainted with the Plaintiffs' attorneys in this case on May 7, 2019. Jonathan Tonge called me to inquire about my expert witness services. On the call, I told him that most of my civil matters are for the Defense of innocent third-party businesses. However, Mr. Tonge insisted that his trafficking cases were "different" than other cases.

Mr. Tonge immediately followed up on our conversation via email (Jon@butlerwooten.com) at 10:21am, asking for my CV and fee schedule. I provided my CV and fee schedule on May 9, 2019 at 4:03pm. That same day at 4:06pm, Mr. Tonge set up a meeting and asked for examples of my reports or deposition transcripts. I provided Mr. Tonge with three reports:

1. Keo Ratha, et.al. v. Phatthana Seafood Co., LTD, et. al. (Case No. 16-2-28453-1 KNT)
2. U.S. v. Landrum et. Al. (Case Number: CR 16-1560-TUC-RM)
3. State of Ohio v. Michael Moore (Case Number: CR 16-3191)

Mr. Tonge and his partner Mr. Snyder (Rob@butlerwooten.com) requested to speak with me again on May 14, 2019 at 9:30am and indicated that they were very interested in retaining my services. However, during this call, I again noted to them that trafficking is a clandestine crime and most businesses encounter it unwittingly. I clearly explained to both Mr. Tonge and Mr. Snyder that these crimes are difficult to identify, even for law enforcement, and third-party businesses very rarely knew about these crimes on premise. I explained to Mr. Tonge and Mr. Snyder that many, if not most, Plaintiffs attempt to conflate sex trafficking and consenting, adult prostitution, and that these crimes are not one in the same. I recall that Mr. Tonge again insisted that his cases were "different" from the others and he claimed that there was overwhelming evidence that the business knew of trafficking specifically, not prostitution.

On September 23, 2019, Mr. Tonge reached out to me again via email, but this time from a new email address (jtonge@atclawfirm.com ) and CCed Mr. Pat McDonough (pmcdonough@atclawfirm.com). In his email he stated:

*"I spoke to you a few months ago regarding sex trafficking cases in Atlanta against hotels. Those cases were on hold for a bit because I changed law firms, but were finally filed on August 26. I don't know if you recall speaking with me, but in our cases we are suing 5 hotel locations and at each hotel employees of the hotels were directly involved in our clients' trafficking and were paid by the traffickers for their assistance"* (see Figure 6).



In response to this email, Mr. McDonough and Mr. Tonge

**Figure 6. September 23 Email from Plaintiff's Attorneys**

arranged to speak with me at 11:00am on Wednesday September 27, 2019. During that call, I again told Mr. Tonge and now Mr. McDonough about the clandestine nature of trafficking crimes, how they are difficult to identify, and how most third parties were unwittingly encountering these crimes, which are very different from prostitution. Again, Mr. Tonge and Mr. McDonough claimed that their cases were "different" and there were overt disclosures of trafficking in their cases and the businesses were aware and deliberately concealed the alleged trafficking operation.

Following our conversation, Mr. Tonge emailed me the complaints for the matters Jane Doe 1-4 and wrote:

*"So great speaking with you today. Attached are the four complaints we filed. They are 95% identical. These four clients are all witnesses to each other's trafficking/hotel involvement, etc. to different extents at different hotels. The differences are primarily changing references when talking events that happened to one client and was witnessed by others, keeping references straight mainly. That and length of time in the life, which varied. All that to say, reading one complaint should do it.*



Figure 7. Figure September 27 Email from Plaintiff's Attorneys

*Also, when you send your fee agreement, could you please send your CV/resume again?"* (see Figure 7).

Based on my education and expertise. the allegations contained in the complaints appeared to be possibly spurious and I determined that I did not wish to continue any additional conversations with the Plaintiffs' counsel. Therefore, I decided not to respond to the September 27th email. Mr. Tonge followed-up with me again via phone on November 8, 2019. I did not answer the call and Mr. Tonge left a voicemail, again asking for my fee agreement and expressing his sincere interest in retaining my services.

Given the language in the complaints, I ultimately refused to engage in any agreement with Plaintiffs' counsel, did not accept any payment, and did not perform for any services. Therefore, when I was later approached by Defense counsel in this case, there was no conflict of interest preventing my retention.

### Concerns Regarding Present Case

Following my retention by the Defense counsel in this case and after reviewing relevant case materials, there were a number of facts that I found particularly concerning regarding the present matter and possibly related to the issue of secondary exploitation.

### Initial/Sole Reporter, Michele Sarkisian, P3 Advisors and ECPAT

In their complaints Jane Does 1-4 claim that "the highest level corporate employees at RRI were directly informed of the conditions at the Defendants' property. This included knowledge of the sex trafficking venture that victimized"[93] Jane Does 1-4. This statement was in reference to a December 4, 2015[94] email sent from Michele Sarkisian.

What the Plaintiffs failed to mention is that evidence suggests that the incentive for this report was gratuitous self-promotion of Michele Sarkisian and her affiliated businesses—P3 Advisors and ECPAT. During his deposition, Red Roof Inn President Andrew Alexander recalled the introduction to Ms. Sarkisian as follows:

> "Well, she -- she came to my attention – Jim Abrahamson, who was the chairman of American Hotel Lodging Association, asked if a friend of his -- Michele -- could reach out to me to discuss, you know, opportunities of working with Red Roof.  So while normally -- that's not how -- I would normally pass that to someone else. Because it was the chairman of the board of the lodging association, I agreed to take her call.  **Sounded like she was looking for work**[95]."

Mr. Alexander's perception was later supported by the fact that, by her own admission, when Ms. Sarkisian believed she had evidence of trafficking, she didn't call law enforcement, she called the chairman of the American Hotel Lodging Association, apparently to try and help herself and her affiliated businesses get work. As an anti-trafficking advocate and expert in this field, I find her actions disheartening and disturbing. Specifically, when asked about this during her deposition, she stated:

> Q: Did you call the police?
> A: No?
> Q: Why not?
> A: It's a good question. I don't know[96].

This is highly concerning and suggestive of secondary exploitation in my opinion. Moreover, when asked for her sources of information, Ms. Sarkisian referred to three unreliable entities:

1. A now defunct blog ATLTrafficking;

---

[93] Jane Doe 4 Second Amended Complaint. Page 12 Paragraph 46.
[94] It should be noted that this is two years after Jane Doe 4's alleged trafficking period ended.
[95] Andrew Alexander Deposition. June 27, 2022. Page 99.
[96] Michele Sarkisian Deposition. October 20, 2021. Page 66. Additionally, it should be noted that, unlike Ms. Sarkisian, when I have encountered evidence of trafficking online, I have demonstrably contacted law enforcement first and foremost. Some encounters are discussed in my book Hidden in Plain Sight, published in 2017.

2. The obscure Red Roofie Blog; and
3. A purported "surveillance organization" that was threatening to make the information public, if the Defendants didn't acquiesce to their demands.

When Ms. Sarkisian was repeatedly asked by Red Roof Inn, as well as during deposition, for the name of the "surveillance organization" she refused to provide the information and went on a tirade against the Defense attorney, suggesting that she would even be defiant to a judge's order:

> *"Ask him (the judge) for an order. I'm not going to -- I'm not going to jeopardize -- you know what. This is the most dangerous freaking thing that a person can get involved in -- is human trafficking. You know how many people die in this stuff? You know how many kids get raped and buried somewhere?*
> *I'm not going to give up an organization that is protecting kids. I'm not going to do it.*
> *ATL Trafficking -- it's perfectly clear about what was going on at the Red Roof property, perfectly clear. All they had to do was look at the Tripadvisor reviews, look at the photographs with their managers there and Anthony Shivers and look up his rap sheet, and they would have plenty. All they had to do was do something about it. It doesn't matter who surveilled them[97]."*

I find Ms. Sarkisan's statements highly concerning and question her intentions, as well as her purported expertise on trafficking. In 2015, Ms. Sarkisian described herself as the "president of P3 Advisors, a company she founded after spending nearly 30 years helping dozens of Fortune 500 companies design and implement strategies to acquire, engage and retain all critical stakeholders to profitably grow business[98]." Her Linkedin also references her "Volunteer Experience" as an Advisory Board member of Businesses Ending Slavery and Trafficking (BEST) from October 2015 to Present and End Child Prostitution and Trafficking (ECPAT) from April 2013 to April 2019.

Jane Does 1 and 2 generally refer to Ms. Sarkisian as "a hospitality industry executive and anti-trafficking advocate[99]." While Ms. Sarkisian holds herself out to be an "anti-trafficking advocate," evidence suggests she has little more than a superficial understanding of this issue, as evidenced by her multiple uses of erroneous and/or misguided information. For example:

**Table 4. Statements by Michele Sarkisian and Countervailing Information**

| Sarkisian Statement | Countervailing Information |
|---|---|
| "No one disputes that anyone under the age of 18 involved in | As previously mentioned, hundreds of juveniles are criminalized for prostitution every year[101]. While I agree with Ms. Sarkisian, in that this is a miscarriage of justice; her statement is factually inaccurate. People do dispute whether all |

---

[97] Michele Sarkisian Deposition. October 20, 2021. Page 71.
[98] Sarkisian, Michele. 2015. Adopting the Code: Human Trafficking and the Hospitality Industry. Cornell Hospitality Report. Retrieved from:
https://ecommons.cornell.edu/bitstream/handle/1813/71224/Sarkisian_2015_Human_trafficking.pdf?sequence=1&isAllowed=y
[99] Jane Doe 4 Second Amended Complaint. Page 12 Paragraph 47.
[101] As previously mentioned, take the cases of In re. N.C. , In re. M.V. , In re. M.D. , and In re. Aarica S . in the state of California. All four cases involved juveniles criminalized for prostitution. In fact, according to the Office of Juvenile Justice and Delinquency Prevention, in 2018 there were 260 children under the age of 18 arrested for prostitution and/or commercialized vice, 50 of which were under the age of 15.

| | |
|---|---|
| sex trafficking has not chosen their situation[100]." | persons under the of 18 are victims of sex trafficking; for example, Vice President Kamala Harris during her time as a prosecutor (e.g. prosecution of in re. Aarica S[102]). |
| "Victims are typically pulled into the industry at 11 to 14 years old[103]." | There is no empirical evidence to support this claim and similar claims have been publicly debunked as myths[104]. |
| "Sixty-three percent of trafficking incidents, according to a 2012 BEST study, happens in hotels[105]." | There is absolutely no reliable data to support this purported statistic. Ms. Sarkisian appears to cite a "newsletter" as fact, which is irresponsible at best. Moreover, BEST is notorious for citing misinformation in their trainings. |
| "One of the most promising mechanisms for interfering with exploitation of children is The Code, which is the hospitality industry's responsible tourism initiative[106]." "I encourage Red Roof Inn to look into ECPAT" -- and I provide the link -- "as | First, there is absolutely no quantitative evidence on the efficacy of the ECPAT Code, while there is qualitative evidence of its ineffectiveness. Second, most of the "peers" mentioned by Ms. Sarkisian have been sued as third parties in multiple cases, similar to this case, and/or implicated as sites of commercial sex exchange—for example, Carlson[108], Hilton[109], Wyndham[110], Hyatt[111], and others.  This demonstrates how companies who take commendable efforts to combat the human trafficking scourge can encounter victimizations without their |

[100] Sarkisian, Michele. 2015. Adopting the Code: Human Trafficking and the Hospitality Industry. Cornell Hospitality Report. Retrieved from:
https://ecommons.cornell.edu/bitstream/handle/1813/71224/Sarkisian_2015_Human_trafficking.pdf?sequence=1&isAllowed=y

[102] https://casetext.com/case/people-v-aarica-s-in-re-aarica-s

[103] Sarkisian, Michele. 2015. Adopting the Code: Human Trafficking and the Hospitality Industry. Cornell Hospitality Report. Retrieved from:
https://ecommons.cornell.edu/bitstream/handle/1813/71224/Sarkisian_2015_Human_trafficking.pdf?sequence=1&isAllowed=y

[104] Klessler, Glenn. 2015. The Four-Pinoccio claim that 'on average, girls first become victims of sex trafficking at 13 years old' The Washington Post. https://www.washingtonpost.com/news/fact-checker/wp/2015/06/11/the-dubious-claim-that-on-average-girls-first-become-victims-of-sex-trafficking-at-13-years-old/

[105] Sarkisian, Michele. 2015. Adopting the Code: Human Trafficking and the Hospitality Industry. Cornell Hospitality Report. Retrieved from:
https://ecommons.cornell.edu/bitstream/handle/1813/71224/Sarkisian_2015_Human_trafficking.pdf?sequence=1&isAllowed=y

[106] Sarkisian, Michele. 2015. Adopting the Code: Human Trafficking and the Hospitality Industry. Cornell Hospitality Report. Retrieved from:
https://ecommons.cornell.edu/bitstream/handle/1813/71224/Sarkisian_2015_Human_trafficking.pdf?sequence=1&isAllowed=y

[108] Mehlman-Orozco, Kimberly. (2017) Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger. Between April 15, 2016-April 15, 2017 Radisson was mentioned 10 times by commercial sex consumers in USASexGuide.info and 161 times in InternationalSexGuide.info. For example, on May 27, 2016, one man claimed that women could be purchased for sex in the bar of the Radisson Blu Hotel in Riga, Latvia. Additionally, despite their efforts, sex trafficking stings have implicated Carlson hotels. For example, McMullen, Maureen (May 23, 2017). Charges: Couple ran 'large-scale' sex trafficking enterprise in Washington County. The Bemidgji Pioneer. Retrieved from: http://www.bemidjipioneer.com/news/4271802-charges-couple-ran-large-scale-sex-trafficking-enterprise-washington-county

[109] https://www.law.com/dailybusinessreview/2021/08/10/craigslist-hilton-marriott-sued-over-alleged-sex-trafficking-activity-in-south-florida/

[110] https://news.bloomberglaw.com/white-collar-and-criminal-law/sex-trafficking-claims-against-wyndham-hotels-survive-dismissal

[111] https://www.dallasnews.com/news/courts/2019/12/12/sold-for-sex-since-age-4-woman-sues-dallas-area-hotels-she-says-looked-the-other-way/

| | |
|---|---|
| well as The Code" -- and I provide the link -- "to learn more about what many in industry are doing to help prevent trafficking. You'll notice many of your peers from Carlson, Hilton, Wyndham, Hyatt, Delta, Sabre, Maritz and others are committed to the cause[107]." | foreknowledge. Ms. Sarkisian completely ignores the fundamental barriers to accurate human trafficking victim identification, as well as evidence-based intervention. More importantly, I find it concerning and potentially a red flag of secondary exploitation, for Ms. Sarkisian to be promoting "The Code", which had no evidence base and anecdotes of ineffectiveness, given her direct affiliation with ECPAT. Moreover, her emails and Defense testimony suggest that the impetus for her contacting the Defendants was gratuitous self-promotion. In one of the emails, Ms. Sarkisian introduces the defendants to Michele Gulebart[112], who serves as a purported human trafficking witness for Plaintiffs in other cases and has a reputation of attacking businesses that do not sign on to her ECPACT Code. |

**Referring Service Provider, Rescuing Hope**

When Jane Doe 1 and Jane Doe 2 were asked how they met her lawyers, both stated that they were referred by Susan Norris from anti-trafficking non-profit Rescuing Hope[113]. Jane Doe 3 was in contact with Rescuing Hope, but states that she connected with her attorneys at an event for "a group home for sex-trafficked teens" called House of Hope[114]. Jane Doe 4 was also in contact with Rescuing Hope. According to the Rescuing Hope website, their mission is to "enlighten the public about sex trafficking in America, educate potential victims and first responders, and empower advocates and survivors[115]".

---

[107] Email and Michele Sarkisian Deposition. October 20, 2021. Page 28, Lines 13-19.

[112] In an email Dated December 8, 2015, Ms. Sarkisian wrote, "On a separate note, I want to introduce you and Red Roof Inn to ECPAT (End Child Prostitution and Trafficking) led by Carol Smolenski and Michelle Guelbert. They can assist you with guidance based on what your peers in the hospitality industry are doing to educate employees and more. You will find ECPAT very helpful Additionally, please look at www.thecode.org for guidance.

[113] Kristin Krawczyk Deposition. June 9, 2022. Page 34, lines 22-24 and Jane Doe 2 Deposition. June 16, 2022. Page 16, lines 9-13.

[114] Shayna Valerio/Jane Doe 3 Deposition. April 13, 2022. Page 14, Lines 1-13.

[115] Retrieved from https://www.rescuinghope.com/our-mission/

Rescuing Hope uses videos/audio of survivors to promote their organization and solicit donations, attention, and/or volunteers[116].

Based on my knowledge regarding secondary exploitation, I am concerned that Rescuing Hope had Jane Doe 1 sign a "Media Release Form" on July 29, 2017 (see Figure 8), which would have been only seven months after her purported exit from the commercial sex industry, if her deposition-disclosed "trafficking period" is to be believed[117]. Regardless of when her alleged trafficking period ended, I did not review any records to suggest that Jane Doe 1 received any substantive services and had been "rehabilitated" prior to her signing this release form, so it appears that she was filmed shortly upon her introduction to the Rescuing Hope organization. According to the generic release, it permitted Rescuing Hope to use photographs, video footage, and/or electronic sound recordings of Jane

**Media Release Form**

Production Title: Rescuing Hope Gala Video

Production Date: 7.29.2017

1. I, Kristin Krawczyk, hereby authorize _____ to photograph me, take video footage of me and/or make electronic sound recordings of me (herein referred to as photographic or electronic reproductions).
2. I authorize the use of any such photographic or electronic reproductions of me for any purpose, including, but not limited to educational and other public media as may be deemed appropriate by Rescuing Hope (I recognize there is a chance that I may be identifiable from such photographic or electronic reproduction).

Agreed and accepted by:

Print Name: Kristin Krawczyk

Title: Rescuing Hope Gala Video

Address: 500 Venue Way Apt#5203

City, State, Zip: Alpharetta GA 30005

Phone: 470-631-4606

Signature & Date: Kristin Krawczyk 7/29/2017

I am signing this form as an individual (✓) Yes ( ) No

I am signing this form as a representative of a group, and have full authority to grant release for this group (✓) Yes ( ) No

Name of Group: Rescuing Hope

Figure 8. Jane Doe 1 Media Release Form July 2017

Doe to use for any purpose, including but not limited to educational and other public media. It is highly inappropriate for a purported anti-trafficking non-profit organization to film a survivor and use her image for advertisements, donation solicitations, education, etc., especially before she or he has received services and is in a safe space. Even Plaintiffs' counsel Pat McDonough recognized in a media interview that it takes victims "years through different complex trauma therapy" before victims and/or survivors are ready to talk about their exploitation. As such, it is highly inappropriate and potentially secondarily exploitative for Rescuing Hope to have compelled Jane Doe 1 to sign a media release and/or film her within months of their introduction, especially prior to the receipt of substantive services and rehabilitation.

Jane Doe 1 later revealed to Rescuing Hope on January 14, 2020 that she did "not want to be known as a sex trafficking survivor, but just as "Kristin." However, despite making her position clear, Rescuing Hope and/or their affiliates appear to have used Jane Doe 1's image. For example, Jane Doe 1 was clearly upset when she saw her image being used in an anti- trafficking advertisement. Specifically, Jane Doe 1 reached out to Rescuing Hope on October 29, 2020, asking "who this woman is that is using me as a post for like some ad or something without my consent." Based on my knowledge regarding secondary exploitation, I am concerned that Rescuing Hope used Jane Doe 1's image, despite the fact that she was not yet safe and doing so was not consistent with her expressed wishes.

On or about July 27, 2020, Jane Doe 1 stated that she can't take anymore and that she feels like she is "dying." She complained to Rescuing Hope that when she reaches out for help service providers will be there for a little, but then act like she "doesn't exist." In Jane Doe 1's own words

---

[116] For example, see Rescuing Hope Empower 2019, retrieved from: https://www.youtube.com/watch?v=hd8W0dCRs_A&t=175s
[117] Kristin Krawczyk Deposition. June 9, 2022. Page 41, lines 8-13.

she stated, "in the survivor in the foundation world whatever those are the people pretty much just kick you to the curb and throw you away like you're nothing." Based on my knowledge regarding secondary exploitation, I am concerned that Jane Doe 1 was being secondarily exploited by people and service providers purported to help her.

I am also concerned that Rescuing Hope failed to report Jane Doe 1's abuse prior to her hospitalization, even though they are "mandated reporters." On November 3, 2020, Jane Doe 1 engaged in a text and/or written electronic communication with Rescuing Hope where she expressed that she was terrified of the guy she is with, Tim Arnold. She said she "can't get to the police station to file a TPO" and she "can't go anywhere without him behind" her. Instead of reporting this, Rescuing Hope told Jane Doe to text "pumpkin pie" as code if Jane Doe wants them to call law enforcement. Jane Doe 1 said she "hates this" and feels like a "prisoner." She said she was afraid of him "punching her in the face." Rescuing Hope told Jane Doe 1 to "take pictures of her injuries and send them to Rescuing Hope" when her abuser is asleep. Jane Doe 1 said she will have to try in the morning because her abuser wakes up every time she moves. Rescuing Hope disturbingly and incredulously replied to this message writing, "Cool." Less than 30 days later, Jane Doe 1 and her two-year-old son were hospitalized. Jane Doe 1 reported that the same man she complained about several weeks earlier, beat her up "really, really bad," dropped a television on her head, which required stitches in her forehead. Jane Doe 1 stated that her abuser "drop-kicked" her two-year-old son, Ryker, "across the house." Still, Jane Doe 1, having nowhere to go, returned to the house, where she and her son were "held hostage" for two days, before her abuser was arrested.

Based on my knowledge regarding secondary exploitation, I am concerned that Rescuing Hope continued speaking with Jane Doe 1's attorneys, even though she stated she was "done with Rescuing Hope." On or about March 30, 2021, Jane Doe hung up a phone call on Rescuing Hope and said she was "done" with them. Even though she said she was "done with Rescuing Hope" the Rescuing Hope employee noted that she "signed a disclosure" so they could still talk with her attorneys and their case worker. Her attorney, Jon, and Rescuing Hope said there is "nothing more" they could do to help her with her recent identity theft charges. Four months after she and her son were brutally abused and hospitalized, Jane Doe 1 was considering pawning her car and/or possibly engaging in survival sex[118] to get a hotel room and to make ends meet. In response, Rescuing Hope callously stated that Jane Doe 1 was "burning bridges everywhere."

**Plaintiffs' Law Firm**

Plaintiffs' attorneys Pat McDonough and Jonathan Tonge claim to have a "comprehensive approach to helping victims of trafficking," which includes a "local and nationwide team of experts" including "therapists who are focused on clients' emotional and mental well-being" and "non-profits and survivors who help clients get to safety (when they're ready)" (see Figure 9).

---

[118] Specifically, Jane Doe 1 stated that she would "try and get someone to help her with a hotel room"—NOTE: "help with a hotel room" can be code for commercial sex and/or survival sex.

## About Our Team

Leading our comprehensive approach to helping victims of sex trafficking, Pat McDonough has gathered a local and nationwide team of experts to handle these very sensitive cases from inception to final judgment. The team includes (but certainly isn't limited to):

- Female intake specialist to assist survivors as they make first contact.

- Therapists who are focused on clients' emotional and mental well-being.

- Non-profits and survivors who help clients get to safety (when they're ready).

- Expert witnesses who have particular expertise with the defendants' businesses.

- Attorneys (locally and nationwide) who are best-suited to create a legal strategy and represent clients in court.

**Figure 9. Screenshot from Plaintiffs' Attorneys' Website: "In The Life Law"**

However, as mentioned previously, during the discovery in this case, Plaintiffs Jane Doe 1-4 seem to have complex, inadequately addressed issues that have gotten progressively worse. For example, of particular concern in this case is that at the time of her deposition Jane Doe 1 reported being pregnant, on methadone and smoking[119], homeless, and living in her 2017 Nissan Rogue[120], while her four-year-old son, Ryker Jonathan Krawczyk lived with her parents. The father of her unborn child is reportedly Tyler Nicolas Showne, but Jane Doe 1 claimed she hadn't spoken to him because there is a no-contact order, because he was also reportedly abusive. Jane Doe 1 admitted that she was also arrested because the police "assumed" that she hit Mr. Showne with her car.[121] At the time of her deposition, Jane Doe 1 admitted she planned to move back with

"I was in the life for years. It never occurred to me I would even have a case. Susan Norris suggested I contact Pat. His team is great. They really understand the life. Their team is laser focused on suing hotels and web sites that profited off of people in the life. The team really cares. Everything is 100% confidential. If they file a lawsuit it is filed under Jane Doe. I trust them completely."

- Survivor, Jane Doe

_____

"I have bounced back and forth in and out of the life, but this is the first time I think I will get out and stay out. I know Pat's team is looking out for me. Anyone in the recovery world will tell you, you can trust Pat's team. If there is a way to get compensated, they will pursue it tirelessly."

- Survivor, Jane Doe

_____

"At age 17 I was arrested as a trafficker, when I was really a victim. Pat's team has taken my case and is preparing a suit against the hotel where I was trafficked. Pat's team is a life saver."

- Survivor, Jane Doe

**Figure 10. Plaintiff's Attorney Testimonials**

_____

[119] Jane Doe 1 claimed she started smoking again, while pregnant, because of the stress of the deposition. Again, a grave concern and potential red flag of secondary exploitation.
[120] Kristin Krawczyk Deposition. June 9, 2022. Page 15.
[121] Kristin Krawczyk Deposition. June 9, 2022. Page 20.

her allegedly abusive boyfriend, Mr. Showne, if/when the no-contact order was lifted. Jane Doe 1 and her son were seriously abused while this litigation was active, she appears to possibly have ongoing substance abuse issues, and may be continuing to engage in commercial sex and/or survival sex. Similarly, Jane Doe 4 was also victimized by domestic violence while this litigation has been ongoing. On December 26, 2020 she called Rescuing Hope and shared that Chris, the father of her child, who Rescuing Hope callously described as her "baby daddy" beat her on Christmas night and threatened that if she called 911, he would send people to "shoot up the house and kill her and their daughter." It does not appear that Rescuing Hope—a mandatory reporter—or her attorney alerted law enforcement. Nevertheless, the Plaintiffs' attorneys in this case incredulously appear to have elicited "testimonials" from their clients involved in ongoing litigation (possibly including Jane Doe 1 and Jane Doe 4) in order to advertise their website (see Figure 10). Based on my knowledge regarding secondary exploitation, this is a concern.

Moreover, similar concerns appear to be shared by others, such as Maggie McNeill, who is a retired consenting sex worker who runs a well-known blog about the commercial sex industry entitled The Honest Courtesan[122]. Ms. McNeill references this lawsuit and the Plaintiffs' attorneys in this case on her blog, suggesting that she believes they are engaged in secondary exploitation, specifically she writes:

> *"[Ambulance-chasing[123] shysters are using "sex trafficking" hysteria as a weapon in an attempt to rob] four Atlanta-area hotels [based on the pretense that they] knew sex trafficking was taking place [because they did not actively persecute sex workers and others who might fit the absurdly-broad]…indicator of sex trafficking [propaganda pushed by prohibitionists]…Jonathan Tonge and Pat McDonough…represent four [women who now claim to be]…trafficking victims…"[124]*

Ultimately, despite the Plaintiffs' attorneys' bold advertisements that their clients (and thereby the Plaintiffs in this case) receive services for their emotional, mental, and physical well-being, the timeline of Plaintiffs experiences suggests these services may have been inadequate and/or secondary to the seemingly-financially-motivated pursuit against the Defendants in this case[125].

# XI.   CASE DETAILS

## Complaint Allegations

According to the complaints, Plaintiffs Jane Doe 1 and Jane Doe 2 both claim that they were trafficked at hotels in and around Atlanta from 2011 through 2016[126]. Plaintiff Jane Doe 3 claims

---

[122] Interview by Reason TV with Ms. McNeill can be found here: https://www.youtube.com/watch?v=D2fCPvuoHx0
[123] This was an interesting analogy, considering that Jane Doe 3, Shayna Valerio, noted that she literally met her attorneys at an event that was held at a group home for sex trafficked teens.
[124] Retrieved from: https://maggiemcneill.com/tag/censorship/page/26/?iframe=true&preview=true%2Ffeed%2F
[125] Note that during her deposition her attorneys were paying for a hotel, but then she would be living in her car the day after it was completed. Kristin Krawczyk Deposition. June 9, 2022. Pages 30-31.
[126] JANE DOE 1. Second Amended Complaint. Page 1.

| | sex trafficking. Sex trafficking remains difficult to identify and frequently misidentified, even by trained law enforcement. |
|---|---|
| *The Defendants participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, hundreds of buyers paid to have sex with Plaintiff at the Defendant's property.[148]* | While I am not and would not provide any legal opinions, it should be noted that per Noble v. Weinstein, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018), "Venture" is defined in Section 1591(e) as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(5).  Plaintiff must allege specific conduct that furthered the sex trafficking venture. Such conduct must have been undertaken with the knowledge, or in reckless disregard of the fact, that it was furthering the alleged sex trafficking venture. In other words, ***some participation in the sex trafficking act itself must be shown.*** Id. at 285 (emphasis added).  As previously discussed in depth, given the clandestine nature of the crime sex trafficking remains difficult to identify and frequently misidentified, even by trained law enforcement. In this case, during the alleged trafficking periods, it is more likely than not that the Plaintiffs believed they were prostitutes and the rogue employee may have assumed the same. Regardless, the Varahi Defendant terminated this employee from his position as soon as it could be determined that he was not complying the company policy[149]. |
| *During the relevant time period, the Defendants knew or should have known of public statements by city officials in Atlanta warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking[150].* | First, it important to note that this statement is not based on empirical data. Second, even if it were accepted as true, that "Atlanta was an epicenter of trafficking," applying an aggregate statement to an individual entity is an ecological fallacy (see definitions above) and improper by social scientific standards. |
| *The Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels[151].* | As discussed in the sections above, given the clandestine nature of the crime, sex trafficking remains difficult to identify and frequently misidentified, even by trained law enforcement. Trafficking crimes are demonstrably and regularly concealed from third parties and indicia are rarely open or obvious. Given the mental manipulation and coercion utilized to recruit, control, and exploit victims, self-identification is even difficult and victims rarely ask for help[152]. To that affect, multiple representatives for the Defendants testified that there were no signs of prostitution or trafficking during their inspections. For example, James Moyer, Vice President of Operations, testified that he personally would visit the property around four times per year: |

---

[148] Jane Doe 1 Second Amended Complaint, Page 83, Paragraph 251. Jane Doe 2 Second Amended Complaint, Page 81, Paragraph 251. Jane Doe 3 Second Amended Complaint, Page 104, Paragraph 335. Jane Doe 4 Second Amended Complaint, Page 71, Paragraph 221.

[149] Deposition of Bharat Patel. May 25, 2022. Bharat Patel. W.K. v. Red Roof Inns, Inc. Page 111-112, "Because I was like if Forrest was involved with all these activities, that's why I fired him right away.  So because he never told me of any such activities that were happening."

[150] Jane Doe 1 Second Amended Complaint, Pages 21-22, Paragraph 73. Jane Doe 2 Second Amended Complaint, Page 21, Paragraph 74. Jane Doe 3 Second Amended Complaint, Page 21, Paragraph 73. Jane Doe 4 Second Amended Complaint, Page 20, Paragraph 71.

[151] Jane Doe 1 Second Amended Complaint, Pages 22, Paragraph 75. Jane Doe 2 Second Amended Complaint, Page 38, Paragraph 117. Jane Doe 3 Second Amended Complaint, Page 22, Paragraph 75. Jane Doe 4 Second Amended Complaint, Page 21, Paragraph 73.

[152] Evidence suggests that Jane Does 1-4 did not perceive themselves as victims during the alleged trafficking period and not explicitly ask for help, despite having multiple opportunities to do so.

## XII.  CONCLUSION

Due to the clandestine nature of the crime, sex trafficking victims are frequently misidentified and often self-identify as "prostitutes" during their trafficking period. As a consequence of misidentification, sex trafficking victims are typically denied services and erroneously criminalized, while facing multiple missed opportunities for intervention and rescue. Additionally, victims of trafficking are known to have multiple or different traffickers, a phenomenon known as "choosing up." Victims of trafficking are known to vacillate from being trafficked, engaging in consenting adult sex work, engaging in consenting pornography, and engaging in survival sex. Given the fluid status that can affect many trafficking victims, misidentification and erroneous criminalization is problematic.

To retroactively correct the erroneous criminalization faced by human trafficking victims in the criminal justice system, an increasing number of states have passed vacatur statues.[219] These laws provide post-conviction relief for survivors of human trafficking by completely erasing criminal convictions related to their victimization. By one count, 18 states had passed vacatur statutes and another 10 states had enacted partial vacatur laws by 2017.[220]

Despite raising awareness and legal adjustments, victims of sex trafficking continue to be misidentified and erroneously criminalized. It is extremely difficult to identify a victim of sex trafficking without in-depth information. Even if you accept the Plaintiffs' allegations and testimony as true, sex traffickers go to great lengths to conceal their exploitation from third parties. While occasionally a rogue employee may face allegations of direct involvement in prostitution, this alone does not convey third-party knowledge of sex trafficking. Moreover, it is important to understand that indicia of prostitution and/or drug addiction are often erroneously conflated with indicia sex trafficking. Extant indicia of sex trafficking have not been evaluated for sensitivity or specificity, which is hypothesized to be low.

Many of the allegations levied by the Plaintiffs appear to be based on misinformation, speculation, conjecture, and/or ecological fallacies, and are not supported by state-of-the-science research. The evidence in this case suggests that the Plaintiffs' alleged victimization was not "open" nor "obvious." Based on the evidence in this case and my expertise on the identification of sex trafficking victims, it is not reasonable to conclude that the RED ROOF INNS, INC.; FMW RRI NC, LLC; RED ROOF FRANCHISING, LLC; RRI WEST MANAGEMENT, LLC; VAHARI HOTEL, LLC; WESTMONT HOSPITALITY GROUP, INC.; and RRI III, LLC Defendants or their staff knew or should have known that Jane Doe 1, Jane Doe 2, Jane Doe 3, or Jane Doe 4 were victims of sex trafficking.

---

[219] Mehlman-Orozco, Kimberly B. and Simon Hedlin. (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." The Houston Chronicle.
[220] https://www.ncjw.org/wp-content/uploads/2017/07/Fact-Sheet_Vacatur-Laws_Updated-2016.pdf